# Exhibit A-1

FILED
8/7/2018 12:15 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH10012

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |  |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| -vs- | ) | **2018CH10012** |
| | ) | |
| BEACON CAPITAL PARTNERS, LLC, MB REAL | ) | |
| ESTATE SERVICES INC., LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY, and BARRY STANEK, | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Now comes the Plaintiff, Westfield Insurance Company, ("Westfield"), by and through its attorneys, David S. Osborne and Lauren E. Rafferty of Lindsay, Pickett & Postel, LLC, and for its Complaint for Declaratory Judgment against the Defendants, Beacon Capital Partners, LLC ("Beacon"), MB Real Estate Services, Inc. ("MB"), Liberty Mutual Insurance Company ("Liberty"), and Barry Stanek ("Stanek"), alleges as follows:

### INTRODUCTION

1. In this declaratory judgment action, Westfield seeks a declaration that it owes no duty to defend or indemnify Beacon or MB on a policy of insurance issued to Bear Construction Company ("Bear"), with respect to a personal injury lawsuit brought by Stanek in the Circuit Court of Cook County, case no. 18 L 000510 ("the underlying litigation").

### THE PARTIES

2. Westfield is an insurance company incorporated under the laws of the State of Ohio with its principal place of business located in Westfield Center, Ohio.

3. Beacon is a Delaware limited liability company that transacts business in Cook County, Illinois.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

4.      MB is a Delaware corporation that transacts business in Cook County, Illinois.

5.      Liberty is an insurance company duly authorized to issue policies in the State of Illinois and, on information and belief, has an interest in the subject matter of this action.

6.      On information and belief, at all relevant times, Stanek is an individual residing in Illinois. Stanek is named herein only in that he may be deemed a necessary party with an interest in the subject matter of this action. Westfield seeks no relief from Stanek, other than to the extent, if any, that he is interested in the subject matter of this action, that he be bound by the judgment sought herein. If Stanek will sign a stipulation to that effect, then Westfield will voluntarily dismiss him as a Defendant.

### THE UNDERLYING LITIGATION

7.      On or about January 16, 2018, Stanek filed the underlying litigation against Beacon, MB, and Bear, among others.

8.      On or about, May 2, 2018, Stanek filed a first amended complaint against the defendants ("the underlying complaint"). A copy of the underlying complaint is attached hereto as **Exhibit A**.

9.      The underlying complaint alleges that on September 21, 2016, Stanek was employed by K&K Ironworks, Inc. ("K&K") and working in the building located at 1 North Dearborn in Chicago, when he was injured when an elevator he was in became dislodged and fell approximately two stories. Ex. A, Count I, ¶¶ 1-2, 9; Count II, ¶¶ 1-2, 11, Count IV, ¶¶ 1-2, 7.

10.     The underlying complaint further alleges that MB was the owner of the property; Beacon was the property manager; and Bear was the general contractor of the construction project and that each negligently caused his injury. Ex. A, Count I, ¶¶ 3-4, 8-10; Count II, ¶¶ 3-4, 10-12; Count IV, ¶¶ 3, 6-8.

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

## THE CONTRACT

11.     On or about July 28, 2016, Bear entered into a contract with BCSP OND Property, LLC for Bear to act as its "construction manager" on the project located at One North Dearborn in Chicago ("the contract"). A true and correct copy of the contract is attached hereto as **Exhibit B**.

12.     The contract identifies the Owner as "BCSP OND Property, LLC" and goes on to list the Owner's address as "c/o Beacon Capital Partners, LLC, 200 State Street, Boston, MA 02109."

13.     Exhibit B to the Contract, titled "Contractor's Insurance Requirements" provides, in pertinent part, as follows:

E.      The Owner and the Owner's lenders and all other parties otherwise designated by the Owner from time to time, including those named in paragraph J hereto, shall each shall (sic) be added as an additional insured (using CG2010 (11/85) or equivalent) on a primary non-contributory basis on all insurance (including competed operations coverage for the full term required by contract), other than Workers' Compensation and Professional Liability.***

J.      *       *       *

2.      The following entities should be named as additional insureds:
BCSP OND Property LLC;
BCSP OND LLC;
BCSP OND Alternative LLC:
BCSP VII Property Management LLC;
BCSP VII Investments, L.P.;
BCSP VII Alternative Investments, L.P.;
BCSP REIT VII, L.P.;
BCSP REIT VII GP, LLC;
BCP Strategic Partners VII, L.P.;
Beacon Capital Strategic Partners VII, L.P.;
MB Real Estate Services, Inc.;
and their successors and/or assigns

## THE WESTFIELD POLICY

14.     Westfield issued a commercial package insurance policy to Bear, policy no. CMM

3

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

4 871 702, effective January 1, 2016 through January 1, 2017, containing Commercial General Liability ("CGL") coverage with liability limits of $2,000,000 per occurrence and $4,000,000 in the general aggregate ("the Westfield policy"). A certified copy of the Westfield policy is attached hereto as **Exhibit C.**

15. The Westfield policy is intended to be interpreted as a whole, but for the convenience of the Court and counsel, Westfield sets forth certain pertinent provisions from the policy's CGL coverage, as follows:

**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION**

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name of Person or Organization: ANY PERSONS OR ORGANIZATIONS WHEN YOU HAVE AGREED IN WRITING IN A CONTRACT OR AGREEMENT THAT SUCH PERSONS OR ORGANIZATIONS BE ADDED AS AN ADDITIONAL INSURED. |
| --- |

A. **Section II – Who Is An Insured** is amended to include is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

\*    \*    \*

**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name of Additional Insured Person(s) or Organization(s) | Location(s) of Covered Operations |
| --- | --- |
| All persons or organizations when | All locations |

4

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

| | |
|---|---|
| you have agreed in writing in a contract or agreement that such persons or organizations be added as an additional insured. | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations | |

A.  **Section II – Who Is An Insured** is amended to include is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by:

      **1.**     Your acts or omissions; or

      **2.**     The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

      **1.**     The insurance afforded to such additional insured only applies to the extent permitted by law; and

      **2.**     If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

         \*      \*      \*

## COUNT I
### NO DUTY TO DEFEND OR INDEMNIFY BEACON

16.    Westfield restates and incorporates the allegations of paragraphs 1 through 15, above, as if set forth fully herein.

17.    The additional insured endorsements in the Westfield policy only confer additional insured status on those persons or organizations that Bear has "agreed in writing in a contract or agreement" to add as an additional insured.

5

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

18.    Bear did not agree in writing in a contract or agreement to add Beacon as an additional insured.

19.    In addition, the additional insured endorsements in the Westfield policy only provide additional insured coverage "with respect to liability arising out of your ongoing operations performed for that insured" and "with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by: **1.** Your acts or omissions; or **2.** The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above."

20.    Bear did not did not perform any work or operations for Beacon on the project.

21.    For these reasons, Westfield has no duty to defend or indemnify Beacon with respect to the underlying litigation.

22.    There may be other bases on which Westfield can properly deny coverage to Beacon and Westfield reserves the right to plead them in the future.

WHEREFORE, the Plaintiff, Westfield Insurance Company, prays that this Honorable Court enter an Order finding and declaring that it does not owe a duty to defend or indemnify the Defendant, Beacon Capital Partners, LLC, with respect to the underlying litigation, and for such other and further relief as this Court deems appropriate and just under the circumstances.

### COUNT II
### NO DUTY TO DEFEND OR INDEMNIFY MB

23.    Westfield restates and incorporates the allegations of paragraphs 1 through 15, above, as if set forth fully herein.

24.    The additional insured endorsements in the Westfield policy only provide additional insured coverage "with respect to liability arising out of your ongoing operations performed for that insured" and "with respect to liability for "bodily injury," "property damage"

6

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

or "personal and advertising injury" caused, in whole or in part, by: **1.** Your acts or omissions; or **2.** The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above."

25.    Bear did not perform any work or operations for MB on the project.

26.    For these reasons, Westfield has no duty to defend or indemnify MB with respect to the underlying litigation.

27.    There may be other bases on which Westfield can properly deny coverage to MB and Westfield reserves the right to plead them in the future.

WHEREFORE, the Plaintiff, Westfield Insurance Company, prays that this Honorable Court enter an Order finding and declaring that it does not owe a duty to defend or indemnify the Defendant, MB Real Estate Services, Inc., with respect to the underlying litigation, and for such other and further relief as this Court deems appropriate and just under the circumstances.

Respectfully submitted,

WESTFIELD INSURANCE COMPANY

By:  _____
David S. Osborne, One of the Attorneys for
Plaintiff, Westfield Insurance Company

David S. Osborne
dosborne@lpplawfirm.com
312-800-6025
Lauren E. Rafferty
lrafferty@lpplawfirm.com
312-995-7903
LINDSAY, PICKETT & POSTEL, LLC
10 S. LaSalle St., Suite 1301
Chicago, Illinois 60603
Fax: (312) 629-1404

Firm No. 44512

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED
8/7/2018 12:15 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# EXHIBIT A



16279/SAB/ks
05/01/18

Attorney ID# 35244

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BARRY STANEK,                                    )
                                                 )
                        Plaintiff,               )
                                                 )        Case No.: 2018L000510
v.                                               )
                                                 )
                                                 )
                                                 )
BEACON CAPITAL PARTNERS, LLC, a                  )
Limited Liability Company, a Limited Liability   )
Company; MB REAL ESTATE SERVICES, INC.,          )
a Corporation; PARKWAY ELEVATORS, INC.,          )
a Corporation; BEAR CONSTRUCTION                 )
COMPANY, a Corporation; and TITAN                )
SECURITY GROUP, LLC, a Limited Liability         )
Company,                                         )
                                                 )
                        Defendants.

FILED-12
2018 MAY -2 PH 3:35

3011

### FIRST AMENDED COMPLAINT AT LAW

### COUNT I – PREMISES LIABILITY
### BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a Corporation

Now comes the Plaintiff, BARRY STANEK, by his attorneys, ANESI, OZMON,

RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendants, BEACON CAPITAL

PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a

Corporation, and each of them, alleges as follows:

1.      That on September 21, 2016, Plaintiff was working within the building/ premises

located at 1 North Dearborn, Chicago, IL, in Cook County.

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

2.      That at all relevant times, Plaintiff was employed by K&K Ironworks, Inc. in furtherance of said work.

3.      That at all relevant times, the aforesaid property was owned by and operated by Defendant, BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company.

4.      That at all relevant times, the aforesaid property was managed by Defendant, MB REAL ESTATE SERVICES, INC., a Corporation.

5.      That at all relevant times, Defendants, and each of them, owned, possessed, operated, controlled and/or maintained the premises, including two freight elevators at the aforesaid location.

6.      That at all relevant times, Defendants, and each of them, owed Plaintiff the highest duty of care as a common carrier in relation to said freight elevators.

7.      That at the aforesaid time and location, Plaintiff along with his equipment, boarded on to the smaller of the freight elevators, per the direction of the elevator operator.

8.      That the Defendants, and each of them, were then and there guilty of one or more of the following careless and negligent acts and/or omissions:

     a.    Improperly operated, managed, maintained, and controlled the aforesaid elevator, so that as a direct and proximate result thereof, the Plaintiff was injured;

     b.    Allowed and permitted heavy equipment to be loaded on to the elevator that was in excess of the elevator's weight capacity;

     c.    Failed to properly instruct Plaintiff and his co-workers to not to load heavy equipment on to the smaller freight elevator, when the Defendants, each of them, knew, or should have known, that said instruction was necessary to prevent injury to the Plaintiff;

     d.    Failed to make a reasonable inspection of the aforesaid elevator, when the Defendants, each of them, knew, or should have known, that said inspection was necessary to prevent injury to the Plaintiff;

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

e.  Failed to ensure a safe, suitable and proper elevator was provided for Plaintiff to be transported in to access his work; and/or

f.  Failed to provide adequate safeguards to prevent Plaintiff from injury while being transported to his work site on said elevator.

9.  That on the aforementioned date and as a result of the aforesaid acts of the Defendants, each of them, the elevator became dislodged and fell approximately 2 stories while the Plaintiff was inside.

10.  That as a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendants, and each of them, Plaintiff then and there sustained severe and permanent injuries, and was, and will be hindered and prevented from attending to his usual duties and affairs and has lost, and will in the future lose, the value of that time as aforementioned. The Plaintiff also suffered great pain and anguish, and will in the future continue to suffer. The Plaintiff further expended and became liable for, and will expend and become liable for, large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, BARRY STANEK, demands judgment against the Defendants, BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a Corporation, and each of them, in a dollar amount to satisfy the jurisdictional limitation of this Court and such additional amounts as the jury and the Court shall deem proper, and additionally, costs of said suit.

## COUNT II – VICARIOUS LIABILITY
### BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company, and MB REAL ESTATE SERVICES, INC., a Corporation

Now comes the Plaintiff, BARRY STANEK, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendants, BEACON CAPITAL

3

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a Corporation, each of them, alleges as follows:

1.      That on September 21, 2016, Plaintiff was working within the building/premises located at 1 North Dearborn, Chicago, IL, in Cook County.

2.      That at all relevant times, Plaintiff was employed by K&K Ironworks, Inc. in furtherance of said work.

3.      That at all relevant times, the property was owned, operated, and/or controlled by Defendant, BEACON CAPITAL PARTNERS, LLC, a limited liability company.

4.      That at all relevant times, the property was operated and managed by Defendant, MB REAL ESTATE SERVICES, INC., a Corporation, as Beacon's agent.

5.      That at all relevant times, Defendants, and each of them, owned, operated, maintained, and/or controlled two freight elevators at the aforesaid location.

6.      That at the aforesaid time and location, Plaintiff boarded, along with his equipment, on to the smaller freight elevator, per the direction of the elevator operator.

7.      That at all relevant times, an elevator operator was in control of said freight elevator as Defendants' employee and/or agent.

8.      That at the aforementioned time and location, the elevator operator oversaw Plaintiff's use of the freight elevator and instructed Plaintiff to load equipment on to the smaller elevator.

9.      That at all relevant times, Defendants, and each of them, by and through their employees and agents, had a duty to exercise ordinary care for the safety of the Plaintiff.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

10.     That the Defendants, and each of them, then and there breached said duty individually and/or vicariously through acts and/or omissions of Defendants' employees/agents by one or more of the following negligent acts and/or omissions:

    a.    Improperly operated, managed, maintained, and controlled the aforesaid elevator, so that as a direct and proximate result thereof, the Plaintiff was injured;

    b.    Allowed and permitted heavy equipment to be loaded on to the elevator, when Defendant, and each of them, knew, or in the exercise of ordinary care should have known, that such was in excess of the elevator's weight capacity;

    c.    Failed to properly instruct Plaintiff and his co-workers to not to load heavy equipment on to the smaller freight elevator, when the Defendant, and each of them, knew, or should have known, that said instruction was necessary to prevent injury to the Plaintiff;

    d.    Failed to make a reasonable inspection of the aforesaid elevator, when the Defendants, and each of them, knew, or should have known, that said inspection was necessary to prevent injury to the Plaintiff

    e.    Failed to ensure a safe, suitable and proper elevator was used by Plaintiff to transport workmen and materials to the worksite on the aforesaid premises; and/or

    f.    Failed to provide adequate safeguards to prevent Plaintiff from injury while working on said elevator.

11.     That on the aforementioned date and as a result of the aforesaid acts of the elevator operator, the elevator became dislodged and fell approximately 2 stories while the Plaintiff was inside.

12.     That as a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendants, and each of them, Plaintiff then and there sustained severe and permanent injuries, and was, and will be hindered and prevented from attending to his usual duties and affairs and has lost, and will in the future lose, the value of that

time as aforementioned. The Plaintiff also suffered great pain and anguish, and will in the future continue to suffer. The Plaintiff further expended and became liable for, and will expend and become liable for, large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, BARRY STANEK, demands judgment against the Defendants, BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a Corporation, each of them, in a dollar amount to satisfy the jurisdictional limitation of this Court and such additional amounts as the jury and the Court shall deem proper, and additionally, costs of said suit.

### COUNT III – NEGLIGENCE
### PARKWAY ELEVATORS, INC., a Corporation

Now comes the Plaintiff, BARRY STANEK, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, PARKWAY ELEVATORS, INC., a Corporation, alleges as follows:

1. That on September 21, 2016, Plaintiff was working within the building/premises located at 1 North Dearborn, Chicago, IL, in Cook County.

2. That at all relevant times, Plaintiff was employed by K&K Ironworks, Inc. in furtherance of said work.

3. On September 21, 2016, and at all relevant times prior thereto, Defendant, PARKWAY ELEVATORS, INC., a Corporation, was the elevator service contractor at 1 North Dearborn, Chicago, IL in Cook County and entered into a contract to perform elevator maintenance at the aforesaid premises and for the freight elevator at issue in this case.

4. That at all relevant times, Defendant was responsible for maintaining the two freight elevators at the aforesaid location, including the one involved in this case.

6

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

5.     That at the aforesaid time and location, Plaintiff entered the smaller freight elevator to transport himself and his equipment to his worksite.

6.     That the Defendant was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

    a.     Improperly managed and maintained the aforesaid elevator, so that as a direct and proximate result thereof, the Plaintiff was injured;

    b.     Failed to make a reasonable inspection of the aforesaid elevator, when the Defendants knew, or should have known, that said inspection was necessary to prevent injury to the Plaintiff;

    c.     Failed to ensure a safe, suitable and proper elevator was provided for Plaintiff;

    d.     Failed to keep the aforesaid elevator maintained to proper standards so that as a direct and proximate result thereof, the Plaintiff was injured; and/or

    e.     Failed to provide adequate safeguards to prevent Plaintiff from injury while being transported on said elevator.

7.     That on the aforementioned date and as a result of the aforesaid negligent acts of the Defendant, the elevator became dislodged and fell approximately 2 stories while the Plaintiff was inside.

8.     That as a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendant, Plaintiff then and there sustained severe and permanent injuries, and was, and will be hindered and prevented from attending to his usual duties and affairs and has lost, and will in the future lose, the value of that time as aforementioned. The Plaintiff also suffered great pain and anguish, and will in the future continue to suffer. The Plaintiff further expended and became liable for, and will expend and become liable for, large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

7

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

WHEREFORE, the Plaintiff, BARRY STANEK, demands judgment against the Defendant, PARKWAY ELEVATORS, INC., a Corporation, in a dollar amount to satisfy the jurisdictional limitation of this Court and such additional amounts as the jury and the Court shall deem proper, and additionally, costs of said suit.

## COUNT IV – NEGLIGENCE
### BEAR CONSTRUCTION COMPANY, a Corporation

Now comes the Plaintiff, BARRY STANEK, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendants, BEAR CONSTRUCTION COMPANY, a Corporation, alleges as follows:

1. That on September 21, 2016, Plaintiff was working at a construction site within the building/premises located at 1 North Dearborn, Chicago, IL, in Cook County.

2. That at all relevant times, Plaintiff was employed by K&K Ironworks, Inc. in furtherance of said construction work.

3. That at all relevant times, the aforesaid construction was being overseen, supervised, superintended, and controlled by Defendant, BEAR CONSTRUCTION COMPANY, a Corporation, as the general contractor.

4. That at all relevant times, Defendant, BEAR CONSTRUCTION COMPANY, a Corporation, retained control over the construction work including the provision of safe and proper freight elevators to transport workers and equipment to the site within the building.

5. That at the aforesaid time and location, Plaintiff was loading heavy equipment on to the smaller of the two freight elevators, to gain access to the construction site.

6. That the Defendant was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

8

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

a.    Required heavy equipment necessary to be used at the construction site to be loaded on to the freight elevator that Defendant knew, or in the exercise of ordinary care should have known, was in excess of the elevator's weight capacity;

b.    Failed to properly instruct Plaintiff and his co-workers to not to load heavy equipment on to the smaller freight elevator, when the Defendant knew, or should have known, that said instruction was necessary to prevent injury to the Plaintiff;

c.    Failed to make a reasonable inspection of the aforesaid elevator, when the Defendants knew, or should have known, that heavy equipment would be transported to the work site on said elevator and that said inspection was necessary to prevent injury to the Plaintiff; and/or

d.    Failed to provide Plaintiff with a safe, suitable and proper means of transport to the worksite.

7.    That on the aforementioned date and as a result of the aforesaid negligent acts of the Defendant, the elevator became dislodged and fell approximately 2 stories while the Plaintiff was inside.

8.    That as a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendant, Plaintiff then and there sustained severe and permanent injuries, and was, and will be hindered and prevented from attending to his usual duties and affairs and has lost, and will in the future lose, the value of that time as aforementioned. The Plaintiff also suffered great pain and anguish, and will in the future continue to suffer. The Plaintiff further expended and became liable for, and will expend and become liable for, large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, BARRY STANEK, demands judgment against the Defendant, BEAR CONSTRUCTION COMPANY, a Corporation, in a dollar amount to satisfy

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

the jurisdictional limitation of this Court and such additional amounts as the jury and the Court shall deem proper, and additionally, costs of said suit.

## COUNT V – NEGLIGENCE
## TITAN SECURITY GROUP, LLC, a Limited Liability Company

Now comes the Plaintiff, BARRY STANEK, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, TITAN SECURITY GROUP, LLC, a Limited Liability Company, alleges as follows:

1.     That on September 21, 2016, Plaintiff was working within the building/premises located at 1 North Dearborn, Chicago, IL, in Cook County.

2.     That at all relevant times, Plaintiff was employed by K&K Ironworks, Inc. in furtherance of said work.

3.     That at all relevant times, the building/premises including freight elevator therein was owned, operated, managed and/or controlled by BEACON CAPITAL PARTNERS, LLC, a limited liability company and MB REAL ESTATE SERVICES, INC., a Corporation

4.     That at all relevant times, Defendant, TITAN SECURITY GROUP, LLC, a Limited Liability Company, by and through its agents and/or employees, operated and/or controlled, or had a duty to operate and/or control two freight elevators at the aforesaid premises.

5.     That at the aforesaid time and location, Plaintiff boarded, along with his equipment, on to the smaller freight elevator, with the knowledge and consent of the elevator operator, an employee and/or agent of the Defendant, TAN SECURITY GROUP, LLC, a Limited Liability Company.

6.     That at the aforementioned time and location, the aforesaid elevator operator oversaw and was in control of Plaintiff's use of the freight elevator on said premises.

10

7. That at all relevant times, Defendant, by and through its employee(s) and agent(s), had a duty to exercise ordinary care in the operation and control of said freight elevator for the safety of the Plaintiff.

8. That the Defendant then and there breached said duty individually and/or vicariously through acts and/or omissions of Defendant's employees/agents by one or more of the following negligent acts and/or omissions:

a. Improperly operated, managed, maintained, and controlled the aforesaid elevator, so that as a direct and proximate result thereof, the Plaintiff was injured;

b. Allowed and permitted heavy equipment to be loaded on to the elevator, when Defendant knew, or in the exercise of ordinary care should have known, that such was in excess of the elevator's weight capacity;

c. Failed to properly instruct Plaintiff and his co-workers to not to load heavy equipment on to the smaller freight elevator, when the Defendant knew, or should have known, that said instruction was necessary to prevent injury to the Plaintiff;

d. Failed to make a reasonable inspection of the aforesaid elevator, when the Defendants knew, or should have known, that said inspection was necessary to prevent injury to the Plaintiff

e. Failed to ensure a safe, suitable and proper elevator was used by Plaintiff to transport workmen and materials to the worksite on the aforesaid premises;

f. Failed to provide adequate safeguards to prevent Plaintiff from injury while working on said elevator, and/or

g. Failed to properly and adequately train its employee/agent as to the safe operation of said freight elevator.

9. That on the aforementioned date and location, the elevator dropped abruptly while the Plaintiff was inside.

11

10.     That as a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendants, and each of them, Plaintiff then and there sustained severe and permanent injuries, and was, and will be hindered and prevented from attending to his usual duties and affairs and has lost, and will in the future lose, the value of that time as aforementioned. The Plaintiff also suffered great pain and anguish, and will in the future continue to suffer. The Plaintiff further expended and became liable for, and will expend and become liable for, large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, BARRY STANEK, demands judgment against the Defendants, BEACON CAPITAL PARTNERS, LLC, a Limited Liability Company; and MB REAL ESTATE SERVICES, INC., a Corporation, each of them, in a dollar amount to satisfy the jurisdictional limitation of this Court and such additional amounts as the jury and the Court shall deem proper; and additionally, costs of said suit.

_____
Attorney for Plaintiff

Steven A. Berman
ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
161 North Clark Street – 21st Floor
Chicago, IL 60601
PH: 312-372-3822
sberman@anesilaw.com

12

FILED
8/7/2018 12:15 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# EXHIBIT  B

# ☖AIA® Document A201™ – 2007

## *General Conditions of the Contract for Construction*

**for the following PROJECT:**
*(Name and location or address)*
One North Dearborn Street, Chicago, IL
Renovate the roof penthouse and roof to provide a roof deck and lounge.   Work will
include demolition, structural improvements, new curtain wall, interior finishes, raised
floors, restrooms, new elevator 12 overrun structure, landscaping, and associated MEP
improvements.

**THE OWNER:**
*(Name, legal status and address)*
BCSP OND Property LLC
c/o Beacon Capital Partners, LLC
200 State Street
Boston, MA  02109

**THE ARCHITECT:**
*(Name, legal status and address)*
Wright Heerema Architects
140 South Dearborn Street
Chicago, IL  60603

**THE CONTRACTOR:**
(Refers to the Construction Manager)

Bear Construction Company
1501 Rohlwing Road
Rolling Meadows, IL  60008

**TABLE OF ARTICLES**

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ARCHITECT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

**ADDITIONS AND DELETIONS:**
The author of this document has
added information needed for its
completion. The author may also
have revised the text of the original
AIA standard form. An *Additions and
Deletions Report* that notes added
information as well as revisions to
the standard form text is available
from the author and should be
reviewed. A vertical line in the left
margin of this document indicates
where the author has added
necessary information and where
the author has added to or deleted
from the original AIA text.

This document has important legal
consequences. Consultation with an
attorney is encouraged with respect
to its completion or modification.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which
expires on 01/12/2017, and is not for resale.
User Notes:                                                                                    (1765947817)

Init.

/

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

11      INSURANCE AND BONDS

12      UNCOVERING AND CORRECTION OF WORK

13      MISCELLANEOUS PROVISIONS

14      TERMINATION OR SUSPENSION OF THE CONTRACT

15      CLAIMS AND DISPUTES

**Init.**

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                        (1765947217)

2

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## INDEX
(Topics and numbers in bold are section headings.)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, 12.3
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
3.16, 6.2.1, 12.1
Accident Prevention
10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 8.3.1, 9.5.1, 10.2.5, 10.2.8, 13.4.2, 13.7, 14.1, 15.2
Addenda
1.1.1, 3.11.1
Additional Costs, Claims for
3.7.4, 3.7.5, 6.1.1, 7.3.7.5, 10.3, 15.1.4
**Additional Inspections and Testing**
9.4.2, 9.8.3, 12.2.1, **13.5**
Additional Insured
11.1.4
**Additional Time, Claims for**
3.2.4, 3.7.4, 3.7.5, 3.10.2, 8.3.2, **15.1.5**
**Administration of the Contract**
3.1.3, **4.2**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13
**Allowances**
**3.8**, 7.3.8
All-risk Insurance
11.3.1, 11.3.1.1
**Applications for Payment**
4.2.5, 7.3.9, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7, 9.10, 11.1.3
Approvals
2.1.1, 2.2.2, 2.4, 3.1.3, 3.10.2, 3.12.8, 3.12.9, 3.12.10, 4.2.7, 9.3.2, 13.5.1
**Arbitration**
8.3.1, 11.3.10, 13.1.1, 15.3.2, **15.4**
**ARCHITECT**
**4**
**Architect, Definition of**
**4.1.1**
Architect, Extent of Authority
2.4.1, 3.12.7, 4.1, 4.2, 5.2, 6.3, 7.1.2, 7.3.7, 7.4, 9.2, 9.3.1, 9.4, 9.5, 9.6.3, 9.8, 9.10.1, 9.10.3, 12.1, 12.2.1, 13.5.1, 13.5.2, 14.2.2, 14.2.4, 15.1.3, 15.2.1
Architect, Limitations of Authority and Responsibility
2.1.1, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 5.2.1, 7.4, 9.4.2, 9.5.3, 9.6.4, 15.1.3, 15.2

Architect's Additional Services and Expenses
2.4.1, 11.3.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
Architect's Administration of the Contract
3.1.3, 4.2, 3.7.4, 15.2, 9.4.1, 9.5
Architect's Approvals
2.4.1, 3.1.3, 3.5, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.1.7, 1.5
Architect's Decisions
3.7.4, 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.2.14, 6.3, 7.3.7, 7.3.9, 8.1.3, 8.3.1, 9.2, 9.4.1, 9.5, 9.8.4, 9.9.1, 13.5.2, 15.2, 15.3
Architect's Inspections
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.4, 3.3.1, 4.2.6, 4.2.7, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.5, 3.1.3, 3.2.2, 3.2.3, 3.2.4, 3.3.1, 3.4.2, 3.5, 3.7.4, 3.7.5, 3.9.2, 3.9.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3.7, 12, 13.4.2, 13.5, 15.2
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.3.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 5.2.1, 11.4.1
Binding Dispute Resolution
9.7, 11.3.9, 11.3.10, 13.1.1, 15.2.5, 15.2.6.1, 15.3.1, 15.3.2, 15.4.1
**Boiler and Machinery Insurance**
**11.3.2**
Bonds, Lien
7.3.7.4, 9.10.2, 9.10.3
**Bonds, Performance, and Payment**
7.3.7.4, 9.6.7, 9.10.3, 11.3.9, **11.4**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                      (1765947217)

Init.

3

/

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion
9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.1, 4.2.5, 4.2.9, 9.3.3, 9.4, 9.5, 9.6.1, 9.6.6, 9.7, 9.10.1, 9.10.3, 14.1.1.3, 14.2.4, 15.1.3
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.7.4, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 5.2.3, 7.1.2, 7.1.3, 7.2, 7.3.2, 7.3.6, 7.3.9, 7.3.10, 8.3.1, 9.3.1.1, 9.10.3, 10.3.2, 11.3.1.2, 11.3.4, 11.3.9, 12.1.2, 15.1.3
**Change Orders**, Definition of
**7.2.1**
**CHANGES IN THE WORK**
2.2.1, 3.11, 4.2.8, 7, 7.2.1, 7.3.1, 7.4, 7.4.1, 8.3.1, 9.3.1.1, 11.3.9
Claims, Definition of
**15.1.1**
**CLAIMS AND DISPUTES**
3.2.4, 6.1.1, 6.3, 7.3.9, 9.3.3, 9.10.4, 10.3.3, **15**, 15.4
Claims and Timely Assertion of Claims
15.4.1
**Claims for Additional Cost**
3.2.4, 3.7.4, 6.1.1, 7.3.9, 10.3.2, **15.1.4**
**Claims for Additional Time**
3.2.4, 3.7.46.1.1, 8.3.2, 10.3.2, **15.1.5**
**Concealed or Unknown Conditions, Claims for**
**3.7.4**
Claims for Damages
3.2.4, 3.18, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.3.5, 11.3.7, 14.1.3, 14.2.4, 15.1.6
Claims Subject to Arbitration
15.3.1, 15.4.1
**Cleaning Up**
**3.15**, 6.3
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.2, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 5.2.1, 5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.3.1, 11.3.6, 11.4.1, 15.1.4
**Commencement of the Work, Definition of**
**8.1.2**
**Communications Facilitating Contract**
**Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8, 9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**

Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3, 12.2, 13.7
Compliance with Laws
1.6.1, 3.2.3, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 9.6.4, 10.2.2, 11.1, 11.3, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14.1.1, 14.2.1.3, 15.2.8, 15.4.2, 15.4.3
Concealed or Unknown Conditions
3.7.4, 4.2.8, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 6.1.1, 6.1.4
Consent, Written
3.4.2, 3.7.4, 3.12.8, 3.14.2, 4.1.2, 9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.3.1, 13.2, 13.4.2, 15.4.4.2
**Consolidation or Joinder**
**15.4.4**
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
1.1.4, 6
**Construction Change Directive, Definition of**
**7.3.1**
**Construction Change Directives**
1.1.1, 3.4.2, 3.12.8, 4.2.8, 7.1.1, 7.1.2, 7.1.3, 7.3, 9.3.1.1
Construction Schedules, Contractor's
3.10, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
**Contingent Assignment of Subcontracts**
5.4, 14.2.2.2
**Continuing Contract Performance**
**15.1.3**
**Contract**, Definition of
**1.1.2**
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.3.9, 14
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.3.6, 11.4.1
Contract Documents, Copies Furnished and Use of
1.5.2, 2.2.5, 5.3
**Contract Documents, Definition of**
**1.1.1**
**Contract Sum**
3.7.4, 3.8, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2, 9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.3.1, 14.2.4, 14.3.2, 15.1.4, 15.2.5
**Contract Sum, Definition of**
**9.1**
Contract Time
3.7.4, 3.7.5, 3.10.2, 5.2.3, 7.2.1.3, 7.3.1, 7.3.5, 7.4, 8.1.1, 8.2.1, 8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2, 15.1.5.1, 15.2.5
**Contract Time, Definition of**
**8.1.1**

**Init.**

**I**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®** **Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®** **Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                                   (1765947217)

4

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**CONTRACTOR**
**3**
Contractor, Definition of
**3.1, 6.1.2**
**Contractor's Construction Schedules**
**3.10**, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
Contractor's Employees
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3,
11.1.1, 11.3.7, 14.1, 14.2.1.1,
**Contractor's Liability Insurance**
**11.1**
Contractor's Relationship with Separate Contractors
and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.3.7, 12.1.2, 12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2,
11.3.1.2, 11.3.7, 11.3.8
Contractor's Relationship with the Architect
1.1.2, 1.5, 3.1.3, 3.2.2, 3.2.3, 3.2.4, 3.3.1, 3.4.2, 3.5,
3.7.4, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.3, 4.2, 5.2,
6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6,
10.3, 11.3.7, 12, 13.5, 15.1.2, 15.2.1
Contractor's Representations
3.2.1, 3.2.2, 3.5, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2
Contractor's Responsibility for Those Performing the
Work
3.3.2, 3.18, 5.3.1, 6.1.3, 6.2, 9.5.1, 10.2.8
Contractor's Review of Contract Documents
3.2
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
14.1, 15.1.6
Contractor's Submittals
3.10, 3.11, 3.12.4, 4.2.7, 5.2.1, 5.2.3, 9.2, 9.3, 9.8.2,
9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.4.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction
Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 6.1.3, 6.2.4,
7.1.3, 7.3.5, 7.3.7, 8.2, 10, 12, 14, 15.1.3
Contractual Liability Insurance
11.1.1.8, 11.2
Coordination and Correlation
1.2, 3.2.1, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications
1.5, 2.2.5, 3.11
Copyrights
1.5, **3.17**
Correction of Work
2.3, 2.4, 3.7.3, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, **12.2**
**Correlation and Intent of the Contract Documents**
**1.2**
Cost, Definition of
7.3.7

Costs
2.4.1, 3.2.4, 3.7.3, 3.8.2, 3.15.2, 5.4.2, 6.1.1, 6.2.3,
7.3.3.3, 7.3.7, 7.3.8, 7.3.9, 9.10.2, 10.3.2, 10.3.6,
11.3, 12.1.2, 12.2.1, 12.2.4, 13.5, 14
**Cutting and Patching**
**3.14**, 6.2.5
Damage to Construction of Owner or Separate
Contractors
3.14.2, 6.2.4, 10.2.1.2, 10.2.5, 10.4, 11.1.1, 11.3,
12.2.4
Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.4.1, 11.3.1, 12.2.4
Damages, Claims for
3.2.4, 3.18, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1,
11.3.5, 11.3.7, 14.1.3, 14.2.4, 15.1.6
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
**Date of Commencement of the Work**, Definition of
**8.1.2**
**Date of Substantial Completion**, Definition of
**8.1.3**
**Day**, Definition of
**8.1.4**
Decisions of the Architect
3.7.4, 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 15.2, 6.3,
7.3.7, 7.3.9, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1,
13.5.2, 14.2.2, 14.2.4, 15.1, 15.2
**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance,
Rejection and Correction of
2.3.1, 2.4.1, 3.5, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2,
9.9.3, 9.10.4, 12.2.1
Definitions
1.1, 2.1.1, 3.1.1, 3.5, 3.12.1, 3.12.2, 3.12.3, 4.1.1,
15.1.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 8.1, 9.1, 9.8.1
**Delays and Extensions of Time**
3.2, 3.7.4, 5.2.3, 7.2.1, 7.3.1, 7.4, **8.3**, 9.5.1, 9.7,
10.3.2, 10.4.1, 14.3.2, 15.1.5, 15.2.5
Disputes
6.3, 7.3.9, 15.1, 15.2
**Documents and Samples at the Site**
**3.11**
**Drawings**, Definition of
**1.1.5**
Drawings and Specifications, Use and Ownership of
3.11
Effective Date of Insurance
8.2.2, 11.1.2
**Emergencies**
**10.4**, 14.1.1.2, 15.1.4
Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2,
10.3.3, 11.1.1, 11.3.7, 14.1, 14.2.1.1

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/29/2016 under Order No.4107745048_1 which
expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                (1765947217)

5

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Equipment, Labor, Materials or
1.1.3, 1.1.6, 3.4, 3.5, 3.8.2, 3.8.3, 3.12, 3.13.1, 3.15.1,
4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.1, 14.2.1.2
Execution and Progress of the Work
1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3.1, 3.4.1, 3.5,
3.7.1, 3.10.1, 3.12, 3.14, 4.2, 6.2.2, 7.1.3, 7.3.5, 8.2,
9.5.1, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3.1, 15.1.3
Extensions of Time
3.2.4, 3.7.4, 5.2.3, 7.2.1, 7.3, 7.4, 9.5.1, 9.7, 10.3.2,
10.4.1, 14.3, 15.1.5, 15.2.5
Failure of Payment
9.5.1.3, 9.7, 9.10.2, 13.6, 14.1.1.3, 14.2.1.2
Faulty Work
(See Defective or Nonconforming Work)
Final Completion and Final Payment
4.2.1, 4.2.9, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.3.1, 11.3.5,
12.3.1, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.4
Fire and Extended Coverage Insurance
11.3.1.1
**GENERAL PROVISIONS**
**1**
**Governing Law**
**13.1**
Guarantees (See Warranty)
**Hazardous Materials**
10.2.4, **10.3**
Identification of Subcontractors and Suppliers
5.2.1
**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.3.5, 10.3.6, 11.3.1.2,
11.3.7
**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.2, 3.12.4, 3.12.10, 6.1.3, 6.1.4, 6.2.5,
9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,
13.5.2, 14.1.1.4, 14.1.4, 15.1.3
**Initial Decision**.
**15.2**
**Initial Decision Maker, Definition of**
**1.1.8**
Initial Decision Maker, Decisions
14.2.2, 14.2.4, 15.2.1, 15.2.2, 15.2.3, 15.2.4, 15.2.5
Initial Decision Maker, Extent of Authority
14.2.2, 14.2.4, 15.1.3, 15.2.1, 15.2.2, 15.2.3, 15.2.4,
15.2.5
**Injury or Damage to Person or Property**
**10.2.8**, 10.4.1
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3,
9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.4, 3.3.1, 3.8.1, 5.2.1, 7, 8.2.2, 12, 13.5.2

Instruments of Service, Definition of
**1.1.7**
Insurance
3.18.1, 6.1.1, 7.3.7, 9.3.2, 9.8.4, 9.9.1, 9.10.2, 11
**Insurance, Boiler and Machinery**
**11.3.2**
**Insurance, Contractor's Liability**
**11.1**
Insurance, Effective Date of
8.2.2, 11.1.2
**Insurance, Loss of Use**
**11.3.3**
**Insurance, Owner's Liability**
**11.2**
**Insurance, Property**
10.2.5, **11.3**
Insurance, Stored Materials
9.3.2
**INSURANCE AND BONDS**
**11**
Insurance Companies, Consent to Partial Occupancy
9.9.1
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
**Interest**
**13.6**
**Interpretation**
1.2.3, 1.4, 4.1.1, 5.1, 6.1.2, 15.1.1
Interpretations, Written
4.2.11, 4.2.12, 15.1.4
Judgment on Final Award
15.4.2
**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.1, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.5, 3.2.3, 3.6, 3.7, 3.12.10, 3.13.1, 4.1.1, 9.6.4, 9.9.1,
10.2.2, 11.1.1, 11.3, 13.1.1, 13.4, 13.5.1, 13.5.2,
13.6.1, 14, 15.2.8, 15.4
Liens
2.1.2, 9.3.3, 9.10.2, 9.10.4, 15.2.8
Limitations, Statutes of
12.2.5, 13.7, 15.4.1.1
Limitations of Liability
2.3.1, 3.2.2, 3.5, 3.12.10, 3.17, 3.18.1, 4.2.6, 4.2.7,
4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 10.2.5, 10.3.3,
11.1.2, 11.2, 11.3.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.2, 3.10, 3.11, 3.12.5, 3.15.1, 4.2.7,
5.2, 5.3.1, 5.4.1, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3,
9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.3.1.5,
11.3.6, 11.3.10, 12.2, 13.5, 13.7, 14, 15
**Loss of Use Insurance**
**11.3.3**

Init.

*I*

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                          (1765947217)

6

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Material Suppliers
1.5, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
**Materials, Hazardous**
**10.2.4, 10.3**
Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.5.1, 3.4.1, 3.5, 3.8.2, 3.8.3, 3.12,
3.13.1, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2,
9.3.3, 9.5.1.3, 9.10.2, 10.2.1.2, 10.2.4, 14.2.1.1,
14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
2.1.2, 15.2.8
**Mediation**
8.3.1, 10.3.5, 10.3.6, 15.2.1, 15.2.5, 15.2.6, **15.3**,
15.4.1
**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 7.1, 7.4
**MISCELLANEOUS PROVISIONS**
**13**
**Modifications, Definition of**
**1.1.1**
Modifications to the Contract
1.1.1, 1.1.2, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1, 9.7,
10.3.2, 11.3.1
**Mutual Responsibility**
**6.2**
**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**
Nonconforming Work, Rejection and Correction of
2.3.1, 2.4.1, 3.5, 4.2.6, 6.2.4, 9.5.1, 9.8.2, 9.9.3,
9.10.4, 12.2.1
Notice
2.2.1, 2.3.1, 2.4.1, 3.2.4, 3.3.1, 3.7.2, 3.12.9, 5.2.1,
9.7, 9.10, 10.2.2, 11.1.3, 12.2.2.1, 13.3, 13.5.1,
13.5.2, 14.1, 14.2, 15.2.8, 15.4.1
**Notice, Written**
2.3.1, 2.4.1, 3.3.1, 3.9.2, 3.12.9, 3.12.10, 5.2.1, 9.7,
9.10, 10.2.2, 10.3, 11.1.3, 11.3.6, 12.2.2.1, **13.3**, 14,
15.2.8, 15.4.1
**Notice of Claims**
3.7.4, 10.2.8, 15.1.2, 15.4
Notice of Testing and Inspections
13.5.1, 13.5.2
Observations, Contractor's
3.2, 3.7.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.3.1.5
Orders, Written
1.1.1, 2.3, 3.9.2, 7, 8.2.2, 11.3.9, 12.1, 12.2.2.1,
13.5.2, 14.3.1
**OWNER**
**2**
**Owner, Definition of**
**2.1.1**

**Owner, Information and Services Required of the**
2.1.2, **2.2**, 3.2.2, 3.12.10, 6.1.3, 6.1.4, 6.2.5, 9.3.2,
9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.3, 13.5.1,
13.5.2, 14.1.1.4, 14.1.4, 15.1.3
Owner's Authority
1.5, 2.1.1, 2.3.1, 2.4.1, 3.4.2, 3.8.1, 3.12.10, 3.14.2,
4.1.2, 4.1.3, 4.2.4, 4.2.9, 5.2.1, 5.2.4, 5.4.1, 6.1, 6.3,
7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1, 9.6.4,
9.9.1, 9.10.2, 10.3.2, 11.1.3, 11.3.3, 11.3.10, 12.2.2,
12.3.1, 13.2.2, 14.3, 14.4, 15.2.7
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.4
**Owner's Liability Insurance**
**11.2**
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
**Owner's Right to Carry Out the Work**
2.4, 14.2.2
**Owner's Right to Clean Up**
**6.3**
**Owner's Right to Perform Construction and to**
**Award Separate Contracts**
**6.1**
**Owner's Right to Stop the Work**
**2.3**
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
**Ownership and Use of Drawings, Specifications**
**and Other Instruments of Service**
1.1.1, 1.1.6, 1.1.7, 1.5, 2.2.5, 3.2.2, 3.11.1, 3.17,
4.2.12, 5.3.1
**Partial Occupancy or Use**
9.6.6, 9.9, 11.3.1.5
**Patching, Cutting and**
**3.14**, 6.2.5
Patents
3.17
**Payment, Applications for**
4.2.5, 7.3.9, 9.2, 9.3, 9.4, 9.5, 9.6.3, 9.7, 9.8.5, 9.10.1,
14.2.3, 14.2.4, 14.4.3
**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, 9.4, 9.5, 9.6.1, 9.6.6, 9.7, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of**
9.5.1.3, 9.7, 9.10.2, 13.6, 14.1.1.3, 14.2.1.2
Payment, Final
4.2.1, 4.2.9, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1, 12.3.1,
13.7, 14.2.4, 14.4.3
**Payment Bond, Performance Bond and**
7.3.7.4, 9.6.7, 9.10.3, 11.4
**Payments, Progress**
9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3, 15.1.3
**PAYMENTS AND COMPLETION**
**9**

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which
expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                                          (1765947217)

7

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 14.2.1.2
PCB
10.3.1
**Performance Bond and Payment Bond**
7.3.7.4, 9.6.7, 9.10.3, 11.4
**Permits, Fees, Notices and Compliance with Laws**
2.2.2, 3.7, 3.13, 7.3.7.4, 10.2.2
**PERSONS AND PROPERTY, PROTECTION OF**
**10**
Polychlorinated Biphenyl
10.3.1
**Product Data, Definition of**
**3.12.2**
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, **8.2**, 9.8, 9.9.1, 14.1.4, 15.1.3
**Progress Payments**
9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3, 15.1.3
**Project, Definition of**
**1.1.4**
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.3**
**PROTECTION OF PERSONS AND PROPERTY**
**10**
Regulations and Laws
1.5, 3.2.3, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14, 15.2.8, 15.4
Rejection of Work
3.5, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
3.2.1, 3.5, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1, 9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.2, 4.2.10, 5.1.1, 5.1.2, 13.2.1
Responsibility for Those Performing the Work
3.3.2, **3.18**, 4.2.3, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1, 10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field Conditions by Contractor**
**3.2**, 3.12.7, 6.1.3
Review of Contractor's Submittals by Owner and Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and Samples by Contractor
3.12

**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5, 3.7.4, 3.15.2, 4.2.6, 5.3, 5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3, 12.2.2, 12.2.4, **13.4**, 14, 15.4
**Royalties, Patents and Copyrights**
**3.17**
Rules and Notices for Arbitration
15.4.1
**Safety of Persons and Property**
**10.2**, 10.4
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3.1, **10.1**, 10.2, 10.4
**Samples, Definition of**
**3.12.3**
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and**
**3.11**
**Schedule of Values**
9.2, 9.3.1
Schedules, Construction
3.10, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 6, 8.3.1, 12.1.2
**Shop Drawings, Definition of**
**3.12.1**
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
**Site, Use of**
**3.13**, 6.1.1, 6.2.1
Site Inspections
3.2.2, 3.3.3, 3.7.1, 3.7.4, 4.2, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
**Specifications, Definition of**
**1.1.6**
**Specifications**
1.1.1, **1.1.6**, 1.2.2, 1.5, 3.11, 3.12.10, 3.17, 4.2.14
Statute of Limitations
13.7, 15.4.1.1
Stopping the Work
2.3, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
**Subcontractor, Definition of**
**5.1.1**
**SUBCONTRACTORS**
**5**
Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2, 9.6.7
**Subcontractual Relations**
**5.3**, 5.4, 9.3.1.2, 9.6, 9.10, 10.2.1, 14.1, 14.2.1

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                              (1765947217)

8

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.7, 9.2, 9.3,
9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3
Submittal Schedule
3.10.2, 3.12.5, 4.2.7
Subrogation, Waivers of
6.1.1, 11.3.7
Substantial Completion
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
12.2, 13.7
Substantial Completion, Definition of
9.8.1
Substitution of Subcontractors
5.2.3, 5.2.4
Substitution of Architect
4.1.3
Substitutions of Materials
3.4.2, 3.5, 7.3.8
Sub-subcontractor, Definition of
5.1.2
Subsurface Conditions
3.7.4
Successors and Assigns
13.2
Superintendent
3.9, 10.2.6
Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 6.1.3, 6.2.4,
7.1.3, 7.3.7, 8.2, 8.3.1, 9.4.2, 10, 12, 14, 15.1.3
Surety
5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2, 15.2.7
Surety, Consent of
9.10.2, 9.10.3
Surveys
2.2.3
Suspension by the Owner for Convenience
14.3
Suspension of the Work
5.4.2, 14.3
Suspension or Termination of the Contract
5.4.1.1, 14
Taxes
3.6, 3.8.2.1, 7.3.7.4
Termination by the Contractor
14.1, 15.1.6
Termination by the Owner for Cause
5.4.1.1, 14.2, 15.1.6
Termination by the Owner for Convenience
14.4
Termination of the Architect
4.1.3
Termination of the Contractor
14.2.2
TERMINATION OR SUSPENSION OF THE
CONTRACT
14

Tests and Inspections
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2,
9.10.1, 10.3.2, 11.4.1.1, 12.2.1, 13.5
TIME
8
Time, Delays and Extensions of
3.2.4, 3.7.4, 5.2.3, 7.2.1, 7.3.1, 7.4, 8.3, 9.5.1, 9.7,
10.3.2, 10.4.1, 14.3.2, 15.1.5, 15.2.5
Time Limits
2.1.2, 2.2, 2.4, 3.2.2, 3.10, 3.11, 3.12.5, 3.15.1, 4.2,
5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3,
9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 12.2, 13.5,
13.7, 14, 15.1.2, 15.4
Time Limits on Claims
3.7.4, 10.2.8, 13.7, 15.1.2
Title to Work
9.3.2, 9.3.3
Transmission of Data in Digital Form
1.6
UNCOVERING AND CORRECTION OF
WORK
12
Uncovering of Work
12.1
Unforeseen Conditions, Concealed or Unknown
3.7.4, 8.3.1, 10.3
Unit Prices
7.3.3.2, 7.3.4
Use of Documents
1.1.1, 1.5, 2.2.5, 3.12.6, 5.3
Use of Site
3.13, 6.1.1, 6.2.1
Values, Schedule of
9.2, 9.3.1
Waiver of Claims by the Architect
13.4.2
Waiver of Claims by the Contractor
9.10.5, 13.4.2, 15.1.6
Waiver of Claims by the Owner
9.9.3, 9.10.3, 9.10.4, 12.2.2.1, 13.4.2, 14.2.4, 15.1.6
Waiver of Consequential Damages
14.2.4, 15.1.6
Waiver of Liens
9.10.2, 9.10.4
Waivers of Subrogation
6.1.1, 11.3.7
Warranty
3.5, 4.2.9, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2, 13.7.1
Weather Delays
15.1.5.2
Work, Definition of
1.1.3
Written Consent
1.5.2, 3.4.2, 3.7.4, 3.12.8, 3.14.2, 4.1.2, 9.3.2, 9.8.5,
9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2, 15.4.4.2
Written Interpretations
4.2.11, 4.2.12

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which
expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                          (1765947217)

9

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Written Notice
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 5.2.1, 8.2.2, 9.7,
9.10, 10.2.2, 10.3, 11.1.3, 12.2.2, 12.2.4, 13.3, 14,
15.4.1

Written Orders
1.1.1, 2.3, 3.9, 7, 8.2.2, 12.1, 12.2, 13.5.2, 14.3.1,
15.1.2

Init.

I

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                        (1765947217)

10

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

## ARTICLE 1 GENERAL PROVISIONS
### § 1.1 BASIC DEFINITIONS
### § 1.1.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between the Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Owner. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements, advertisement or invitation to bid, Instructions to Bidders, sample forms, other information furnished by the Owner in anticipation of receiving bids or proposals, the Contractor's bid or proposal, or portions of Addenda relating to bidding requirements.

### § 1.1.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Contractor and the Architect or the Architect's consultants, (2) between the Owner and a Subcontractor or a Sub-subcontractor, (3) between the Owner and the Architect or the Architect's consultants or (4) between any persons or entities other than the Owner and the Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

### § 1.1.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

*(Paragraphs deleted)*
### § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS
### § 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and
completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the intended results.   All Work indicated in the Contract Documents shall be performed by the Contractor as part of this Contract unless it is specifically indicated in the Contract Documents that such Work is to be done by others.

### § 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall
not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

### § 1.2.3 Unless otherwise stated in the Contract Documents, words that have well-known technical or construction
industry meanings are used in the Contract Documents in accordance with such recognized meanings.

### §1.2.4 In case of discrepancies or conflicts in the Contract Documents, the order of precedence shall be as follows:

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                        (1785947217)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

A. Written amendments to the Owner-Contractor Agreement signed by both parties – those of a later date shall take precedence over those of an earlier date;
B. Change Orders – Those of a later date shall take precedence over those of an earlier date;
C. The Owner-Contractor Agreement;
D. Construction Change Directives;
E. Clarifications;
F. Special Conditions;
G. General Conditions;
H. Project Manual and Specifications;
I. Schedules;
J. Details – Large scale control over small scale drawings;
K. Drawings;
L. Figured Dimensions; and
M. Drawings not dimensioned.

The Contractor shall identify any duplications, discrepancies or conflicts of which the Contractor becomes aware to the Architect, in which event the Architect shall issue clarifications to address all discrepancies and conflicts identified by the Contractor and such clarifications shall govern in all events.

**§1.2.5** Notwithstanding the order of priority of documents set forth in Section 1.2.4, any matters contained in the Specifications which have been omitted from the Drawings or vice versa shall be construed as though contained in both. In the event of any duplications, conflict or discrepancy between the Drawings and Specifications or between other contract clauses, so far as the same pertains to the Drawings, the Specifications or any Modifications to the Drawings or Specifications, the matter shall be promptly brought to the attention of the Architect, without whose instructions the Contractor shall not adjust the matter except as his own risk. Any instructions of the Architect shall be given in writing. Any Claim of the Contractor arising out of such instructions shall be governed by the provisions of Article 15.

**§1.2.6** Notwithstanding the order of priority of documents set forth in Section 1.2.4, in the event of any such duplication, conflict or discrepancy, the best quality or method of work, materials and equipment shall be construed as the requirement. No such duplication of work, conflict or discrepancy is intended by the Contract Documents, and any duplication, conflict or discrepancy specified shall not become a basis for extra cost to the Owner.

**§1.2.7** Wherever in the Contract Documents reference is made to codes, standards, requirements or publications of any public or private bodies, the reference shall be construed as being to the latest revision thereof prior to the date of execution of this Agreement unless otherwise indicated. The Contractor warrants that all work performed hereunder shall meet the requirements of all such codes, standards, requirements and publications; however, the Contractor shall not be responsible for insuring that the design complies with such codes, standards, requirements and publications except where specification sections specifically require design certification and registered professional engineer seal and signature as provided in Section 3.12.10 (all other such compliance being the responsibility of the Architect).

**§1.2.8** In order to complete the Work satisfactorily and to preserve warranties and guarantees, all manufactured articles, materials and equipment shall be applied, installed, connected, erected, used, cleaned and conditioned in accordance with the manufacturer's written or printed directions and instructions unless otherwise indicated in the Contract Documents.

**§1.2.9** Where a typical detail is shown on the Drawings, such detail shall constitute the standard in workmanship and materials throughout corresponding parts of the Work. Any adaptation shall be subject to the written approval of the Architect.

**§1.2.10** The Work shall be performed without additional expense to the Owner in such sequence and manner as to avoid conflicts, to provide clear access to all control points (including valves, strainers, control devices and specialty items of every nature related to such systems and equipment), to obtain maximum headroom, to provide adequate clearances as required for operation and maintenance and to present an orderly appearance where exposes. The alignment of pipes, ducts or similar equipment shall be varied from that shown on the Drawings without additional

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes: (1765947217)

12

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

expense to the Owner where necessary to prevent conflicts. If the actual layout of the Work affects the architectural and structural integrity and limitations of the Work, further directions shall be obtained from the Architect prior to performing the same.

**§1.2.11** Tests, surveys, test borings, soil tests or other information relating to existing conditions or work in place included with the Contract Documents or otherwise made accessible to the Contractor were obtained by the Owner for use by the Architect in the design of the Work. No representation is made, and the Owner hereby expressly disclaims, that all conditions that might affect the construction of the Work have been investigated or indicated in such information.

### § 1.3 CAPITALIZATION
Terms capitalized in these General Conditions include those that are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

### § 1.4 INTERPRETATION
In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

### § 1.5 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
**§ 1.5.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

*(Paragraph deleted)*
### § 1.6 EXECUTION OF CONTRACT DOCUMENTS
**§1.6.1** The Contract Documents shall be signed by the Owner and Contractor. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

**§1.6.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents. The Contractor has evaluated and satisfied himself or will cause his Subcontractors to satisfy themselves as to the conditions and limitations under which the Work is to be performed, including, without limitation (1) the location, condition, layout and physical conditions of the Project site and surrounding areas, (2) generally prevailing climatic conditions, (3) anticipated labor supply and costs, (4) anticipated availability and costs of materials, tools and equipment and (5) except as provided in Section 10.3, anticipated soil and subsurface conditions of the Project site. The Owner shall not be required to pay any amount or make any adjustment in the Contract Time in connection with any failure by the Contractor or any Subcontractor to comply with the requirements of this Section.

### ARTICLE 2    OWNER
### § 2.1 GENERAL
**§ 2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner's representative shall be the person designated as such in

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                          (1765947217)

**13**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

the Agreement, or any successor to such person designated by the Owner in writing from time to time, which person shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization, subject to such limitations (if any) as Owner may specify in writing to Contractor from time to time. Any action taken on Owner's behalf by anyone other than the representative so designated by Owner will not be binding upon Owner. The Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

## § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
§ 2.2.1 The Owner represents and warrants to the Construction Manager (in addition to any other representations and warranties contained in the Contract Documents) as a material inducement to the Construction Manager to execute the Contract which representation and warranty shall survive the execution and delivery of the Contract, any termination of this Agreement and the final completion of the Work, that the Owner is financially solvent, able to pay all debts as they mature and possessed of sufficient working capital to complete the Work and perform all obligations under the Contract.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, that are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner, unless otherwise provided in the Contract Documents and except to the extent that the Contractor knows of any inaccuracy in the Contract Documents, but shall exercise proper precautions relating to the safe performance of the Work.

§ 2.2.4 Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

§ 2.2.5 The Owner shall furnish the Contractor with one (1) reproducible copy of the Contract Documents. The Contractor shall arrange for the reproduction of the Contract Documents as necessary, and the cost of such reproduction shall be included as a reimbursable Cost of the Work, subject to the Guaranteed Maximum Price.

## § 2.3 OWNER'S RIGHT TO STOP THE WORK
§ 2.3.1 If the Contractor fails to correct Work that is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3. If the Owner exercises its right to stop the Work pursuant to this Section 2.3.1, the Contractor shall be responsible for all costs, damages, delays and associated impacts arising from such stoppage.

## § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
§2.4.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a three-day period after receipt of written notice from the Owner to acknowledge its obligation to correct such default or neglect and commences correction with diligence and promptness, or if, having commenced such correction, the Contractor fails to continue such correction with diligence, the Owner may, upon written notice to the Contractor and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the third-party actual cost of correcting such deficiencies, including Owner's expenses and compensation for the

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                          (1766947217)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

Architect's additional services made necessary by such default, neglect or failure and the Contractor shall be responsible for all other costs, damages, delays and associated impacts arising in the event that the Owner exercises its rights under this Section 2.4.1. In performing any work pursuant to this Section 2.4.1, the Owner shall have the right to take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Contractor or any Subcontractor. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

**§2.4.2** The rights of the Owner set forth in this Section 2.4 are cumulative and not in limitation of any other rights of the Owner contained in the Contract Documents, at law or in equity.

**ARTICLE 3    CONTRACTOR**
**§ 3.1 GENERAL**
**§ 3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number.   The term "Contractor" means the Contractor or the Contractor's authorized representative.

**§ 3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**§ 3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons or entities other than the Contractor.

**§3.1.4** The Contractor warrants that its financial condition is sound and that the Contractor shall be capable of obtaining any bonds required by the Contract Documents.  Upon request by the Owner, the Contractor shall make available to the Owner such audited and unaudited financial statements of the Contractor as the Owner may reasonably request.  The Contractor shall promptly advise the Owner of any occurrence, event, fact or other matter that has had, will have or might reasonably be predicted to have a material adverse effect upon the financial condition of the Contractor.

**§3.1.5** The Contractor hereby represents and warrants to the Owner that the Contractor is a business entity which is experienced and skilled in the construction of projects of the type described in the Contract Documents, is licensed to engage in the general construction business in the jurisdiction where the site is located and is in compliance with all governmental laws and regulations applicable thereto.

**§ 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR**
**§ 3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. Any errors, discrepancies, conflicts, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

**§ 3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect and the Owner, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional, unless otherwise specifically provided in the Contract Documents.  The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

**§ 3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1, 3.2.2 and 3.2.4, the Contractor shall make Claims as provided in Article 15.  If the Contractor fails to perform the obligations of Sections 3.2.1, 3.2.2 and 3.2.4, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations and the Contractor shall be responsible for associated delays and impacts.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                    (1765947217)

**15**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**§ 3.2.4** The Contractor shall give the Architect notice of any additional Drawings, Specifications or instructions required to define the Work in greater detail, or to permit the proper progress of the Work. Requests for such information shall be made by the Contractor sufficiently in advance of the time such information is needed by the Contractor so as to permit the Architect a reasonable time for responding to such requests without affecting the progress of the Work.

### § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Owner. If the Contractor is then instructed by the Owner to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any loss or damage arising solely from those Owner-required means, methods, techniques, sequences or procedures. In no event shall the Contractor employ construction means, methods, techniques, sequences or procedures that violate (1) requirements of any warranties applicable to the Work or (2) laws, ordinances, regulations, rules and orders which bear upon the Contractor's performance of the Work.

**§ 3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors.

**§ 3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

**§3.3.4** The Contractor shall furnish sufficient forces, plant and equipment as may be necessary to insure the progress of the Work in accordance with the Construction Schedule. If, in the opinion of the Owner, the Contractor has fallen behind the Construction Schedule, the Contractor shall submit his proposal demonstrating the manner in which the desired rate of progress may be increased and shall take such steps, as may be necessary to meet the Construction Schedule. It shall be the responsibility of the Contractor to maintain his schedule so as not to delay the progress of the Work or the scheduled work of separate contractors.

**§3.3.5** Coordination of all work shall include, without limitation, review of all shop drawings (including without limitation, architectural, civil, structural, mechanical and electrical shop drawings) submitted by Subcontractors for various trades or subdivisions of work; and approval of such shop drawings indicated by Contractor's stamp of approval in accordance with Section 3.12.

**§3.3.6** The Contractor shall be solely responsible for properly laying out the Work, and for all lines, elevations and measurements for all of the Work. He shall verify the figures shown on the Drawings before laying out the Work and will be responsible for any errors or inaccuracies resulting from his failure to do so. In the event that the Contractor shall, while laying out the Work, become aware of: (1) any conflicts between (a) the Drawings, the Specifications or any Modification to the Drawings or the Specifications and (b) the actual layout of the Work; or (2) any conflicts or inconsistencies in the Drawings, the Specifications or any Modification to the Drawings or the Specifications themselves, he shall promptly notify the Architect, without whose instructions the Contractor shall not adjust the matter except at his own risk.

### § 3.4 LABOR AND MATERIALS

**§ 3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                              (1765947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 3.4.2** If the Contractor desires to substitute a product or method in lieu of what has been specified or shown in the Contract Documents, the Contractor may propose to do so in a written request delivered to the Architect and the Owner setting forth the following:

.1     Full explanation of the proposed substitution and submittal of all supporting data including technical information, catalog cuts, warranties, test results, installation instructions, operating procedures and other like information necessary for a complete evaluation of the substitution and relevant materials prepared as part of pre-construction services;

.2     Reasons why the substitution is advantageous and necessary, including the benefits to the Owner and the Work in the event the substitution is acceptable;

.3     The adjustment, if any, in the Contract Sum, in the event the substitution is acceptable;

.4     The adjustment, if any, in the Contract Time and any milestone dates in the event the substitution is acceptable;

.5     The Contractor shall submit a written request for any substitution, together with complete substantiating data and information, to the Architect and the Owner not later than thirty (30) days prior to the time that such substitute produce or method would be incorporated into the Work. No substitution shall be made by the Contractor, or considered or approved by the Architect or the Owner, without the Contractor's submittal of a written request with respect to such substitution as provided above. The Contractor may make a substitution only: (1) upon the written approval of the Architect and the Owner of such written request therefor after evaluation by them of such request and all accompanying data and information; and (2) in accordance with a Change Order; and

.6     Any written request for a substitution by the Contractor shall be a representation by the Contractor to the Owner that: (1) the Contractor has investigated the product or method proposed to be substituted and found it to be equivalent or better than the produce or method specified in the Contract Documents, and (2) except to the extent otherwise expressly stated in such request, the Contractor is waiving any Claim for additional costs related to such substitution.

**§ 3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not properly skilled in tasks assigned to them.

**§ 3.4.4** All manufactured materials shall be ordered to be delivered in the manufacturer's original, unbroken packages, containers or bundles, bearing the name of the manufacturer and brand name or other designation, and all materials shall be handled, stored, installed, cleaned and protected in accordance with the manufacturer's directions unless otherwise indicated in the Contract Documents.

**§ 3.4.5** Any product, material or equipment specified in the Contract Documents by reference to the number symbol or title of a specified standard, such as a commercial standard, federal specification, trade association standard, or other similar or related construction industry standard, shall comply with requirements in the latest revision thereof as of the date the Owner and the Contractor execute the Agreement.

**§ 3.4.6** In all cases in which a manufacturer's name, trade name or other propriety designation is used in the Contract Documents in connection with a material equipment or product to be furnished thereunder, the Contractor shall furnish the material, equipment or product of the named manufacturer(s) unless a written request for substitution is made in accordance with Section 3.4.2 and the substitution is approved in writing by the Architect.

**§ 3.4.7** The Contractor and all Subcontractors shall make all provisions necessary to avoid any disputes with labor unions and shall be responsible for any delays, damages or extra costs incurred as a result of such disputes, except to the extent the same constitute an Excusable Delay (as such term is defined in Section 8.3.1 of these A201 General Conditions).

**§ 3.5 WARRANTY**
**§3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                   (1765947217)

**17**

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

§3.5.2 The Contractor further agrees that each Subcontract shall contain a guarantee of the work performed thereunder in the same form as the above-stated guarantee of Contractor. Included in said guarantee shall be the statement that it shall be enforceable directly by the Owner, if the Owner so elects. The guarantee of any Subcontractor shall not relieve the Contractor of its guarantee as set forth above and the Owner may look to the Contractor, directly, and in the first instance to correct any defects in the Work.

§3.5.3 The warranties provided in this Section 3.5 shall be in addition to and not in limitation of any other warranties, guarantees or remedies allowed by the Contract Documents or otherwise prescribed by law.

§3.5.4 The Contractor shall procure and deliver to the Owner, no later than the date claimed by the Contractor as the date of Substantial Completion, all warranties required by the Contract Documents.

§3.5.5 All warranties under this Section 3.5 shall commence as of the date of Substantial Completion of the Work. In no event shall the commencement of the use of building systems in connection with system testing and trial operations prior to the actual commencement by Owner of beneficial use of the entire Project be deemed to commence the term of any warranty, it being understood and agreed that any such warranty shall not commence until the Owner has actually commenced beneficial use of the entire Project and that Contractor shall obtain, at no additional cost to Owner, any extended warranties required in connection therewith.

§3.5.6 The Contractor agrees to assign to the Owner, at the time of Substantial Completion of the Work, all manufacturer's warranties required by the Contract Documents relating to materials and labor used in the Work and further agrees to perform the Work in such manner so as to preserve all such manufacturer's warranties.

§3.5.7 In addition to any warranties contained in the description of the Work attached hereto, Contractor agrees to guarantee all work and to replace without cost to Owner any and all defects due to imperfect workmanship or defects in materials and equipment and to pay for any damages resulting therefrom which shall manifest themselves within one (1) year from the date of Substantial Completion of the Work.

### § 3.6 TAXES
The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect. All such taxes shall be included within the Contract Sum.

### § 3.7 PERMITS, FEES, NOTICES AND COMPLIANCE WITH LAWS
§ 3.7.1 The Contractor shall secure and pay for the building permit and certificates of occupancy. The Contractor (directly or through its subcontractors) shall secure and pay for any other permits and governmental fees necessary for the proper execution and completion of the Work.

§ 3.7.2 The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules, regulations and lawful orders and other requirements of public authorities relating to the performance of the Work.

§ 3.7.3 It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes and rules and regulations except as otherwise provided in Section 3.2. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be made to the Contract Documents if the Architect and Owner make the determination that such conflict exists and a change is required.

§ 3.7.4 If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party

**Init.**

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                          (1765947217)

**18**

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents or that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision.  Subject to Sections 1.5.1 and 2.2.3, if the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted.

§ 3.7.5 If, in the course of the Work, the Contractor encounters human remains or recognizes the existence of burial markers, archaeological sites or wetlands not indicated in the Contract Documents, the Contractor shall immediately suspend any operations that would affect them and shall notify the Owner and Architect. Until and unless otherwise instructed by the Owner, the Contractor shall continue to suspend such operations and shall continue with all other operations that do not affect those remains or features. Requests for adjustments in the Contract Sum and Contract Time arising from the existence of such remains or features may be made as provided in Article 15.

§3.7.6 If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes and rules and regulations without such notice to the Architect and Owner, or if the Contractor, as a knowledgeable and experienced contractor, should have known of such variance, the Contractor shall assume full responsibility for such Work and shall bear the costs attributable to correction.

### § 3.8 ALLOWANCES
§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

§ 3.8.2 Unless otherwise provided in the Contract Documents,
    .1    Allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;
    .2    Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances; and
    .3    Whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2.

§ 3.8.3 Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

§ 3.8.4 The Owner's advance written approval is required before Contractor can incur any cost to be applied to an allowance item.

### § 3.9 SUPERINTENDENT
§ 3.9.1 The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor.  Important communications shall be confirmed in writing.  Other communications shall be similarly confirmed on written request in each case.

§ 3.9.2 Contractor shall arrange for and attend job meetings with the Owner and the Architect and such other persons as the Architect or the Owner may from time to time wish to have present.  The Contractor shall be represented by a principal, project manager, general superintendent or other authorized main office representative, as well as by the Contractor's own superintendent.  An authorized representative of any Subcontractor or Sub-subcontractor shall attend such meetings if the representative's presence is required by the Owner or the

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                          (1765947217)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

Architect. Such representative of the Contractor and the Subcontractors shall be empowered to make binding commitments on all matters to be discussed at such meetings, including costs, payments, change orders, time schedules and manpower. Any written notices required under the Contract may be served on such representatives.

§ 3.9.3 The key members of Contractor's staff shall be persons agreed upon with the Owner as identified in the Guaranteed Maximum Price Amendment. Such key members of Contractor's staff shall not be changed without the written consent of Owner, unless such person becomes unable to perform his or her duties due to death, disability or termination of employment, or unless Owner requests removal. If a key member is no longer capable of performing in the capacity required, or is removed by the Owner, the Owner and the Contractor shall agree on a mutually acceptable substitute.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES
§ 3.10.1 The Contractor shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work, a final, approved version of which will be attached to the Guaranteed Maximum Price Amendment (the "Construction Schedule"). Such schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project (but in no event less frequently than monthly), shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work. The Construction Schedule and all updates thereto shall be in a detailed, precedence-style critical path method (CPM) format satisfactory to the Owner and the Architect and shall: (1) provide a graphic representation of material activities and events that will occur during performance of the Work; (2) identify each phase of construction and occupancy; and (3) set forth dates that are critical in ensuring the timely and orderly completion of the Work in accordance with the requirements of the Contract Documents, including but not limited to each and all of the Substantial Completion Dates. The acceptance of the Construction Schedule will not impose on Owner or the Architect any responsibility for the schedule, for timely submittals of complete and Project conforming Shop Drawings, for Work sequencing, scheduling milestones or progress of the Work nor interfere with or relieve Contractor from Contractor's full responsibility to complete all Work in accordance with the Contract Documents.

§ 3.10.2 The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Construction Schedule and allows the Architect reasonable time to review submittals. Such submittal schedule shall be delivered to the Architect for review and approval within thirty (30) days of receipt of the completed Design Development Documents.

§ 3.10.3 The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect. The Architect shall review and take appropriate action on submittals in accordance with such schedules or, where not depicted on the schedules, within a reasonable time after receipt thereof.

§3.10.4 The Contractor shall monitor the progress of the Work for conformance with the requirements of the Construction Schedule and shall promptly advise the Owner of any delays or potential delays. The Construction Schedule shall be updated each month to reflect actual conditions (such updates are sometimes referred to in these General Conditions as "progress reports"). In the event any progress report indicates delays in achievement of any elements of the Work on the critical path of construction and such delays are not attributable to the acts or failures to act of the Owner or the Architect, or to other causes beyond the Contractor's control for which extensions of time are available under Section 8.3, the Contractor shall propose in written form an affirmative plan (the "Corrective Plan") to correct the delay, including overtime and/or additional labor, if necessary. The Corrective Plan shall indicate the date by which the progress of the Work will comply with the Construction Schedule and shall be subject to the approval of the Owner and the Architect. In no event shall any progress report or Corrective Plan constitute an adjustment in the Contract Time unless any such adjustment is agreed to by the Owner and authorized pursuant to a Change Order.

§3.10.5 In the event (1) that the performance of any element of the Work on the critical path of construction has not progressed or reached the level of completion required by the Construction Schedule and (2) the progress of the Work is not brought back into compliance with the Construction Schedule on the date proposed by the Corrective Plan, or the Contractor otherwise fails to comply with the Corrective Plan, the Owner shall have the right to order the Contractor to take corrective measures to expedite the progress of the Work, including, without limitation, (a) working additional shifts or overtime, (b) supplying additional manpower, equipment and facilities and (c) other similar measures (hereinafter referred to collectively as "Extraordinary Measures"). Such Extraordinary Measures

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                    (1765947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

shall continue until the progress of the Work complies with the stage of completion required by the Contract Documents.   The Owner's right to required Extraordinary Measures is solely for the purpose of ensuring the Contractor's compliance with the Construction Schedule:

    .1       The Contractor shall not be entitled to an adjustment in the Contract Sum in connection with Extraordinary Measures required by the Owner under or pursuant to Section 3.10.5;

    .2       The Owner may exercise the rights furnished the Owner under or pursuant to this Section 3.10.5 as frequently as reasonably necessary to ensure that the Contractor's performance of the Work complies with the elements of the Work on the critical path of construction set forth in the Construction Schedule.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

§3.11.1 The Contractor shall maintain at the site a record set of plans which shall record all deviations from the Drawings and Specifications and shall be updated in detail to reflect the actual progress of the Work.   The Owner and the Architect shall have free and complete access to such drawings during the construction of the Work.   Upon Substantial Completion, the Contractor shall furnish to the Owner through the Architect one set of "as built" plans in such form as the Owner shall require.   Such plans shall completely record all Work in place.

§3.11.2 If and to the extent applicable given the Work to be performed hereunder, the Contractor shall prepare and deliver to the Architect four copies of an operating and maintenance manual for the Project, which shall contain, if and to the extent applicable given the Work to be performed hereunder:  (1) full information for each item of mechanical, electrical or other operating equipment, copies of warranties therefor, schematic diagrams of control systems, circuit directories for each electric and communications panel board and charts showing the tagging of all valves; and (2) complete keying schedules, paint color schedules and paint color samples.  Each volume of the manual shall be clearly indexed and shall include a directory of all Subcontractors and maintenance contractors, indicating the area of responsibility of each and the name and telephone number of the responsible member of each organization.   The volumes shall be bound in book form.   Typewritten, drawn or photographic material shall be protected by clear plastic sleeves.

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES
§ 3.12.1 Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

§ 3.12.2 Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

§ 3.12.3 Samples are physical examples that illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

§ 3.12.4 Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents.   Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

§ 3.12.5 The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors.   Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.   The Contractor shall be responsible for all costs, damages, delays or impacts arising from the Contractor's failure to comply with its obligations under this Section.   The Contractor shall meet with the Architect in a timely fashion to discuss the schedule of submittals required under Section 3.10.2 and shall thereafter timely prepare and submit for approval by the Architect a schedule of submittals for the Work.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                                              (1765947217)

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect. The Contractor shall be responsible for all costs, damages, delays or impacts arising from the Contractor's failure to comply with its obligations under this Section. Contractor's schedule of Shop Drawings and Sample submittals will be acceptable to Architect if it provides a workable arrangement and time schedule for reviewing and processing the required submittals and re-submittals (second submittals and additional submittals when necessary).

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice, the Architect's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner or the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all applicable Shop Drawing Submittals, including drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. All such design professionals shall be required to carry professional liability insurance for the Project, from insurance companies approved by the Owner and with such limits as the Owner may require. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner or Architect has specified to the Contractor appropriate performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

**§ 3.13 USE OF SITE**
The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment. The right of possession of the site and the improvements made thereon by the Contractor shall remain at all times with the Owner and the Contractor shall in no event have exclusive use of the Project site. On-site parking, staging and storage areas may not be available for use by the Contractor and can in no event be guaranteed. The Contractor's right to entry and use thereof arises solely from the permission granted by the Owner under the Contract Documents. The Owner shall have the right to refuse admittance to the site to any employee of the Contractor or Subcontractors whose presence the Owner deems hostile to the Owner's interest. Protection of construction materials and equipment

Init.

/

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                              (1765947217)

22

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

stored at the Project site from weather, theft, damage and all other adversity is solely the responsibility of the Contractor, subject to Owner's obligation to provide property insurance pursuant to Article 11 as to materials stored at the site for incorporation into the Project that are not yet fully incorporated into the Project.

### § 3.14 CUTTING AND PATCHING

§ **3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ **3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

§3.14.3 Unless authorized in writing by the Owner, the Architect and the structural engineer, structural elements of the Work shall not be cut, patched or otherwise altered or repaired. Existing work that is cut, damaged, disturbed or otherwise interfered with by the Contractor, a Subcontractor or anyone for whom they are responsible shall be fully, properly and carefully repaired by the responsible Contractor or Subcontractor. All such repairs shall be completed in a first-class manner to the satisfaction of the Architect and shall match similar existing adjoining work.

### § 3.15 CLEANING UP

§ **3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials from and about the Project.

§ **3.15.2** If the Contractor fails to clean up as provided in the Contract Documents beyond two (2) days after the Owner gives written notice to the Contractor thereof, the Owner may do so and the cost thereof shall be charged to the Contractor.

### § 3.16 ACCESS TO WORK

The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

### § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS

The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

### § 3.18 INDEMNIFICATION

§ **3.18.1** To the fullest extent permitted by law the Contractor shall defend, indemnify and hold harmless the Owner, Architect, Architect's consultants, Jones Lang LaSalle Americas (Illinois), L. P., BCSP VII Property Management LLC, BCSP VII Investments, L. P., BCSP REIT VII, L. P., BCSP REIT VII GP, LLC, BCP Strategic Partners VII, L. P., Beacon Capital Strategic Partners VII, L. P., and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions or violations of applicable law or breach of this Contract on the part of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                    (1765947217)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.1. The obligations of the Contractor under the foregoing indemnity shall include, to the fullest extent permitted by law, any and all claims (including attorneys' fees resulting therefrom) directly or indirectly arising or alleged to arise (1) out of the performance of or the failure to perform the Work, or the condition of the Work, the job site, adjoining land or driveways, or streets or alleys used in connection with the performance of the Work and from any and all claims by workmen, suppliers or Subcontractors who are involved in the performance of the Work and (2) under any scaffolding, structural work or safe place law or any law with respect to the protection of adjacent landowners but shall not include any claims arising solely from the negligence of the party asking to be defended, indemnified or held harmless.

The foregoing shall not deprive the Owner or any other party indemnified under this Section 3.18.1 of any other action, right or remedy otherwise available to them, or any of them, at common law or otherwise.

The term "Work" for purposes of this Section means the obligations undertaken by the Contractor pursuant to the Contract Documents. Work includes, unless specifically excepted, the furnishing, installation and construction, as applicable, of all material, labor, equipment, supplies, plant, tools, scaffolding, transportation, superintendence, insurance, taxes and all other services, facilities and expenses necessary for the full performance and completion of the requirements of the Contract Documents. Work also includes that which is produced, constructed or built pursuant to the Contract Documents.

§ 3.18.2 With respect to Claims against any Indemnitee by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

§3.18.3 To the fullest extent permitted by law, the Contractor shall further indemnify, defend and hold harmless the Indemnitees from and against any and all claims and liens from the Contractor's Subcontractors and suppliers and from lower level Subcontractors and employees or agents of any of them arising out of alleged or actual non-payment, insufficient payment or late payment as required under the applicable Subcontract or purchase order of amounts owed for labor, materials, supplies, equipment or services provided in connection with the Project, unless such claims or liens result from the failure of the Owner to make payments to the Contractor as provided for in the Contract Documents.

§3.18.4 To the fullest extent permitted by law, the Contractor shall further indemnify, defend and hold harmless the Indemnitees and Architect, Architect's consultants and agents and employees of any of them from and against any and all claims and shall bear any and all costs, damages and expenses of any of them suffered, incurred or arising from the failure of the Contractor, the Contractor's Subcontractors, lower level Subcontractors and employees or agents of any of them to conduct the Work in accordance with applicable laws, statutes, ordinances, rules and regulations and lawful orders and other requirements of any governmental authority.

§3.18.5 The Contractor shall bear any and all reasonable expense incurred by any party indemnified under this Section 3.18 because of any claim or other matter indemnified against hereunder, including without limitation, attorneys' and consultants' fees and expenses, court costs, and costs related to the defense of, or preparing for the defense against, any such claim. If any such claim has not been settled or discharged or bonded at the time of final completion of the Work, and if such claim is not covered in full by a policy of insurance then in effect from a reputable and financially sound insurance company which has not declined or reserved the right to decline coverage of such claim, the Owner may withhold an amount equal to one hundred fifty percent (150%) of the outstanding claim until the earlier to occur of (i) the date on which any such Claim is paid or settled or the Contractor provides a bond acceptable to the Owner, to satisfy such Claim and (ii) the date which is one hundred eighty (180) days after the date on which the Owner first holds back such amount (except that the Owner shall have the right to continue to withhold such amount if such insurance company shall have declined coverage of such Claim prior to such date).

§3.18.6 Any party indemnified under this Section 3.18, at its election and at its expense, may defend against or settle any Claim that is not defended by/any of the Contractor's insurance providers, or at the request of any such indemnified party, the Contractor shall assume the defense of any such Claim on behalf of such party, provided,

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                (1765947217)

24

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

however, that any attorney employed in such defense must be reasonably satisfactory to such indemnified party and such attorney shall obtain the consent of such party prior to effecting any settlement of a Claim, such consent not to be unreasonably withheld.

**§3.18.7** The Contractor shall pay any judgment finally awarded in any claim relating to any Claim which is brought against any party indemnified hereunder which is covered by the Contractor's indemnity herein and shall pay any amounts payable in settlement or compromise of any such claim approved by the Contractor, such approval not to be unreasonably withheld.

**§3.18.8** In the event that the Contractor is requested but refuses to honor its indemnity obligations hereunder then the Contractor shall, in addition to its other obligations, pay the cost of bringing any action to enforce the Contractor's indemnity obligations, including, without limitation, reasonable attorneys' and consultants' fees, expenses and court costs, to the party requesting such indemnity.

## ARTICLE 4    ARCHITECT
### § 4.1 GENERAL
**§ 4.1.1** The Owner shall retain an architect lawfully licensed to practice architecture or an entity lawfully practicing architecture in the jurisdiction where the Project is located. That person or entity is identified as the Architect in the Agreement and is referred to throughout the Contract Documents as if singular in number.

**§ 4.1.2** Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**§ 4.1.3** If the employment of the Architect is terminated, the Owner shall employ a successor architect as to whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the Architect.

### § 4.2 ADMINISTRATION OF THE CONTRACT
**§ 4.2.1** The Architect will provide administration of the Contract as described in the Contract Documents.

**§ 4.2.2** The Architect will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not have control over, charge of, or responsibility for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

**§ 4.2.3** The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work. Nothing in this Section 4.2.3 shall relieve the Architect of his responsibilities under Section 4.2.2 or otherwise hereunder or under the Architect's agreement with the Owner.

### § 4.2.4 COMMUNICATIONS FACILITATING CONTRACT ADMINISTRATION
The Owner and Contractor shall endeavor (but shall in no event be required) to communicate with each other through the Architect about matters arising out of or relating to the Contract, and copies of any written communications to the Architect shall be sent to the Owner. Communications by and with the Architect's consultants shall be through the Architect, with copies of any written communications being sent to the Owner. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

**§ 4.2.5** Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                    (1769847217)

**25**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 4.2.6** The Architect has authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

**§ 4.2.7** The Architect will review and approve, or take other appropriate action upon, the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, and in coordination with the Contractor's approved (i.e. approved by the Contractor and the Architect) schedule for submittals, while allowing sufficient time in the Architect's professional judgment to permit adequate review, but in no event shall the Architect's action take more than ten (10) days from the date the Architect receives such submittals.. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**§ 4.2.8** The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.

**§ 4.2.9** The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion; issue Certificates of Substantial Completion pursuant to Section 9.8; receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor pursuant to Section 9.10; and issue a final Certificate for Payment pursuant to Section 9.10.

**§ 4.2.10** If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

**§ 4.2.11** The Architect shall, in the first instance interpret matters concerning performance of the Owner and the Contractor under the requirements of the Contract Documents'as such requirements relate to the Drawings and Specifications, and as to whether the Contractor's performance conforms to the Drawings and Specifications. Further, if the Owner shall so elect, Claims relating to the acceptability of the Work, the quantities and classifications of unit price work, the interpretation of the requirements of the Contract Documents pertaining to the performance of the Work, and Claims seeking changes in the Contract Sum or Contract Time will be referred initially to Architect in  writing. When functioning as interpreter and judge, Architect will not show partiality to Owner or Contractor and will not be liable in connection with any interpretation or decision rendered in good faith in such capacity.  The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon.

**§ 4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of, and reasonably inferable from, the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions rendered in good faith.

**§ 4.2.13** Architect may, as the Architect judges desirable, issue additional drawings or  instructions indicating in greater detail the construction or design of the various parts of the Work; such drawings or  instructions may be effected by field order or other notice to the Contractor, and provided such drawings or instructions are reasonably

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                (1765947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

consistent with the previously existing Contract Documents, the Work shall be executed in accordance with such additional drawings or instructions without adjustments to the Contract Time or the Contract Sum. If the Contractor claims additional cost or time on account of such additional drawings or instructions, the Contractor shall give the notice required by Section 15.1.2.

§ 4.2.14 The Architect will review and respond to requests for information about the Contract Documents. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If appropriate, the Architect will prepare and issue supplemental Drawings and Specifications in response to the requests for information.

## ARTICLE 5   SUBCONTRACTORS
### § 5.1 DEFINITIONS
§ 5.1.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

§ 5.1.2 A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect or the Owner will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not substitute a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitution.

§ 5.2.5 The form of each subcontract shall be the Contractor's standard form subcontract.   Each subcontract shall expressly provide for the contingent assignment referred to in Section 5.4.1.   The Owner shall be provided with copies of all executed subcontracts.

### § 5.3 SUBCONTRACTUAL RELATIONS
By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                (1765947217)

**27**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement that may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

**§ 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS**
**§ 5.4.1** Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner, provided that

    .1    assignment is effective only after termination of the Contract by the Owner and only for those subcontract agreements that the Owner accepts by notifying the Subcontractor and Contractor in writing; and

    .2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

When the Owner accepts the assignment of a subcontract agreement, the Owner assumes the Contractor's rights and obligations under the subcontract.

**§ 5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

**§ 5.4.3** Upon such assignment to the Owner under this Section 5.4, the Owner may further assign the subcontract to a successor contractor or other entity. If the Owner assigns the subcontract to a successor contractor or other entity, the Owner shall nevertheless remain legally responsible for all of the successor contractor's obligations under the subcontract.

**§ 5.5 TERMS AND CONDITIONS APPLY TO SUBCONTRACTORS OF ALL TIERS**
Any specific requirement in the Contract Documents that the responsibilities or obligations of the Contractor also apply to a Subcontractor or supplier is added for emphasis and is also hereby deemed to include Subcontractors and suppliers of any tier. The omission of a reference to a Subcontractor or supplier in connection with any of the Contractor's responsibilities or obligations shall not be construed to diminish, abrogate, or limit any responsibilities or obligations of a Subcontractor or supplier of any tier under the Contract Documents or the applicable Subcontractor or supplier.

**ARTICLE 6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS**
**§ 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS**
**§ 6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Article 15. The Owner and Contractor agree that only union trades and labor shall be employed in construction activities at the Project Site.

**§ 6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**§ 6.1.3** The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

Init.

_I_

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                         (1765947217)

28

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

**§ 6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights that apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

**§ 6.2 MUTUAL RESPONSIBILITY**
**§ 6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**§ 6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**§ 6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall have the right to off-set such costs against any amounts owed by the Contractor to the Owner to the extent related to the Project and such off-sets are consistent with unit pricing (if applicable). The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor, provided that the Contractor timely notifies the Owner of its Claim based upon the fault of such separate contractor.

**§ 6.2.4** The Contractor shall promptly remedy damage the Contractor wrongfully causes to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

**§ 6.3 OWNER'S RIGHT TO CLEAN UP**
If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

**ARTICLE 7  CHANGES IN THE WORK**
**§ 7.1 GENERAL**
**§ 7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**§ 7.1.2** A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect or the Owner, but in all instances shall be reviewed by the Architect for conformity with the design intent before the Work is executed.

**§ 7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

**§ 7.1.4** Upon request of the Owner or the Architect (with the Owner's approval), the Contractor shall submit to the Architect a Change Order Request Form (see Exhibit J) along with an accurate written estimate of the cost of any proposed extra Work or change in the Work. Such estimates shall be provided without cost to the Owner provided that the number of estimates requested is reasonable in the context of the Project as a whole. The Contractor's estimate shall indicate the description, quantity and unit cost of each item of material, and the number of hours of work and hourly rate for each class of labor, as well as all other costs chargeable

Init.

**AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:**                                                                    **(1765947217)**

29

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

under the terms of this Article. Unit labor costs for the installation of each item of materials shall be shown if required by the Architect. The Contractor shall promptly revise and resubmit such estimate if the Architect determines that it is not in compliance with the requirements of this Section, or that it contains errors of fact or mathematical errors. If required by the Architect, in order to establish the exact cost of new Work added or of previously required Work omitted, the Contractor shall obtain and furnish to the Architect bona fide proposals from recognized suppliers for furnishing any material included in such Work. Provided the requests for such estimates are made reasonably in advance of the time they are needed, such estimates shall be furnished promptly so as to occasion no delay in the Work. The Contractor shall also state in the estimate any change in the Contract Time that would result from the change or extra work.

## § 7.2 CHANGE ORDERS
§ 7.2.1 A Change Order is a written instrument in the form attached hereto as Exhibit L prepared by the Architect and signed by the Owner, Contractor and Architect stating their agreement upon all of the following:
.1     The change in the Work;
.2     The amount of the adjustment, if any, in the Contract Sum; and
.3     The extent of the adjustment, if any, in the Contract Time.

§7.2.2 Unless expressly reserved therein, an executed Change Order shall constitute a final settlement of all matters relating to the change in the Work which is the subject of the Change Order, including, but not limited to, all direct and indirect costs associated with such change, any adjustments to the Contract Sum and any and all adjustments to the Construction Schedule and/or Contract Time.

§7.2.3 An agreed upon extension of the Contract Time shall constitute a Change in the Work for which the Owner and Contractor shall execute a Change Order which may include payment to the Contractor of extended General Conditions Costs properly attributable and allocable to such extension.

## § 7.3 CONSTRUCTION CHANGE DIRECTIVES
§ 7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

§ 7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

§ 7.3.3 If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:
.1     Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
.2     Unit prices stated in the Contract Documents or subsequently agreed upon;
.3     Cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
.4     As provided in Section 7.3.7.

§ 7.3.4 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

§ 7.3.5 Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                   (1765947217)

30

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

**§ 7.3.6** A Construction Change Directive signed by the Contractor indicates the Contractor's agreement therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 7.3.7** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, allowance(s) for overhead and profit as provided in Section 7.3.3.3. In such case, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.7 shall be limited to the following:

.1 Costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2 Costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3 Rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

.4 Costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.5 Additional costs of supervision and field office personnel directly attributable to the change.

Notwithstanding anything to the contrary herein contained, in performing any Change Order work, the Contractor shall not be paid for any cost which is excluded from the definition of Cost of the Work as set forth in the Owner-Contractor Agreement.

**§ 7.3.8** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change that results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.9** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will, with the approval of the Owner, make an interim determination for purposes of monthly certification for payment for those costs. Such determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a Claim in accordance with Article 15.

**§ 7.3.10** When the Owner and Contractor agree with a determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**§ 7.4 MINOR CHANGES IN THE WORK**
The Owner has authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

**ARTICLE 8   TIME**
**§ 8.1 DEFINITIONS**
**§ 8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**§ 8.1.2** The date of commencement of the Work is the date established in the Agreement.

**§ 8.1.3** The date of Substantial Completion is the date certified by the Architect in accordance with Section 9.8.

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                    (1765947217)

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

§ **8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

§ **8.2 PROGRESS AND COMPLETION**
§ **8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ **8.2.2** The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages and other security interests.

§ **8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

§ **8.3 DELAYS AND EXTENSIONS OF TIME**
§ **8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work by any of the following: an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by industry-wide, city-wide or other labor disputes affecting the construction industry generally or labor employed by another contractor of the Owner or any of the Owner's tenants (as opposed to affecting only the Contractor, any Subcontractor or the Project), fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation (each singly, an "Excusable Delay," and collectively, "Excusable Delays"), then the Milestone Dates and/or the Contract Time shall be extended by Construction Change Directive for such reasonable time as the Owner may determine, subject, however, to the following:

 .1 The Contractor acknowledges that no adjustments to any Milestone Date or the Contract Time shall be made unless the events described above have the effect of delaying completion of components of Work on any critical path indicated in the Construction Schedule. The Contractor shall be entitled to reallocate any time saved in the completion of any of the particular activities in the Construction Schedule to the time permitted for the completion of any other activities; provided, however that in no event shall any such reallocation result in any adjustments to any milestone date or the Contract Time and/or result in any extension of the time originally allocated in the Construction Schedule for the completion of components of Work on any critical path indicated in the Construction Schedule.

 .2 The Contractor further acknowledges and agrees that adjustments to any Milestone Dates and the Contract Time shall be permitted in connection with any of the events described above only to the extent that the delays resulting therefrom (1) are not caused by, or could not have been avoided by the exercise of reasonable efforts of the Contractor, (2) could not be limited or avoided by the Contractor's timely notice to the Owner of the delay and (3) have an impact of at least one (1) day.

§ **8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Article 15.

§ **8.3.3** This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

§ **8.3.4** No claim for extension of time shall be allowed on account of failure of the Architect to furnish Drawings, Specifications or instructions or to return Shop Drawings or Samples until two (2) days after receipt by the Architect of written demand for such Drawings, Specifications, instructions, Shop Drawings, or Samples, and then only if the requirements in Sections 8.3.1.1 and 8.3.1.2 are satisfied.

§ **8.3.5** The Contractor hereby agrees that the Contractor shall have no claim for damages of any kind against the Owner or the Architect on account of any delay in the commencement of the Work and/or any hindrance, delay or suspension of any portion of the Work, unless delays for which the Contract Time is extended in accordance with the provisions of Section 8.3.1, result in an aggregate extension of the Contract Time of more than one (1) calendar day. In such event, the Owner shall pay to the Contractor an amount equal to the Contractor's reasonable and

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes: (1765947217)

**32**

verified expenses for labor, materials and equipment and other General Conditions Costs directly attributable to extensions of the Contract Time. The right of the Contractor to receive reimbursement for such expenses shall be, at law and in equity, the Contractor's sole and exclusive damage remedy for delays.

## ARTICLE 9   PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
**§ 9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Owner and the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents. The Contractor shall not make requests for payment of monies if the Contractor does not intend to pay same to Subcontractor(s) or supplier(s).

**§ 9.3.1.1** As provided in Section 7.3.9, such applications may include requests for payment on account of changes in the Work that have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**§ 9.3.1.2** Applications for Payment shall not include requests for payment for portions of the Work for which the Contractor does not intend to pay a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

**§ 9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, which shall include coverage naming the Owner and the Lender (and such others as may be identified by the Owner from time to time) as additional named insureds and which shall specify and relate to the address where the stored materials and equipment are located (including, if applicable, the Project Site), storage and transportation to the site for such materials and equipment stored off the site.

**§ 9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

### § 9.4 CERTIFICATES FOR PAYMENT
**§ 9.4.1** The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                     (1785947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 9.4.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

### § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**§ 9.5.1** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Section 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of

.1 defective Work not remedied;

.2 third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3 failure of the Contractor to make payments properly to any Subcontractor or for labor, materials or equipment;

.4 reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5 damage to the Owner or a separate contractor;

.6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

.7 failure to carry out the Work in accordance with the Contract Documents;

.8 amounts previously paid to the Contractor in excess of amounts properly due the Contractor;

.9 failure of the Contractor to comply with any of the Contractor's indemnification obligations under the Contract Documents; or

.10 failure of the Contractor to discharge or bond over any lien established by a Subcontractor, supplier or other party for whom the Contractor is responsible.

In any such event, the Owner or the Architect shall specify in writing the reasons for withholding and the amount specifically withheld based on each such reason.

**§ 9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

*(Paragraph deleted)*
### § 9.6 PROGRESS PAYMENTS

**§ 9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled pursuant to the terms and conditions of the Subcontract. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner. Notwithstanding anything to the contrary contained in the Contract Documents, the Owner

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                          (1765947217)

**34**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

may elect to make any payment requested by the Contractor on behalf of a Subcontractor or supplier of any tier jointly payable to the   Contractor and such Subcontractor or supplier in the event that the Owner reasonably believes that such joint payment is required in order to protect the Owner's interest in the Project or the Project site, to prevent the filing of liens against the Project site by any Subcontractor or supplier, or to continue the performance of the Work in accordance with the   Construction Schedule. The Contractor and such Subcontractor or supplier shall be responsible for the allocation and   disbursement of funds included as part of any such joint payment. In no event shall any joint payment be construed to   create any (1) contract between the Owner and a Subcontractor or supplier of any tier, (2) obligations from the Owner to such Subcontractor or supplier, or (3) rights in such Subcontractor or supplier against the Owner.

§ 9.6.3 The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

§ 9.6.4 The Owner has the right to request written evidence from the Contractor that the Contractor has properly paid Subcontractors and material and equipment suppliers amounts paid by the Owner to the Contractor for subcontracted Work. If the Contractor fails to furnish such evidence within seven days, the Owner shall have the right to contact Subcontractors to ascertain whether they have been properly paid. Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor, except as may otherwise be required by law.

§ 9.6.5 Contractor payments to material and equipment suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

§ 9.6.6 A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with applicable laws, statutes, ordinances, codes, rules and regulations and lawful orders or other requirements of public authorities or the Contract Documents.

§ 9.6.7 Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

§ 9.7 FAILURE OF PAYMENT
If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

§ 9.8 SUBSTANTIAL COMPLETION
§ 9.8.1 Substantial Completion of the Work (or applicable portion thereof) shall be achieved when (a) the Work has been completed in accordance with all Contract Documents, subject only to such immaterial items of correction or completion work as shall not interfere with the Owner intended use of the premises; and (b) the Architect Certification to the Owner pursuant to AIA Document No. 6-704, that Substantial Completion has been achieved other than the items on the Punch List (the "Substantial Completion Certification").   Construction Manager shall complete all Punch List items within sixty (60) days of Substantial Completion.   The Owner shall afford Construction Manager reasonable access during normal working hours in order to complete the Punch List work provided Construction Manager does not unreasonably interfere with or delay Owner's occupancy and use of the premises.   Should Contractor fail to complete the Punch List within sixty (60) days, without further notice, Owner may complete the Work itself and backcharge Contractor all costs incurred.

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                      (1765947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees in its sole discretion to accept separately, is substantially complete, the Contractor shall prepare and submit to the Owner and the Architect a comprehensive punch list of items to be completed or corrected prior to final payment. Failure to include an item on such punch list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**§ 9.8.3** Upon receipt of the Contractor's punch list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's punch list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

**§ 9.8.4** When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion that shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the punch list accompanying the Certificate and shall otherwise be in recordable and statutory form. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**§ 9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

**§ 9.9 PARTIAL OCCUPANCY OR USE**
**§ 9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.3.1.5 and authorized by public authorities having jurisdiction over the Project. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a punch list to the Architect as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

**§ 9.9.2** Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**§ 9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

**§ 9.10 FINAL COMPLETION AND FINAL PAYMENT**
**§ 9.10.1** Upon receipt of the Contractor's or the Owner's written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/26/2016 under Order No.4107746048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                              (1765947217)

36

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Owner and the Architect(1) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (2) consent of surety, if any, to final payment and (3) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If any such lien or other claim remains unsatisfied after payments are made, the Contractor shall forthwith pay over to the Owner on demand all funds that the Owner may be compelled to pay in discharging such lien, including all costs and expenses (including reasonable attorneys' fees) incurred in connection therewith.   Without limiting any other conditions to final payment, as set forth in the Contract Documents, to the extent consistent with the Contractor's scope of work under the Contract Documents, the Contractor shall be required to submit the following to the Owner and the Architect, as conditions to the issuance of a final Certificate for Payment and final   payment:

.1  final documents of similar nature to those required by the Contract Documents for any monthly payments hereunder;

.2  all final permits, approvals (including, without limitation, the approval of the Owner's insurance   company, if required) certificates (including, without limitation, certificates in respect of electrical   systems and life safety systems) and authorizations for use and occupancy
of the Project required by any authority having jurisdiction, other than any building permits, temporary and unconditioned permanent   and full certificate of occupancy, the securing of which permit and certificate(s) is the responsibility of the Owner;

.3  formally prepared "as built" drawings, records and related data including all field notes of all the Work (such drawings shall be in the form of "Mylar" reproducible drawings, or as otherwise called for in the Contract Documents);

.4  all operating and maintenance manuals, parts lists, the final version of the Project Directory, and repair   source lists;

.5  all guarantees and warranties to which the Owner is entitled hereunder;

.6  satisfactory proof that all claims, including taxes, arising out of the Work (including any claims of Subcontractors or suppliers) have been released or bonded;

.7  a certificate of insurance for product liability and completed operations, for the three year period following final completion;

.8  a final statement of accounting for all allowances in form satisfactory to the Owner and the Lender;

.9  if required by the Owner or the Lender, other data establishing payment or satisfaction of all such obligations, and releases and final unconditional waivers of liens arising out of the Contract, to the extent   and in form reasonably satisfactory to the Owner;

.10  delivery of all spare parts required to be submitted pursuant to the Contract Documents; and

.11  final releases from the Contractor and all Subcontractors in the form attached hereto as Exhibit I, which include (1) a certification that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, or will be paid from proceeds of final payment, (2) a certification that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, and (3) a release of the Owner from the Contractor and each Subcontractor of and from any and all Claims whatsoever then existing or thereafter at any time arising under the Contract Documents, whether known or unknown, except for: (i) Claims of third parties which are not known by the Contractor at the time of execution of such release, (ii) Claims based upon the Claims of third parties which are known to the Contractor at the time of execution of such release and identified by the Contractor to the Owner in writing and (iii) unsettled Claims previously asserted by the Contractor against the Owner in accordance with all requirements of the Contract Documents.

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                    (1765947217)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

If the final documentation submitted by the Contractor is not deemed complete by the Owner or if the Owner deems the Work incomplete in any respect, the Contractor shall promptly complete any such Work and shall promptly resubmit the final documentation.

§ 9.10.3 If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

§ 9.10.4
*(Paragraphs deleted)*
Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

*(Paragraph deleted)*
ARTICLE 10    PROTECTION OF PERSONS AND PROPERTY
§ 10.1 SAFETY PRECAUTIONS AND PROGRAMS
The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs required by law, the Contract Documents or as reasonably requested by the Owner in connection with the performance of the Contract.

§ 10.2 SAFETY OF PERSONS AND PROPERTY
§ 10.2.1 The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to
   .1    employees on the Work and other persons who may be affected thereby;
   .2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
   .3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

The Owner assumes no responsibility or liability for the physical condition or safety of the Project site. The Contractor shall be solely responsible for providing a safe place for the performance of the Work. The Owner shall not be required to make any adjustment in either the Contract Sum or Contract Time in connection with any failure by the Contractor to have complied with the requirements of this Article 10 or in connection with clarifications, supplemental information, or other materials issued by the Architect after the date of this Agreement except for any change in the Work as described in Article 7. Without limiting the generality of the foregoing, the Owner shall have no obligation to furnish watchmen/security services during non-working hours, other than for its own convenience, and nor shall Owner have any liability to Contractor for loss or damage to, or for the safekeeping of, materials, equipment, tools, supplies, scaffolding, machinery, or any other property of Contractor wherever located. The risk of loss or damage to such materials, equipment, tools, supplies, scaffolding, machinery, or other property of Contractor, or the Owner's property under the control of, or in the possession of Contractor, whether caused by fire, other casualty, theft, vandalism, mysterious disappearance or any other reason, shall be solely that of Contractor. Contractor shall comply with all security rules, if any, of general applicability promulgated by Owner or the Owner's representative.

§ 10.2.2 The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders and other requirements of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                    (1765647217)

38

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's indemnification obligations under the Contract Documents.

**§ 10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**§ 10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

**§ 10.2.8 INJURY OR DAMAGE TO PERSON OR PROPERTY**
If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 10.3 HAZARDOUS MATERIALS**
**§ 10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing; provided, however, that Contractor shall be responsible for taking all necessary precautions with respect to any material or substance present on the site of which Contractor has knowledge as a result of information given to Contractor by Owner as of the date of execution of this Contract with respect to the site, including but not limited to any such material or substance which the Owner has retained Contractor to abate, remove or otherwise remediate pursuant to the Contract Documents (the "Known Materials") and shall not be entitled to stop Work on account thereof.   See Exhibit K.

**§ 10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

Init.

**/**

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                           (1765947217)

**39**

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 (other than any of the Known Materials) is present on the site and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) caused by the presence of such material or substance (other than any of the Known Materials) on the site, except to the extent that such damage, loss or expense arises out of or results from the negligence or willful misconduct of a party seeking indemnity.

**§ 10.3.4** The Contractor shall not use in connection with the performance of the Work, bring onto the Project site or otherwise use or release at, onto or within the Project site any regulated substance, toxic substance, hazardous substance, hazardous waste, pollution, pollutant or contaminant as defined or referred to in the applicable statutes or ordinances; the federal underground storage tank law of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act, as amended 42 U.S.C.§9601 et seq.; the Water Pollution and Control Act, 33 U.S.C. §1251 et seq.; together with any amendments thereto and regulations   promulgated thereunder or any other applicable federal, state, county or municipal environmental statute, ordinance, code rule or regulation and including, without limitation, any oils or petroleum products (except for amounts of oils or petroleum products necessary in the performance of the Work and then in compliance with applicable law), any lead paint, asbestos and polychlorinated biphenals.  The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**§ 10.3.5**  If, without negligence or willful misconduct on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by  the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred. Contractor shall be solely responsible for compliance with all state and federal laws and all governmental regulations pertaining to environmental matters enacted or adopted and in existence during the time of this Contract, excluding any such laws and regulations as may be applicable to or concern any pre-existing hazardous materials (other than any of the Known Materials) on the site. Contractor shall perform all Work consistent with safe and reasonable construction practices. Contractor shall employ equipment, machinery and techniques of a kind which will minimize any detrimental impact on the environment. Without limiting the generality of the foregoing, Contractor agrees: (1) when the use of hazardous materials is necessary, such uses shall be under the supervision of properly qualified   personnel, licensed if required by laws, and the storage and use of such hazardous materials shall be at locations that   will not create a hazard to the environment or personnel engaged at the job site; (2) unnecessary air pollution from   dust, demolition, machinery exhaust, and the use of sprayed-on materials shall not be allowed; (3) that he will not carry out open burning on the construction site; and (4) that he will remove and dispose of hazardous waste, including but not limited to friable asbestos, off site after giving notice to and observing all procedures mandated by the U.S. Environmental Protection Agency and other federal, state and local environmental authorities having jurisdiction over such matters including, without limitation, the securing of all necessary approvals and permits prescribed by such  agencies or authorities. The Contractor shall indemnify, defend and hold harmless the parties indemnified under Section 3.18, in the manner provided in such Section 3.18, from and against any and all loss, cost or damage incurred by any of such indemnified parties as the result of Contractor's failure to comply with the foregoing,

*(Paragraph deleted)*
**§ 10.4 EMERGENCIES**
In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Article 15 and Article 7.

**ARTICLE 11   INSURANCE AND BONDS**
**§ 11.1 CONTRACTOR'S LIABILITY INSURANCE**
**§ 11.1.1** The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745C48_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                    (1765947217)

40

*(Paragraphs deleted)*
insurance and bonds in accordance with the requirements contained in Exhibit B to the Agreement attached hereto. Certificates of Insurance and executed, original bonds acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. The premiums for any required bonds shall not be included in the GMP.

*(Paragraphs deleted)*
§ 11.2 INTENTIONALLY OMITTED.

§ 11.3 PROPERTY INSURANCE
§ 11.3.1 Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance on an "all-risk" policy form, including builder's risk, in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied and installed by others (but not including coverage for Contractor's tools and equipment as Contractor shall be responsible for the same and all associated property insurance), comprising total value for the entire Project at the site on a replacement cost basis with such deductibles as the Owner may elect. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.3 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project, as their interests may appear. The Construction Manager shall be named as an Additional Insured, as its interests may appear.

§ 11.3.1.1 This property insurance shall cover portions of the Work stored off the site (with the Owner's approval) and also portions of the Work in transit.

*(Paragraphs deleted)*
§ 11.3.2 THROUGH 11.3.6 INTENTIONALLY OMITTED

*(Paragraphs deleted)*
§ 11.3.7 WAIVERS OF SUBROGATION
The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, (2) the Architect, Architect's consultants, and (3) separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged. Contractor and any of its subcontractors, sub-subcontractors (at all tiers), agents and employees waive all rights of subrogation against Owner for any liability and workers' compensation claims they incur in relation to work under this Contract and agree to have all such policies appropriately endorsed with waiver of subrogation endorsements.

§ 11.3.8 A loss insured under the Owner's property insurance shall be adjusted by the Owner in good faith and made payable to the Owner for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

§ 11.3.9 The Owner shall have power to adjust and settle a loss with insurers.

*(Paragraph deleted)*

Init.

/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes: (1765947217)

41

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

### § 11.4 PERFORMANCE BOND AND PAYMENT BOND

**§ 11.4.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder and a statutory lien bond. The premiums for any required bonds shall not be included in the Guaranteed Maximum Price.

**§ 11.4.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall authorize a copy to be furnished.

### ARTICLE 12    UNCOVERING AND CORRECTION OF WORK
### § 12.1 UNCOVERING OF WORK

**§ 12.1.1** If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if requested in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

**§ 12.1.2** If a portion of the Work has been covered that the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, such costs and the cost of correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### § 12.2 CORRECTION OF WORK
### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION

The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

### § 12.2.2 AFTER SUBSTANTIAL COMPLETION

**§ 12.2.2.1** In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Section 2.4.

**§ 12.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual completion of that portion of the Work.

**§ 12.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

**§ 12.2.3** The Contractor shall remove from the site portions of the Work that are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**§ 12.2.4** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work that is not in accordance with the requirements of the Contract Documents.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes: (1765947217)

**42**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 12.2.5** Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor may have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

### § 12.3 ACCEPTANCE OF NONCONFORMING WORK
If the Owner prefers to accept Work that is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

### ARTICLE 13   MISCELLANEOUS PROVISIONS
### § 13.1 GOVERNING LAW
The Contract shall be governed by the law of the place where the Project is located.

### § 13.2 SUCCESSORS AND ASSIGNS
**§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 13.2.2** The Owner may, without consent of the Contractor, assign the Contract. The Contractor shall execute all consents reasonably required to facilitate such assignment.

### § 13.3 WRITTEN NOTICE
Any notice, request, demand, approval or consent given or required to be given under this Agreement shall, except as otherwise expressly herein provided, be in writing and sent by hand, by certified mail, return receipt requested, or by nationally recognized overnight delivery services which provide delivery receipts. Notices shall be sent to the Contractor at the Contractor's address set forth on the first page of the Owner-Contractor Agreement or to the Owner at the Owner's address set forth on the first page of the Owner-Contractor Agreement, or to such other address as   either party may specify by written notice sent to the other party by any such means. Notices shall be deemed to have been given when delivered, or upon receipt or refusal of delivery, whichever shall first occur.

### § 13.4 RIGHTS AND REMEDIES
**§ 13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.  Further, a waiver by the Owner or the Contractor of a breach or violation by the other of any provision herein or in any of the other Contract Documents must be in writing and shall not constitute a waiver of any further or additional breach of such provision or of any other provision hereunder.

### § 13.5 TESTS AND INSPECTIONS
**§ 13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders or other requirements of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                    (1765947217)

**43**

(2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating their cost to the Contractor.

**§ 13.5.2** If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

**§ 13.5.3** If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

**§ 13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

**§ 13.5.5** If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

**§ 13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

*(Paragraphs deleted)*
**ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT**
**§ 14.1 TERMINATION BY THE CONTRACTOR**
**§ 14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

    .1    Issuance of an order of a court or other public authority having jurisdiction that requires all Work to be stopped;

    .2    An act of government, such as a declaration of national emergency that requires all Work to be stopped;

    .3    Because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents.

**§ 14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

**§ 14.1.3** If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools and construction equipment and machinery, including reasonable overhead, profit and damages.

**§ 14.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has repeatedly failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

**Init.**

  /

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®️ Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®️ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                         (1765947217)

**44**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

### § 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ **14.2.1** The Owner may terminate the Contract if the Contractor

.1   refuses or fails to supply enough properly skilled workers or proper materials;

.2   fails to meet any of the Substantial Completion Dates set forth in the Construction Schedule and such failure continues beyond fifteen (15) days after receipt of written notice from the Owner thereof;

.3   files for protection under the Federal Bankruptcy Act or any other creditor protection laws; or there is an involuntary filing against the Contractor under the Federal Bankruptcy Act or any other creditor protection laws;

.4   fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.5   disregards any applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders or other requirements of   public authorities;

.6   fails to discharge or bond over a lien established by a Subcontractor, supplier or any other party for whom the Contractor is responsible within the time limits established in Section 9.10.4; or

.7   otherwise is guilty of substantial breach of a provision of the Contract Documents.

§ **14.2.2** When any of the above reasons exist, the Owner, upon certification by the Initial Decision Maker that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

.1   Exclude the Contractor from the site and take possession of the site and all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2   Accept assignment of any subcontracts pursuant to Section 5.4; and

.3   Finish the Work by whatever reasonable method the Owner may deem expedient. Upon written request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

§ **14.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

§ **14.2.4** If, after final completion of the Work, the Owner determines that the unpaid amount (if any) due to the Contractor for the portion of the Work performed by the Contractor exceeds any costs and damages incurred by the Owner as a result of the Contractor's breach of this Agreement, such excess shall be paid to the Contractor. If the costs and damages incurred by the Owner as the result of the Contractor's breach of this Agreement exceed the unpaid amount (if any) due to the Contractor for the portion of the Work performed by the Contractor, the Contractor shall pay such excess on demand.

§**14.2.5** In the event of a termination of the Contract pursuant to this Article 14, the Owner and the Contractor shall forthwith return to the other all papers, materials and other properties of the other held by each for the purposes of execution of the Contract.   In addition, each party will assist the other party in an orderly termination of this Contract.

### § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

§ **14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

§ **14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent

.1   that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

.2   that an equitable adjustment is made or denied under another provision of the Contract.

### § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

§ **14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:48 on 07/28/2018 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                        (1765947217)

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

§ **14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall

    .1    cease operations as directed by the Owner in the notice;

    .2    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

    .3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

§ **14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work properly executed in accordance with the Contract Documents (the basis for such payment shall be as provided in the Agreement) and for costs incurred by the Contractor and directly related to the termination of Work including reasonable demobilization and cancellation charges provided such costs are authorized in advance by the Owner. No payment shall be made by the Owner, however, to the extent that such Work could have been terminated without payment to the Contractor under the Contract Documents or if an equitable adjustment is made or denied under another provision of the Contract Documents. In the event of termination for the Owner's convenience, the Owner will authorize a Change Order or, if necessary, a Construction Change Directive, making any required adjustment to the Milestone Dates and/or the Contract Sum. For the remainder of the Work, the Contract Documents shall remain in full force and effect. The Contractor shall use reasonable efforts to minimize costs incurred by reason of such termination. Without limiting any of the above, in the case of termination for the Owner's convenience the Contractor shall not be entitled to recover any lost profit.

**ARTICLE 15    CLAIMS AND DISPUTES**
§ **15.1 CLAIMS**
§ **15.1.1 DEFINITION**
A "Claim" is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

*(Paragraphs deleted)*
§ **15.1.2 TIME LIMITS ON CLAIMS**
Claims by either party must be initiated within twenty-one (21) days after occurrence of the event giving rise to such Claim or within twenty-one (21) days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. THE OWNER AND THE CONTRACTOR EXPRESSLY AGREE THAT FAILURE OF A PARTY TO INITIATE A CLAIM WITHIN THE TIME LIMITS SPECIFIED SHALL RESULT IN SUCH CLAIM BEING WAIVED. Claims must be initiated by written notice containing a clear statement of the basis of the claim and the relief sought by the claimant, and such notice shall be provided to the Architect and the other party.

§ **15.1.3 CONTINUING CONTRACT PERFORMANCE**
Pending final resolution of a Claim or dispute, the Contractor shall proceed diligently with performance of the Contract, provided Owner shall pay amounts due Contractor not in dispute.

§ **15.1.4 CLAIMS FOR ADDITIONAL COST**
If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.4.

§ **15.1.5 CLAIMS FOR ADDITIONAL TIME**
§ **15.1.5.1** If the Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay, only one Claim is necessary.

§ **15.1.5.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

Init.

*I*

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:07:46 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:           (1765947217)

46

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

*(Paragraphs deleted)*
## § 15.2 INITIAL DECISION

§ **15.2.1** Claims, excluding those arising under Sections 10.3, 10.4, 11.3.9, and 11.3.10, shall be referred to the Initial Decision Maker for initial decision. The Owner will serve as the Initial Decision Maker, unless otherwise indicated in the Agreement. Except for those Claims excluded by this Section 15.2.1, an initial decision shall be required as a condition precedent to mediation of any Claim arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Initial Decision Maker with no decision having been rendered. Unless the Initial Decision Maker and all affected parties agree, the Initial Decision Maker will not decide disputes between the Contractor and persons or entities other than the Owner.

§ **15.2.2** The Initial Decision Maker will review Claims and within ten days of the receipt of a Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Initial Decision Maker is unable to resolve the Claim if the Initial Decision Maker lacks sufficient information to evaluate the merits of the Claim or if the Initial Decision Maker concludes that, in the Initial Decision Maker's sole discretion, it would be inappropriate for the Initial Decision Maker to resolve the Claim.

§ **15.2.3** In evaluating Claims, the Initial Decision Maker may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Initial Decision Maker in rendering a decision. The Initial Decision Maker may request the Owner to authorize retention of such persons at the Owner's expense.

§ **15.2.4** If the Initial Decision Maker requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either (1) provide a response on the requested supporting data, (2) advise the Initial Decision Maker when the response or supporting data will be furnished or (3) advise the Initial Decision Maker that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Initial Decision Maker will either reject or approve the Claim in whole or in part.

§ **15.2.5** The Initial Decision Maker will render an initial decision approving or rejecting the Claim, or indicating that the Initial Decision Maker is unable to resolve the Claim. This initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) notify the parties and the Architect, if the Architect is not serving as the Initial Decision Maker, of any change in the Contract Sum or Contract Time or both. The initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

§ **15.2.6** In the event of a Claim against the Contractor, the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

*(Paragraph deleted)*
§ **15.2.7** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

*(Paragraph deleted)*
## § 15.3 IN PERSON MEETING
The Owner and the Contractor agree that, for any dispute arising out of or related to the interpretation of or compliance with this Agreement or the completion of the Project, responsible persons selected by each party will meet together (with the Architect, to the extent necessary or desirable) and attempt to resolve the dispute between them within 21 days after the date on which such meeting is first requested in writing by either party. Such an in-person meeting shall be a condition precedent to the initiation of mediation or litigation, unless legal action must be filed in order to satisfy the requirements of any applicable statute of limitations, in which case such action shall be stayed until such in-person meeting has occurred.

*(Paragraphs deleted)*

**Init.**

_/_

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                       (1765947217)

**47**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 15.4 MEDIATION** If either party wishes to submit any such Claim to non-binding mediation, the party requesting such mediation shall submit such request in writing to the other party and the American Arbitration Association. In such event, if the other party agrees in writing so to do, the parties shall endeavor for a period of time not to exceed thirty (30) days without the further written agreement of the parties to resolve their Claims by non-binding mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect.

*(Paragraphs deleted)*
**§ 15.5** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. In the event that the parties execute a written agreement as a result of such mediation in settlement of any such Claim, such agreement shall be enforceable as a settlement agreement in any court having jurisdiction thereof.

**§ 15.6 LITIGATION**
Claims made prior to final completion of the Project that are not resolved by negotiation or mediation may be submitted to a court of competent jurisdiction located in the City of Chicago, provided that no Claim arising under this Contract during construction of the Project shall be brought before any court without first having been submitted to the procedures outlined in Section 15.2.1 above.   A party's failure to comply with the foregoing requirements shall be deemed a waiver of such Claim.

**§ 15.7** Any Claim arising following final completion of the Project, unless otherwise settled by the parties, may be submitted to a court of competent jurisdiction located in the City of Chicago.   THE OWNER AND THE CONTRACTOR EACH EXPRESSLY WAIVES THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO CLAIMS RESULTING FROM OR ARISING OUT OF THE CONTRACT DOCUMENTS, THE WORK PERFORMED BY THE CONTRACTOR HEREUNDER AND THE PROJECT.
*(Paragraph deleted)*

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 12:07:48 on 07/26/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                                            (1765947217)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# ▓AIA® Document A133™ – 2009

## *Standard Form of Agreement Between Owner and Construction Manager as Constructor* where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

**AGREEMENT** made as of the 28th    day of July     in the year 2016
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status and address)*

BCSP OND Property, LLC
c/o Beacon Capital Partners, LLC
200 State Street
Boston, MA   02109

and the Construction Manager:
*(Name, legal status and address)*

Bear Construction Company
1501 Rohlwing Road
Rolling Meadows, IL   60008

for the following Project:
*(Name and address or location)*

One North Dearborn Street, Chicago, IL
Renovate the roof penthouse and roof to provide a roof deck and lounge.   Work includes demolition, structural improvements, new curtain wall, interior finishes, raised floors, restrooms, new elevator 12 overrun structure, landscaping, and associated MEP improvements.

The Architect:
*(Name, legal status and address)*

Wright Heerema Architects
140 South Dearborn Street
Chicago, IL   60603

The Owner's Designated Representative:
*(Name, address and other information)*

Michael Graham
MB Real Estate
3700 One North LaSalle Street, Suite 3700
Chicago, IL   60602

The Construction Manager's Designated Representative:

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

**Init.**

*/*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                               (2035177576)

1

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

*(Name, address and other information)*

~~Jarrik Mitchell~~ Scott Kurinsky
Bear Construction Company
1501 Rohlwing Road
Rolling Meadows, IL   60008

The Architect's Designated Representative:
*(Name, address and other information)*

Matt Meives
Wright Heerema Architects
140 South Dearborn Street
Chicago, IL   60603

The Owner and Construction Manager agree as follows.

| | AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. **User Notes:** (2035177575) |
| --- | --- |

Init.

/

2

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    CONSTRUCTION MANAGER'S RESPONSIBILITIES

3    OWNER'S RESPONSIBILITIES

4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

5    COMPENSATION FOR CONSTRUCTION PHASE SERVICES

6    COST OF THE WORK FOR CONSTRUCTION PHASE

7    PAYMENTS FOR CONSTRUCTION PHASE SERVICES

8    INSURANCE AND BONDS

9    DISPUTE RESOLUTION

10   TERMINATION OR SUSPENSION

11   MISCELLANEOUS PROVISIONS

12   SCOPE OF THE AGREEMENT

ARTICLE 1    GENERAL PROVISIONS
§ 1.1 The Contract Documents
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents listed in this Agreement, and Modifications issued after execution of this Agreement, all of which form the Contract and are as fully a part of the Contract as if attached to this Agreement or repeated herein. Upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal, the Contract Documents will also include the documents described in Section 2.2.3 and identified in the Guaranteed Maximum Price Amendment and revisions prepared by the Architect and furnished by the Owner as described in Section 2.2.9. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement, this Agreement shall govern.

§ 1.2 Relationship of the Parties
The Construction Manager accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Construction Manager's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. Construction Manager will ensure that the best interests of the Owner are "always put first". The Construction Manager recognizes that the Owner's representative is Michael Graham ("Graham"). In that role, Graham, or such other party as Owner may designate, shall act as the Owner's representative and shall be entitled to the same rights and protections afforded the Owner under this Contract. The Owner shall endeavor to promote harmony and cooperation among the Owner, Architect, Construction Manager, Tenant and other persons or entities employed by the Owner for the Project.

The Construction Manager acknowledges that the Owner is relying upon the Construction Manager's special expertise and experience with and knowledge of the premises at One North Dearborn Street, as well as upon its extensive construction experience working on multiple similar existing buildings in Chicago, Illinois.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                              (2035177575)

3

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**§ 1.3 General Conditions**
For the Preconstruction Phase, AIA Document A201™–2007, General Conditions of the Contract for Construction, as amended by the parties, shall apply only as specifically provided in this Agreement. For the Construction Phase, the general conditions of the contract shall be as set forth in A201–2007, as amended by the parties, which document is incorporated herein by reference. The term "Contractor" as used in A201–2007 shall mean the Construction Manager.

**ARTICLE 2   CONSTRUCTION MANAGER'S RESPONSIBILITIES**
The Construction Manager's Preconstruction Phase responsibilities are set forth in Sections 2.1 and 2.2. The Construction Manager's Construction Phase responsibilities are set forth in Section 2.3. The Owner and Construction Manager may agree, in consultation with the Architect, for the Construction Phase to commence prior to completion of the Preconstruction Phase, in which case, both phases will proceed concurrently. The Construction Manager shall identify a representative authorized to act on behalf of the Construction Manager with respect to the Project.

**§ 2.1 Preconstruction Phase**
**§ 2.1.1** The Construction Manager shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other.

**§ 2.1.2 Consultation**
The Construction Manager shall schedule and conduct meetings with the Architect and Owner to discuss such matters as procedures, progress, coordination, and scheduling of the Work. The Construction Manager shall consult with the Owner and Architect regarding site use and improvements and the selection of materials, building systems and equipment. The Construction Manager shall provide recommendations on construction feasibility; actions designed to minimize adverse effects of labor or material shortages; time requirements for procurement, installation and construction completion; and factors related to construction cost, including estimates of alternative designs or materials, preliminary budgets and possible economies. The Construction Manager will assist the Architect, Engineers, consultants and the Owner in developing and completing the Drawings and Specifications for the Project or any component of the Project. The Construction Manager shall (1) determine whether the provisions in such documents pertaining to temporary facilities and temporary utilities are adequate and appropriate; (2) review technical specifications for consistency with drawings details and notices; (3) review technical specifications for provisions that inhibit competition among suppliers; (4) review such documents for completeness; and (5) provide advice with respect to preparing construction documents in design packages to facilitate the progress of bidding and executing the Work and to minimize conflicts among subcontractors.  It is understood that, in performing these services, Construction Manager is performing them in his capacity as a construction professional and not as a licensed design professional.

**§ 2.1.3** The Construction Manager shall, within thirty (30) days after execution of this Agreement, prepare, and periodically update, preliminary schedules for the Project (referred to herein as the "preliminary Project schedule") for the Architect's review and the Owner's approval. The Construction Manager, with the assistance of the Owner, shall prepare, and periodically update, a preliminary Project schedule for the Architect's review and the Owner's approval. This preliminary Project Schedule shall reflect December 1, 2016 as the Project Substantial Completion date and shall be prepared around this milestone. The Construction Manager shall obtain the Architect's approval of the portion of the preliminary Project schedule relating to the performance of the Architect's services. The Construction Manager shall coordinate and integrate the preliminary Project schedule with the services and activities of the Owner, Architect and Construction Manager. As design proceeds, the preliminary Project schedule shall be updated to indicate proposed activity sequences and durations, milestone dates for receipt and approval of pertinent information, submittal of a Guaranteed Maximum Price proposal, preparation and processing of shop drawings and samples, delivery of materials or equipment requiring long-lead-time procurement, Owner's occupancy requirements showing portions of the Project having occupancy priority, and proposed date of Substantial Completion. If preliminary Project schedule updates indicate that previously approved schedules may not be met, the Construction Manager shall make appropriate recommendations to the Owner and Architect.

**§ 2.1.4 Phased Construction**
The Construction Manager shall provide recommendations with regard to accelerated or fast-track scheduling, procurement, or phased construction. The Construction Manager shall take into consideration cost reductions, cost

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                     (2035177575)

**4**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

information, constructability, provisions for temporary facilities and procurement and construction scheduling issues.

### § 2.1.5 Preliminary Cost Estimates

§ 2.1.5.1 Intentionally omitted.

§ 2.1.5.2 When Design Development Documents have been prepared by the Architect and approved by the Owner, the Construction Manager shall prepare a detailed estimate with supporting data for review by the Architect and approval by the Owner. During the preparation of the Construction Documents, the Construction Manager shall update and refine this estimate at appropriate intervals agreed to by the Owner, Architect and Construction Manager.

§ 2.1.5.3 If any estimate submitted to the Owner exceeds previously approved estimates or the Owner's budget, the Construction Manager shall assist the Owner and the Architect in identifying and analyzing revisions to the Construction Documents to reduce the Construction Cost. The Architect shall rely on the accuracy and completeness of the construction cost estimates provided by the Construction Manager, which estimates may include bid alternates for elements of the Work in an effort to achieve the approved budget. The Construction Manager shall be responsible for providing performance data to support such recommended alternatives or substitutes. The Construction Manager and the Architect shall communicate in sufficient detail.

§ 2.1.5.4 All estimates developed under this Section shall be in accordance with a master cost code format to be furnished to the Construction Manager by the Owner. Estimates shall be submitted with complete detail indicating quantities, unit prices and assumptions. All material, Subcontractor or equipment quotations on which cost elements have been based shall be included with the estimate submission. Additionally, each detailed estimate listed shall include a detailed description of any changes from the previous estimate.

### § 2.1.6 Subcontractors and Suppliers

§ 2.1.6.1 The Construction Manager shall develop subcontractor interest in the Project and shall furnish to the Owner and Architect for their information a list of recommended and prequalified subcontractors, including suppliers who are to furnish materials or equipment fabricated to a special design, from whom proposals will be requested for each principal portion of the Work. The Owner or Architect will promptly reply in writing to the Construction Manager if the Architect or Owner objects to such subcontractor or supplier. The receipt of such list shall not require the Owner or Architect to investigate the qualifications of proposed subcontractors or suppliers, nor shall it waive the right of the Owner or Architect later to object to or reject any proposed subcontractor or supplier.

§ 2.1.6.2 The Construction Manager shall develop bid packages for components of the Work and shall solicit bids from subcontractors and vendors in each trade. The bid list and bid packages shall be subject to approvals, modifications and additions by the Owner. Except as set forth below, the Construction Manager shall obtain at least three competitive bids from qualified bidders for each such trade, provided however that such requirement of a minimum three competitive bids may be waived by the Owner only upon the condition that the Construction Manager has requested in writing such a waiver stating the Construction Manager's contention that obtaining three bids will not be in the best interest of Owner and the Project. The decision to grant such a waiver will be in the sole discretion of the Owner. The Construction Manager and Owner shall review all bids and interview candidates. Owner shall authorize the Construction Manager to retain such subcontractors and vendors as shall be in Owner's sole judgment and discretion the most competitively priced and competent.

§ 2.1.6.3 The Construction Manager shall summarize the bid results for each component of the Work in a spreadsheet format, including all analysis and adjustments necessary to permit a meaningful comparison among bidders. The Construction Manager shall also provide, as appropriate, comments concerning the subcontractors and suppliers under consideration, including financial strength, past performance, current workload, etc., and recommendations as to subcontractor and supplier selection. If the price for the Work of a subcontractor or supplier selected by the Owner is higher than the price offered by another subcontractor or supplier and recommended by the Construction Manager, and if the Construction Manager relied upon such other subcontractor or supplier in compiling its Guaranteed Maximum Price, then the Guaranteed Maximum Price shall be increased by the difference between the price offered by the originally recommended subcontractor or supplier and the price offered by the subcontractor or supplier selected by the Owner.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. **User Notes:**                                                                                         (2035177575)

**5**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 2.1.6.4** The Construction Manager may submit a bid on any bid package for which it customarily performs the work with its own labor force.    In such event, the Construction Manager's bid will include all costs required by the Independent subcontractors bidding on such bid package.   Such costs will include but not be limited to labor, material, equipment, supervising tools, staging, hoisting, commissioning and overhead and profit.   In the event the Owner accepts the bid of the Construction Manager, the Construction Manager shall be paid for such work in the same manner as other subcontractors employed on the Project.

**§ 2.1.7** The Construction Manager shall prepare, for the Architect's review and the Owner's acceptance, a procurement schedule for items that must be ordered well in advance of construction. The Construction Manager shall expedite and coordinate the ordering and delivery of materials that must be ordered well in advance of construction. If the Owner agrees to procure any items prior to the establishment of the Guaranteed Maximum Price, the Owner shall procure the items on terms and conditions acceptable to the Construction Manager. Upon the establishment of the Guaranteed Maximum Price, the Owner shall assign all contracts for these items to the Construction Manager and the Construction Manager shall thereafter accept responsibility for them.

**§ 2.1.8 Extent of Responsibility**
The Construction Manager shall exercise reasonable care in preparing schedules and estimates. The Construction Manager, however, does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The recommendations and advice of the Construction Manager concerning design alternatives shall be subject to the review and approval of the Owner and the Owner's professional consultants. The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Construction Manager shall promptly report to the Architect and Owner any nonconformity discovered by or made known to the Construction Manager as a request for information in such form as the Architect may require.

**§ 2.1.9 Notices and Compliance with Laws**
The Construction Manager shall comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to its performance under this Contract, and with equal employment opportunity programs, and other programs as may be required by governmental and quasi governmental authorities for inclusion in the Contract Documents.   Contractor must also comply with the employment provisions of the Americans with Disabilities Act and any immigration laws, rules and/or regulations.  If requested by Owner, Construction Manager agrees to execute a certification affidavit regarding I-9 compliance of all employees performing Work, in a form provided by Owner.  Construction Manager shall not perform any Work, nor shall Construction Manager be entitled to any payments respecting this Agreement until Contractor has provided Owner with a properly executed copy of such certification affidavit (if requested by Owner).  If requested by Owner, Construction Manager shall secure like certifications from all firms with whom Construction Manager contracts who will be performing any Work.  No such firms, or any subcontractors of such firms, performing any Work shall be permitted on the Project Site until such time as they have first provided Owner with a properly executed copy of such certification affidavit.  Construction Manager further agrees that in the event that Owner should object in writing to the employment on site of any specific employee, with concerns stated in writing respecting the employee's compliance with I-9 protocol, Construction Manager shall promptly remove the employee from performing Work and not return the employee to perform any Work until such time as Construction Manager provides Owner with sufficient information to address Owner's concerns, within Owner's reasonable discretion. Construction Manager shall defend and indemnify Owner in the event that any of the workers on the Project are found not to be authorized to work under the Immigration Reform and Control Act ("IRCA") or in the event that there is a determination that the obligations set forth under IRCA, including the obligation to prepare correctly and maintain I-9s for such workers, have not been complied with, including but not limited to all direct and indirect damages, fines and penalties, punitive damages, attorneys' fees and costs.

**§ 2.1.10 VALUE ENGINEERING**
During the design process, the Construction Manager shall be the lead member of and shall organize and coordinate the efforts of the value engineering task force. This task force will also include Owner's and Architect's representatives.   The task force shall (i) evaluate alternative approaches and methods of completing the Work, (ii) evaluate alternative materials, products and systems, and (iii) make decisions based on such evaluations that allow the Owner's budget, scheduling and program requirements to be satisfied while maximizing quality and achievement of design objectives. Upon the reasonable request of the Owner, the Construction Manager shall, as

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                                                   (2035177575)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

part of the value engineering process, conduct constructability analyses of alternative materials, products and systems. The Construction Manager shall present the results of such analyses and recommendations related thereto to the Owner and the Architect.

### § 2.1.11 CONSTRUCTION LOGISTICS PLANNING
The Construction Manager shall, to the extent possible, identify all of its requirements related to construction logistics planning. Such requirements shall include, but not be limited: (1) site, office and storage, (2) traffic and parking, (3) material and equipment deliveries, (4) hoisting and crane lifting, (5) scaffolding and exterior access, (6) debris and rubbish removal and (7) site vehicular circulation. As such needs are identified, the Construction Manager shall cooperate with the Owner to develop a comprehensive Construction Logistics Plan encompassing the total site. The Construction Manager shall participate in all regular meetings necessary to coordinate logistics throughout the construction period. The Construction Manager recognizes that it does not have exclusive rights to any portion of the Project.

### § 2.2 Guaranteed Maximum Price Proposal and Contract Time
§ 2.2.1 When the Drawings and Specifications for the Work are sufficiently complete, and the Construction Manager has done the cost estimating required by Section 2.1.5.4, upon the request of the Owner, the Construction Manager shall propose a Guaranteed Maximum Price for the Work, which shall be the sum of the estimated Cost of the Work and the Construction Manager's Fee. .

§ 2.2.2 As the Drawings and Specifications may not be finished at the time the Guaranteed Maximum Price proposal is prepared, the Construction Manager shall provide in the Guaranteed Maximum Price for further development of the Drawings and Specifications by the Architect that is consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order. The estimated Cost of the Work shall include a proposed Construction Manager's contingency (the "Contingency"). The Contingency shall be included in the Guaranteed Maximum Price. The Contingency, when agreed upon by the Owner and the Construction Manager as set forth below and subject to the conditions in this Section 2.2.2, shall be an amount available to reimburse the Construction Manager for    work not identified or quantified by the Construction Manager in its cost estimate, such as:    (a) estimating and purchasing errors; (b) premium time to maintain the progress of the Work in accordance with the Project schedule due to an action or inaction by the Construction Manager or any Subcontractor (provided that the Construction Manager shall require Subcontractors to absorb in their base Subcontracts all premium time due to failure of the Subcontractor to properly man the Project or organize the Work); (c) unforeseen construction problems (except to the extent that, as a contractor experienced in the construction of projects similar to the Project, the Construction Manager should have foreseen such problems); (d) ordinary or seasonal weather conditions; and (e) Work identified or reasonably inferable from the Contract Documents, but not properly or completely detailed in such documents. For purposes hereof, "reasonably inferable" shall mean necessary in order to complete any system or finished product.    Notwithstanding anything to the contrary herein contained: (i) the Contingency may only be used for costs which are included in the Cost of the Work, as defined in Section 6.1, (ii) the Contingency may not be used for costs which are excluded from the Cost of the Work, as set forth in Section 6.8, (iii) the Contingency may not be used to pay for any cost category (other than trade labor costs) included in General Conditions (as that term is defined below) to the extent that doing so would cause the aggregate amount of such cost category (on a projected basis) to exceed the total budgeted amount for such category (i.e., as set forth in the Schedule of Values attached to the Guaranteed Maximum Price Amendment (as that term is defined in Section 2.2.6 hereof), unless the Construction Manager obtains the Owner's prior written consent, (iv) the Contingency may not be used to pay for costs due to unforeseen conditions (subject to other conditions of this Contract or the A201 General Conditions), overages in "Allowances" or Scope Changes, all of which shall be subject to Change Orders in accordance with Section 5.3, and (v) the Construction Manager shall be required to obtain the Owner's written consent in advance of incurring costs during any calendar month that the Construction Manager proposes be charged to the Contingency. The Owner agrees that it shall not unreasonably withhold its consent to any request from the Construction Manager pursuant to clauses (iii), (iv) or (v) above, recognizing that the Owner will collaborate with the Construction Manager in order to enable the Construction Manager to achieve the Project schedule. In order to enable the Owner to monitor the Construction Manager's compliance with the provisions of clauses (iii) and (iv) above, the Construction Manager shall, commencing as of the execution and delivery of this Contract and continuing until Final Completion: (a) submit to the Owner a detailed monthly (or more frequently, if the Owner has a reasonable basis for requiring the same more frequently) Contingency log and projection for review by the Owner of all Contingency expenditures, and (b) prior to incurring

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                                   (2035177575)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

any cost which may be charged to the Contingency, the Construction Manager shall submit a written request to the Owner for reimbursement of such cost, together with an explanation of the reason such cost is to be incurred.

*(Paragraphs deleted)*

**§ 2.2.3** At the same time the Construction Manager proposes a Guaranteed Maximum Price to the Owner, the Construction Manager shall prepare and provide to the Owner, a schedule for completion of the Work (the "Construction Schedule"). The Construction Schedule shall be in a detailed, precedent-style critical path method (CPM) or Primavera type format and shall:  (1) provide a graphic representation of material activities and events that will occur during performance of the Work; (2) indicate a proposed cash flow schedule based on anticipated monthly requisitions by the Construction Manager through final completion; (3) identify key dates for Owner-provided or Architect-provided information and materials, and (4) set forth dates that are critical in ensuring the timely and orderly completion of the Work in accordance with the requirements of the Contract Documents (hereinafter referred to as "Milestone Dates") including but not limited to the date by which substantial completion of the Work shall be achieved.

**§ 2.2.4** The Construction Manager shall include with the Guaranteed Maximum Price proposal a written statement of its basis, which shall include the following:

.1  A list of the Drawings and Specifications, including all Addenda thereto, and the Conditions of the Contract, which were used in preparation of the Guaranteed Maximum Price proposal;

.2  A list of the clarifications and assumptions made by the Construction Manager in the preparation of the Guaranteed Maximum Price proposal, to supplement the information provided by the Owner and contained in the Drawings and Specifications;

.3  A statement of the proposed Guaranteed Maximum Price, including a statement of the estimated Cost of the Work organized by trade categories or systems, allowances, Contingency, General Conditions costs and other items and the Construction Manager's Fee.  The term "General Conditions" shall mean, collectively, those properly reimbursable Cost of the Work items specified in Schedule B attached;

.4  The anticipated date of Substantial Completion upon which the proposed Guaranteed Maximum Price is based and the proposed Construction Schedule; and

.5  A list of allowances and a statement of their basis.

**§ 2.2.5** The Construction Manager shall meet with the Owner and Architect to review the Guaranteed Maximum Price proposal and the written statement of its basis. In the event that the Owner or Architect discover any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Construction Manager, who shall make appropriate adjustments to the Guaranteed Maximum Price proposal, its basis, and/or the proposed Construction Schedule.  During the time the proposed Guaranteed Maximum Price, its basis, and the proposed Construction Schedule are under review, the Construction Manager shall participate with and assist Owner and the Architect in the analysis of alternative approaches to design and construction in order to advance the Owner's objectives of reducing the Cost of the Work, the time of construction, the potential for problems during the Construction Phase, and the cost of operating and maintaining the completed Project.

**§ 2.2.6** Following review by the Owner and the Architect of the Guaranteed Maximum Price proposal and its basis, the Construction Manager shall, upon the request of the Owner, prepare and submit to the Owner a revised Guaranteed Maximum Price proposal together with the basis thereof.   If the Owner and the Construction Manager reach agreement on the terms of such proposal, the Guaranteed Maximum Price Amendment for the Project in the form attached hereto as **Exhibit A** (the "Guaranteed Maximum Price Amendment") shall be executed by the Owner and the Construction Manager.

**§ 2.2.7** Prior to the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of a Notice to Proceed, the Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work, except as the Owner may specifically authorize in writing.

**§ 2.2.8** The Guaranteed Maximum Price shall be subject to additions and deductions and the Construction Schedule and the date of Substantial Completion shall be subject to adjustment by Change Orders, authorized in accordance with the requirements of the Contract Documents.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. **User Notes:**                                                                                                                                      (2035177575)

**8**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

§ **2.2.9** The Owner shall authorize and cause the Architect to revise the Drawings and Specifications to the extent necessary to reflect the agreed-upon assumptions and clarifications contained in the Guaranteed Maximum Price Amendment. Such revised Drawings and Specifications shall be furnished to the Construction Manager in accordance with schedules agreed to by the Owner, Architect and Construction Manager. The Construction Manager shall promptly notify the Architect and Owner if such revised Drawings and Specifications are inconsistent with the agreed-upon assumptions and clarifications.

§ **2.2.10** The Guaranteed Maximum Price shall include in the Cost of the Work only those taxes which are enacted at the time the Guaranteed Maximum Price is established.

§ **2.2.11** By executing the Guaranteed Maximum Price Amendment, the Construction Manager represents and warrants that the Drawings and Specifications and other materials and information furnished to the Construction Manager as of the date of the Guaranteed Maximum Price Amendment are sufficiently detailed to enable the Construction Manager to firmly establish the Guaranteed Maximum Price, subject to Clarifications and Assumptions (if any) attached to the Guaranteed Maximum Price Amendment.  The Construction Manager shall not be permitted to claim any adjustment in the Guaranteed Maximum Price in connection with the timely completion of drawings, clarifications, supplemental information and other materials (collectively, "Supplemental Materials") issued by the Architect after the date of the Guaranteed Maximum Price Amendment, except for Scope Changes as described in Sections 2.2.12 through 2.2.14.

§ **2.2.12** Subsequent to execution of the Guaranteed Maximum Price Amendment, the Architect shall from time to time issue Supplemental Materials.   The Construction Manager shall review such Supplemental Materials in detail and notify the Owner and the Architect of any error, inconsistency or discrepancy that the Construction Manager discovers between the Supplemental Materials and the Drawings and Specifications listed in the Guaranteed Maximum Price Amendment.  Upon completion of such review, the Construction Manager shall also notify the Owner in writing of any item in the Supplemental Materials which in the Construction Manager's opinion represents a Scope Change as defined in Section 2.2.13 below, setting forth, with specificity, the reasons the Construction Manager contends that information or requirements of the Supplemental Materials represent a Scope Change (such notice shall constitute a "Scope Change Request").  The Scope Change Request shall set forth the change in costs and the impacts of the Construction Schedule, if any, that the Construction Manager attributes to the Work covered by such Scope Change Request, including but not limited to any and all Subcontractor costs and extended General Conditions items.  Failure of the Construction Manager to so notify the Owner within ten (10) business days after the date of receipt by the Construction Manager of any Supplemental Materials (provided, however, that if the Owner or Architect indicates in such Supplemental Materials that a quicker response is necessary due to exigent circumstances, then the Construction Manager shall use best efforts to so notify the Owner within five (5) business days after the date of receipt by the Construction Manager thereof, in which case any such failure by the Construction Manager to do so) is hereby deemed to mean:  (1) such Supplemental Materials are consistent with the Drawings and specifications listed in the Guaranteed Maximum Price Amendment; (2) no Scope Changes exist; and (3) the Construction Manager is willing and able to perform all of the work, including any Work described in the Supplemental Materials for the Guaranteed Maximum Price and in accordance with all the requirements of the Contract Documents.

§ **2.2.13** A "Scope Change" is hereby deemed to mean Work described in any Supplemental Materials which is not reasonably inferable from the Drawings and Specifications listed in the Guaranteed Maximum Price Amendment and is (i) inconsistent with the Clarifications and Assumptions, (ii) a change in the quantity, quality, programmatic requirements or other substantial deviation from the Drawings and Specifications listed in the Guaranteed Maximum Price Amendment, (iii) subject to Sections 1.2.7, 2.2.3, 3.2, and 3.7 of the General Conditions, due to a code change or unforeseen interpretation of any code, and (iv) subject to Sections 1.2.7, 2.2.3, 3.2, and 3.7 of the General Conditions, due to an error or omission in design.

§ **2.2.14** If the Construction Manager timely submits to the Owner a Scope Change Request, then the Owner shall have the following options:

    .1  within ten (10) days of receipt of the Scope Change Request, the Owner shall direct the Architect in writing, with a copy to the Construction Manager, to modify that aspect of the Supplemental Materials to which the Construction Manager objects.  The Construction Manager shall cooperate with the Owner and the Architect during the modification effort and shall assist in making recommendations appropriate to correct such portions of the Supplemental Materials:  Within ten

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                    (2035177575)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

(10) days of receipt of the Owner's written directive to revise the Supplemental Materials, the Architect shall submit to the Construction Manager, the revised Supplemental Materials as approved by the Owner.   The Construction Manager shall promptly re-examine such revised Supplemental Materials as described in Section 2.2.12.

.2    if, upon review of the Scope Change Request, the Owner believes that the portion of the Work described therein does not constitute a Scope Change, the Owner shall so advise the Construction Manager within ten (10) days of receipt of the Scope Change Request.   If such disagreement is not resolved, the Work subject to disagreement shall be identified in a schedule (the "Disputed Work Schedule").   Whenever possible, the Owner and the Construction Manager shall resolve items set forth in the Disputed Work Schedule, confirming such resolution in Change Orders.   Items in the Disputed Work schedule that are not resolved by the Owner and Construction Manager shall be subject to the dispute resolution procedures set forth in Article 15 of the General Conditions.   During the pendency of such dispute resolution procedures, all items remaining in the Disputed Work Schedule shall be performed by the Construction Manager as part of the Work and shall be included within and paid for as a Cost of the Work on a time and materials basis, without mark-up for General Conditions or the Construction Manager's Fee unless and until such items are determined to constitute Scope Changes as a result of such dispute resolution procedures.   The Cost of the Work paid for under this Section 2.2.14.2 shall not be applied against the GMP unless and until such items are determined not to constitute Scope Changes as a result of such dispute resolution procedures.   For each item in the Disputed Work Schedule, the Construction Manager shall keep a specific detailed accounting of the item and materials required to complete such item.   Adjustments to the Construction Schedule shall not be permitted on a tentative basis.

.3    if, upon review of the Scope Change Request, the Owner agrees that all or a portion of the Work therein constitutes a Scope Change, and the Owner elects not to direct the Architect to modify the Supplemental Materials, the Owner and the Construction Manager shall execute a Change Order providing for changes to the Guaranteed Maximum Price and Construction Schedule.

§ 2.2.15 The Guaranteed Maximum Price Amendment shall contain the date by which the Substantial Completion of the Project shall be achieved, which shall be based upon the performance of the Work by the Construction Manager in accordance with a project schedule to be attached to the Guaranteed Maximum Price Amendment.

### § 2.3 Construction Phase
### § 2.3.1 General
§ 2.3.1.1 For purposes of Section 8.1.2 of A201–2007, the date of commencement of the Work shall mean the date of commencement of the Construction Phase.

§ 2.3.1.2 The Construction Phase shall commence on the earlier of:
(1)    the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of a Notice to Proceed, or
(2)    the Owner's first authorization to the Construction Manager to:
(a) award a subcontract, or
(b) undertake construction Work with the Construction Manager's own forces, or
(c) issue a purchase order for materials or equipment required for the Work.

### § 2.3.2 Administration
§ 2.3.2.1 Except as set forth in Section 6.2.1.1, all of the Work shall be performed under subcontracts or by other appropriate agreements with the Construction Manager. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated to a special design for the Work in accordance with the provisions of Section 2.1.6.2 above.

§ 2.3.2.2 If the Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Construction Manager to the Owner and Architect (1) is recommended to the Owner by the Construction Manager, (2) is pre-qualified by the Construction Manager under §2.1.6 above to perform that portion of the Work, and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Construction Manager may require that a Change Order be issued to adjust the Contract Time and the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Construction

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                          (2035177575)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

Manager and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ **2.3.2.3** Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If the Subcontract is awarded on a cost-plus a fee basis, the Construction Manager shall provide in the Subcontract for the Owner to receive the same audit rights with regard to the Subcontractor as the Owner receives with regard to the Construction Manager in Section 6.11 below.

§ **2.3.2.4** If the Construction Manager recommends a specific bidder that may be considered a "related party" according to Section 6.10, then the Construction Manager shall promptly notify the Owner in writing of such relationship and notify the Owner of the specific nature of the contemplated transaction, according to Section 6.10.2.

§ **2.3.2.5** The Construction Manager shall schedule and conduct meetings at which the Owner, Architect, Construction Manager and appropriate Subcontractors can discuss the status of the Work. Such meetings shall occur on at least a weekly basis in order to insure proper coordination of the Work, to facilitate communication between the parties involved in the Project, and to advance the Project within the Owner's time requirements.   A representative of the Construction Manager who has authority to bind and act on behalf of the Construction Manager shall attend each such meeting. The Construction Manager shall prepare and promptly distribute meeting minutes.

§ **2.3.2.6** Promptly after the execution of the Guaranteed Maximum Price Amendment, the Construction Manager shall prepare and submit to the Owner and Architect a construction schedule for the Work and submittal schedule in accordance with Section 3.10 of A201–2007.

§ **2.3.2.7** The Construction Manager shall provide monthly written reports to the Owner and Architect on the progress of the entire Work. Such reports shall be in a format approved by the Owner, with a summary in a form approved by the Owner. The Construction Manager shall also keep, and make available to the Owner and Architect, a daily log containing a record for each day of weather, portions of the Work in progress, number of workers on site, identification of equipment on site, problems that might affect progress of the work, accidents, injuries, and other information required by the Owner.

§ **2.3.2.8** The Construction Manager shall develop a system of cost control for the Work, including regular monitoring of actual costs for activities in progress and estimates for uncompleted tasks and proposed changes. The Construction Manager shall identify variances between actual and estimated costs and report the variances to the Owner and Architect at regular intervals, but in any event not less than monthly.   Such reports shall be in a format approved by the Owner.

§ **2.4 Professional Services**
Section 3.12.10 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

§ **2.5 Hazardous Materials**
Section 10.3 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

§ **2.6** The Construction Manager's project superintendent shall be Dan Sweeney, its project executive shall be Scott Kurinsky, and its project manager shall be Jack Kramerer.

**ARTICLE 3   OWNER'S RESPONSIBILITIES**
§ **3.1 Information and Services Required of the Owner**
§ **3.1.1** The Owner shall provide full information in a timely manner regarding the requirements of each phase of the Project, including a program which sets forth the Owner's objectives, constraints and criteria, including space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements with respect to such phase of the Project. The Owner shall not be deemed to have failed to provide such full information in a timely manner unless the Construction Manager advises the Owner that it requires such information with respect to such phase of the Project within a reasonable period of time and the Owner declines or fails to provide such information by such time.

**Init.**

*I*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                        (2035177575)

**11**

FILED
8/7/2018 12:15 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH10012

§ **3.1.2** The Owner shall establish and update overall budgets for the Project and components of the Project cost on consultation with the Construction Manager and Architect, which shall include contingencies for changes in the Work and other costs which are the responsibility of the Owner.

§ **3.1.3 Environmental Tests, Surveys and Reports.** In the Preconstruction Phase, upon the Construction Manager's written request, the Owner shall furnish the following with reasonable promptness and at the Owner's expense. Except to the extent that the Construction Manager knows of any inaccuracy, the Construction Manager shall be entitled to rely upon the accuracy of any such information, reports, surveys, drawings and tests described in Sections 3.1.4.1 through 3.1.4.4 but shall exercise customary precautions relating to the performance of the Work.

*(Paragraphs deleted)*
§ **3.1.3.1** Upon the Construction Manager's written request, reports, surveys, drawings and tests concerning the conditions of the site which are required by law.

§ **3.1.3.2** Surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ **3.1.3.3**
Structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports which are required by law.

§ **3.1.3.4** The services of other consultants when such services are reasonably required by the scope of the Project and are requested, in writing, by the Construction Manager.

§ **3.2 Owner's Designated Representative**

Michael Graham, or such other party as the Owner may designate (hereinafter, the "Owner's representative"), is hereby designated as Owner's representative for purposes of this Agreement. The Owner's representative shall, acting individually, have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. The Owner's representative, or his designee, shall be present at each regularly scheduled Project meeting and shall render decisions in a timely fashion pursuant to the terms of this Agreement.

§ **3.2.1 Legal Requirements.** The Owner shall determine and advise the Architect and Construction Manager of any special legal requirements relating specifically to the Project which differ from those generally applicable to construction in the jurisdiction of the Project. The Owner shall furnish such legal services as are necessary to provide the information and services required under Section 3.1.

§ **3.3 Architect**

The Owner shall retain an Architect and engineers to provide services, including normal structural, mechanical and electrical engineering services, other than cost estimating services, described in separate written Owner/Architect Owner/Engineer agreements. The Owner shall authorize and cause the Architect and engineers to provide other services requested by the Construction Manager which must necessarily be provided by the Architect for the Preconstruction and Construction Phases of the Work. Such services shall be provided in accordance with time schedules agreed to by the Owner, Architect, engineers and Construction Manager.

**ARTICLE 4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES**
§ **4.1 Compensation - None**
*(Paragraphs deleted)*
§ **4.2 Payments - None**

*(Paragraphs deleted)*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                      (2035177575)

Init.

/

12

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## ARTICLE 5   COMPENSATION FOR CONSTRUCTION PHASE SERVICES

§ 5.1 For the Construction Manager's performance of the Work as described in Section 2.3, the Owner shall pay the Construction Manager the Contract Sum in current funds. The Contract Sum is the Cost of the Work as defined in Section 6.1.1 plus the Construction Manager's Fee.

§ 5.1.1 The Construction Manager's Fee:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Construction Manager's Fee.)*

Two and one-half percent (2.5%) of the Cost of the Work.   For purposes of computing the Fee, Cost of the Work shall not include general liability or other insurance cost, subguard insurance (subcontractor default insurance) cost or bonds premiums.   The Construction Manager's Fee on changes in the Work shall be two and one-half percent (2.5%).   Such Fee shall include all site overhead costs unless the change causes (i) an extension to the construction schedule as provided herein or (ii) an actual and specific increase in the Construction Manager's General Conditions costs.   Construction Manager shall also be entitled to a mark-up on the cost of changes of not more than 1.0% for comprehensive liability insurance.

*(Table deleted)*
*(Paragraphs deleted)*
### § 5.2 Guaranteed Maximum Price
§ 5.2.1 The Construction Manager guarantees that the Contract Sum shall not exceed the Guaranteed Maximum Price set forth in the Guaranteed Maximum Price Amendment, as it is amended from time to time. To the extent the Cost of the Work exceeds the Guaranteed Maximum Price, the Construction Manager shall bear such costs in excess of the Guaranteed Maximum Price without reimbursement or additional compensation from the Owner.
*(Paragraphs deleted)*
§ 5.2.2 The Guaranteed Maximum Price is subject to additions and deductions by Change Order as provided in the Contract Documents and the Date of Substantial Completion shall be subject to adjustment as provided in the Contract Documents.

### § 5.3 Changes in the Work
§ 5.3.1 Adjustments to the Guaranteed Maximum Price on account of changes in the Work subsequent to the execution of the Guaranteed Maximum Price Amendment may be determined by any of the methods listed in Section 7.3.3 of A201™–2007.

*(Paragraph deleted)*
### § 5.3.2 INTENTIONALLY OMITTED

§ 5.3.3 In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of AIA Document A201–2007 and the term "costs" as used in Section 7.3.7 of AIA Document A201–2007 shall have the meanings assigned to them in AIA Document A201–2007 and shall not be modified by Sections 5.1 and 5.2, Sections 6.1 through 6.7, and Section 6.8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

§ 5.3.4 In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201–2007 shall mean the Cost of the Work as defined in Sections 6.1 to 6.7 of this Agreement and the term "fee" shall mean the Construction Manager's Fee as defined in Section 5.1 of this Agreement.

### § 5.3.5 INTENTIONALLY OMITTED

## ARTICLE 6   COST OF THE WORK FOR CONSTRUCTION PHASE
### § 6.1 Costs to Be Reimbursed
§ 6.1.1 The term Cost of the Work shall mean costs actually and necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in Sections 6.1 through 6.7.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/26/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                        (2035177575)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 6.1.2** Where any cost is subject to the Owner's prior approval, the Construction Manager shall obtain this approval prior to incurring the cost. The parties shall endeavor to identify any such costs prior to executing Guaranteed Maximum Price Amendment.

**§ 6.2 Labor Costs**
**§ 6.2.1**

.1  Wages of construction workers directly employed or otherwise retained directly by the Construction Manager to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.   Except as otherwise agreed in writing by both parties hereto, the Construction Manager must competitively bid any trade Work (excluding General Conditions Work) that the Construction Manager wishes to perform with the Construction Manager's own forces, or through an Affiliate, the cost of which exceeds $25,000.00 and shall obtain no less than two (2) additional responsive bids from responsible subcontractors acceptable to the Owner.   The Construction Manager's bid shall be submitted to the Owner at least one day in advance of receipt of bids from the unaffiliated Subcontractors.   The Construction Manager, or an Affiliate, shall be permitted to perform such trade Work only if (i) the Owner consents thereto in writing in its sole and absolute discretion after full disclosure in writing by the Construction Manager to the Owner of the affiliation or relationship of Affiliate to the Construction Manager; and (ii) the Owner approves in writing any subcontract, contract, purchase order, agreement or other arrangement between the Construction Manager and such Affiliate in form and substance.   Any trade Work performed by the Construction Manager's own forces or by an Affiliate, if required by the Owner, shall be covered in a separate agreement between the Owner and the Construction Manager or the Affiliate.   Such agreement shall, without limitation, satisfy all requirements for Subcontracts set forth in Section 5.3 of the General Conditions.   The term "Affiliate" is hereby deemed to mean any party or entity related to or affiliated with the Construction Manager or in which the Construction Manager has direct or indirect ownership or control, including, without limitation:   (i) any entity owned in whole or in part by the Construction Manager; (ii) any party or entity with an ownership interest in the Construction Manager; and (iii) any entity in which any officer, director, employee, partner or shareholder (or member of the family of any of the foregoing persons) of the Construction Manager or any entity owned by the Construction Manager has a direct or indirect interest.

.2  Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site or, with the Owner's agreement, wherever stationed, for that portion of their time performing the Work.   Such wages or salaries shall be allocated to the Cost of the Work based upon hourly time charges maintained by employees in the ordinary course of their duties in accordance with **Exhibit C**.   All exempt employees shall charge straight time only.   The rates set forth on **Exhibit C** are fully burdened for taxes, insurance, contributions, assessments and benefits.   The rates set forth on **Exhibit C** may only be adjusted one time per calendar year, effective as of April 1.   In no event shall such rate for any individual, after any adjustment, exceed 110% of the rate for such individual in effect immediately preceding such adjustment for such individual, and in no event shall the sum of the hourly rates for all individuals listed on **Exhibit C** after any such adjustment be more than 105% of the sum of such hourly rates immediately preceding any such adjustment.

.3  Intentionally omitted.

.4  Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements, and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided that such costs are based on wages and salaries included in the Cost of the Work under Sections 6.1.2.1 and 6.1.2.2.   Employee bonuses will not be considered reimbursable and shall be considered covered by Construction Manager's Fee.

*(Paragraphs deleted)*
**§ 6.3 Subcontract Costs**
Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.   The Construction Manager shall include in each subcontract a limitation on the amount of profit and overhead the Subcontractor can charge for Work performed pursuant to Change Orders and Construction Change Directives.   Unless otherwise approved by the Owner on self-performed work, such combined profit and overhead shall be not more than five percent (5%) of the sum of Subcontractor's direct cost for labor (including labor burden)

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
**User Notes:**                                                                                                                          (2035177575)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

and materials (including sales tax). This Subcontractor's combined profit and overhead amount shall include all other mark-ups and non-direct costs including, but not limited to, any and all non-productive labor, clean-up, supervision, field supervision, incidental costs, fixed costs, variable costs, incurrance, testing, start-up, warranty, small tools, big tools, miscellaneous materials, lay-out, engineering, waste, coordination, estimating, other estimating expenses, remobilization, etc. For example: Subcontractor's maximum cost for a change comprised of self-performed work = ((Subcontractor's direct labor cost including labor burden) + (Subcontractor's direct material cost including sales tax)) X (1.05). With regard to Changes involving work performed by lower tier subcontractors, the markup for overhead and profit allowable to the subcontractor on that work performed by the lower tier subcontractor shall not exceed five percent (5%). The total maximum markup fee allowable with respect to change order work performed by lower tier subcontractors shall be ten percent (10%) (5% to the lower tier subcontractor and 5% to the subcontractor supervising the work).

### § 6.4 Costs of Materials and Equipment Incorporated in the Completed Construction
**§ 6.4.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ 6.4.2** Costs of materials described in the preceding Section 6.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### § 6.5 Costs of Other Materials and Equipment, Temporary Facilities and Related Items
**§ 6.5.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Construction Manager shall mean fair market value.

### § 6.5.2
Rental charges of all necessary machinery and equipment used at the site of the Work, whether rented from the Construction Manager or others, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof. Except in the case of emergency, rental charges shall be consistent with those generally prevailing in the location of the Project. The Construction Manager shall obtain bids for all machinery and equipment to be rented from no less than two (2) responsible parties other than the Construction Manager, or an Affiliate (as such term is defined in Section 6.2.1.1). Such bids shall, in addition to the rental cost of the machinery and equipment, also indicate the bidder's opinion of the fair market value of each item of machinery and equipment to be rented. The Owner shall, with the advice of the Construction Manager, determine which bid is to be accepted. In no event shall the Construction Manager be entitled to reimbursement for any cumulative total of rental charges in connection with any single piece of machinery or equipment in excess of one hundred percent (100%) of its fair market value as of the date that such machinery or equipment is first put into service in connection with the Work. If the cumulative total of rental charges in connection with any single piece of machinery or equipment equals or exceeds one hundred percent (100%) of its fair market value as of the date such machinery and equipment was first put into service, the Owner shall be deemed to have purchased such machinery or equipment and, upon final completion of the Work, the Construction Manager shall deliver such machinery or equipment to the Owner together with appropriate documentation conveying free and clear title to the Owner.

**§ 6.5.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ 6.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 6.5.5** That portion of the reasonable expenses of the Construction Manager's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                          (2035177575)

**15**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

| *(Paragraph deleted)*
**§ 6.6 Miscellaneous Costs**
**§ 6.6.1** That portion directly attributable to this Contract of premiums for insurance and bonds. Insurance required of the Construction Manager pursuant to Article 8 and Exhibit B hereof shall be reimbursed at a rate of not more than 1% of the total Cost of the Work. Premiums for bonds on which Construction Manager is the principal shall not exceed 2% times the face amount of the bond. The Owner approves the use of Subguard. The cost of Subguard shall be reimbursed at a fixed rate of 1% of the total subcontract amounts covered by the insurance. In any such instance, the premium cost of such bond shall be reimbursed at a bond premium rate not to exceed 2% of the subcontract amount.

**§ 6.6.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Construction Manager is liable.

**§ 6.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay.

**§ 6.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201–2007 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 6.7.3.

**§ 6.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of AIA Document A201–2007 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**§ 6.6.6 INTENTIONALLY OMITTED**

**§ 6.6.7** Deposits lost for causes other than the Construction Manager's negligence or failure to fulfill a specific responsibility in the Contract Documents.

**§ 6.6.8** Legal, mediation and arbitration costs, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager in the performance of the Work and with the Owner's prior written permission, which permission shall be given only if the Owner determines in its sole discretion that it is in the Owner's interest to pay the Construction Manager's legal fees incurred in defending a claim by a Subcontractor.

**§ 6.6.9** Subject to the Owner's prior written approval, expenses incurred in accordance with the Construction Manager's standard written personnel policy for relocation and temporary living allowances of the Construction Manager's personnel required for the Work.

**§ 6.7 Other Costs and Emergencies**
**§ 6.7.1** Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

**§ 6.7.2** Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of AIA Document A201–2007.

**§ 6.7.3** Costs of repairing or correcting damaged or nonconforming Work executed by the Construction Manager, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Construction Manager or the Construction Manager's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Construction Manager, or the failure of the Construction Manager's personnel to supervise adequately the Work of the

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes: (2035177575)

**16**

Subcontractors or suppliers and only to the extent that the cost of repair or correction is not recovered by the Construction Manager from insurance, sureties, Subcontractors, suppliers, or others.

**§ 6.7.4** The costs described in Sections 6.1 through 6.7 shall be included in the Cost of the Work, notwithstanding any provision of AIA Document A201–2007 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Section 6.8.

**§ 6.7.5** Costs as defined herein shall be actual costs paid by the Construction Manager, less all discounts, rebates and salvages which shall be taken by the Construction Manager. All payments made by the Owner pursuant to this Article 6, whether those payments are actually made before or after the execution of the Guaranteed Maximum Price Amendment for the portion of the Work for which such costs were incurred, shall be included within the Guaranteed Maximum Price Amendment for such Work; provided, however, that in no event shall the Owner be required to reimburse the Construction Manager for any portion of the Cost of the Work incurred prior to the Commencement Date of the Work unless the Construction Manager has received the Owner's written consent prior to incurring such cost. The provisions of this Section 6.7.5 shall not apply to payments made to the Construction Manager in accordance with Section 4.1.1.

**§ 6.7.6** Notwithstanding the breakdown or categorization of any costs to be reimbursed in this Article 6 or elsewhere in the Contract Documents, there shall be no duplication of payments in the event any particular items for which payment is requested can be characterized as falling into more than one of the types of compensable or reimbursable categories.

**§ 6.7.7** The inclusion of general conditions costs shall be subject to the provisions of Section 2.2.2. At the time that the parties execute the Guaranteed Maximum Price Amendment, the parties shall agree upon a Schedule of Values to be attached to such Guaranteed Maximum Price Amendment which shall include an estimate of all direct costs and general conditions costs. Each Application for Payment shall be based upon such Schedule of Values.

**§ 6.8 Costs Not To Be Reimbursed**
**§ 6.8.1** The Cost of the Work shall not include the items listed below:

.1 Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Section 6.2, or as may be provided in Article 11;

.2 Expenses of the Construction Manager's principal office and offices other than the site office;

.3 Overhead and general expenses, except as may be expressly included in Sections 6.1 to 6.7;

.4 The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work;

.5 Except as provided in Section 6.7.3 of this Agreement, costs due to the negligence or failure of the Construction Manager, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

.6 Any cost not specifically and expressly described in Sections 6.1 to 6.7;

.7 Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded; and

.8 Costs for services incurred during the Preconstruction Phase.

.9 Rental costs of machinery and equipment, except as specifically provided in Section 6.5.2.

.10 Legal, mediation and arbitration costs, except when the Owner determines in its reasonable discretion that it is in the Owner's interest to pay the Construction Manager's legal fees incurred in defending a claim by a Subcontractor.

**§ 6.9 Discounts, Rebates and Refunds**
**§ 6.9.1** Cash discounts obtained on payments made by the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they can be obtained.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes: (2035177575)

Init.

17

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 6.9.2** Amounts that accrue to the Owner in accordance with the provisions of Section 6.9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

### § 6.10 Related Party Transactions
**§ 6.10.1** For purposes of Section 6.10, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Construction Manager; any entity in which any stockholder in, or management employee of, the Construction Manager owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Construction Manager. The term "related party" includes any member of the immediate family of any person identified above.

**§ 6.10.2** If any of the costs to be reimbursed arise from a transaction between the Construction Manager and a related party, the Construction Manager shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Construction Manager shall procure the Work, equipment, goods or service from the related party, as a Subcontractor, according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3. If the Owner fails to authorize the transaction, the Construction Manager shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3.

### § 6.11 Accounting Records
The Construction Manager shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract; the accounting and control systems shall be satisfactory to the Owner. This Agreement shall be considered a "100% open-book contract". The Owner and the Owner's accountants shall be afforded access to the Construction Manager's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Project, and the Construction Manager shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

**§ 6.12** If any inspection by the Owner of the Construction Manager's records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda and any other data relating to the Contract Documents reveals an overcharge, the Construction Manager shall pay the Owner upon demand an amount equal to such overcharge, as reimbursement for said overcharge and shall also, in the event the amount of such overcharge, exceeds two percent (2.0%) of the Guaranteed Maximum Price under the Guaranteed Maximum Price Amendment, reimburse the Owner for the administrative expenses incurred by the Owner in determining the overcharge.

### ARTICLE 7   PAYMENTS FOR CONSTRUCTION PHASE SERVICES
#### § 7.1 Progress Payments
**§ 7.1.1** Based upon Applications for Payment submitted to the Architect and Owner  by the Construction Manager and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents. Applications for Payment shall include the cover sheet and sworn statement attached hereto as Exhibit E.

**§ 7.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month.

**§ 7.1.3** Provided an Application for Payment properly prepared and accompanied by all required supporting documentation is received and approved by the Architect and approved by the Owner not later than the first day of the month, the Owner shall make payment to the Construction Manager not later than thirty (30) days thereafter.  If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than thirty (30) days after the Architect receives the Application for Payment.

**§ 7.1.4** With each Application for Payment, the Construction Manager shall submit receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed progress payments already received by the Construction Manager, less that portion of those payments attributable to the Construction Manager's Fee, plus personnel costs for the period covered by the present Application for Payment.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. **All rights reserved.** **WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                     (2035177576)

**18**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

In addition to the other required items, each Application for Payment shall be accompanied by the following, all in form and substance satisfactory to Owner:

.1 Duly executed Partial Waiver of Liens from the Construction Manager and all such Subcontractors and such sub-Subcontractors and suppliers as the Owner may request (in the form attached hereto as **Exhibit F**) establishing payment or satisfaction of the payment of all amounts requested by the Construction Manager in previous Applications for Payment;

.2 Copies of applications for payment submitted by Subcontractors and copies of invoices from suppliers, substantiating the amounts the Construction Manager has requested for such Subcontractors and suppliers in the Construction Manager's Application for Payment;

.3 Copies of receipts, payrolls, invoices and other documentation to substantiate the amount the Construction Manager has requested in the Application for Payment for General Conditions items; and

.4 Such other information, documentation and materials in such form and substance as the Owner or the Owners' construction lender may reasonably require.

**§ 7.1.5** Each Application for Payment shall be based on the most recent schedule of values submitted by the Construction Manager in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work and the General Conditions items, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect and Owner may require. This schedule, unless objected to by the Architect and Owner, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

**§ 7.1.6** Applications for Payment shall show the percentage of completion of each portion of the Work and the General Conditions items as of the end of the period covered by the Application for Payment. The percentage of completion shall be the percentage of that portion of the Work which has actually been completed.

**§ 7.1.7** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1 Take the Cost of the Work completed including Work and General Conditions items (less retainage in accordance with Section 7.1.8), but not to exceed without the Owner's consent, that portion of the Guaranteed Maximum Price allocated to that portion of the Work in the Schedule of Values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included even though the Guaranteed Maximum Price as established in the Guaranteed Maximum Price Amendment has not yet been adjusted by Change Order.

.2 Add the cost of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, materials suitably stored off the site at a location agreed upon in writing (less retainage in accordance with Section 7.1.8), but not to exceed, without the consent of the Owner, the portion of the Guaranteed Maximum Price allocated to such stored materials in the schedule of values.

.3 Add the Construction Manager's Fee, but not to exceed, without the Owner's consent, the amount stipulated in the Guaranteed Maximum Price Amendment. The Construction Manager's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Section 5.1.1

.4 Subtract the aggregate of previous payments made by the Owner.

.5 Subtract the shortfall, if any, indicated by the Construction Manager in the documentation required by Section 7.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

.6 Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of A201™–2007.

**§ 7.1.8** Progress payments to the Construction Manager shall be subject to retainage of ten percent (10%) until Substantial Completion, except that no retainage shall be withheld against any payments required for payment, performance, lien bond or insurance (including Subguard) premiums or other General Conditions Costs (hereinafter collectively referred to as the "No Retainage Items").   Upon achievement of Substantial Completion of the Work, the Owner shall release one half of the retainage to the Construction Manager.   The remaining retainage shall be paid to the Construction Manager at the time of Final Payment.

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                  (2035177575)

**19**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**§ 7.1.9** Except with the Owner's prior approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ 7.1.10** In taking action on the Construction Manager's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 7.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections; or that the Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

**§ 7.1.11** Payments are due and payable thirty (30) days from the date the Construction Manager's fully-complete application for payment approved by the Architect is received by the Owner.  Payments made by the Owner more than thirty (30) days after the time for payments set forth herein shall bear interest which shall begin accruing after such thirty (30) day grace period at the prime rates published by the Wall Street Journal from time to time.

**§ 7.2 Final Payment**
**§ 7.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when
.1   the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201–2007, and to satisfy other requirements, if any, which extend beyond final payment;
.2   the Construction Manager has submitted a final accounting for the Cost of the Work and a final Application for Payment; and
.3   a final Certificate for Payment has been issued by the Architect.

The Owner's final payment to the Construction Manager shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment.

**§ 7.2.2** The Owner's auditors will review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner's auditors report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Section 7.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's auditors, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the AIA Document A201–2007. The time periods stated in this Section supersede those stated in Section 9.4.1 of the AIA Document A201–2007.

**§ 7.2.3** If the Owner's auditors report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of A201–2007. A request for mediation shall be made by the Construction Manager within 60 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 60-day period shall result in the substantiated amount reported by the Owner's auditors becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

*(Paragraphs deleted)*
**ARTICLE 8   INSURANCE**
For all phases of the Project, the Construction Manager and the Owner shall purchase and maintain insurance as set forth in Article 11 of AIA Document A201–2007 and Exhibit B attached hereto.

*(Table deleted)*

Init.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                           (2035177575)

20

/

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

## ARTICLE 9   DISPUTE RESOLUTION

§ 9.1 Any Claim between the Owner and Construction Manager shall be resolved in accordance with the provisions set forth in this Article 9 and Article 15 of A201–2007. However, for Claims arising from or relating to the Construction Manager's Preconstruction Phase services, no decision by the Initial Decision Maker shall be required as a condition precedent to mediation or binding dispute resolution, and Section 9.3 of this Agreement shall not apply.

§ 9.2 For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Construction Manager do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[     ]     Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[ **X**  ]     Litigation in a court of competent jurisdiction

[     ]     Other: *(Specify)*

§ 9.3 Initial Decision Maker
The Owner will serve as the Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007 for Claims arising from or relating to the Construction Manager's Construction Phase services, unless the parties appoint below another individual, not a party to the Agreement, to serve as the Initial Decision Maker.
*(Paragraphs deleted)*

## ARTICLE 10   TERMINATION OR SUSPENSION

§ 10.1 Termination Prior to Establishment of the Guaranteed Maximum Price
§ 10.1.1 Prior to the execution of the Guaranteed Maximum Price Amendment, the Owner may terminate this Agreement upon not less than seven days' written notice to the Construction Manager for the Owner's convenience and without cause, and the Construction Manager may terminate this Agreement, upon not less than seven days' written notice to the Owner, for the reasons set forth in Section 14.1.1 of A201–2007.

§ 10.1.2 In the event of termination of this Agreement pursuant to Section 10.1.1, the Construction Manager shall not be entitled to compensation for Preconstruction Phase services.

§ 10.1.3 If the Owner terminates the Contract pursuant to Section 10.1.1 after the commencement of the Construction Phase but prior to the execution of the Guaranteed Maximum Price Amendment, the Owner shall pay to the Construction Manager an amount calculated as follows:
 .1    Take the Cost of the Work incurred by the Construction Manager to the date of termination;
 .2    Add the Construction Manager's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and
 .3    Subtract the aggregate of previous payments made by the Owner for Construction Phase services.

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Section 10.1.3.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders. All Subcontracts, purchase orders and rental

Init.

*I*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                                         (2035177575)

21

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

agreements entered into by the Construction Manager will contain provisions allowing for assignment to the Owner as described above.

If the Owner accepts assignment of subcontracts, purchase orders or rental agreements as described above, the Owner will reimburse or indemnify the Construction Manager for all costs arising under the subcontract, purchase order or rental agreement, if those costs would have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner chooses not to accept assignment of any subcontract, purchase order or rental agreement that would have constituted a Cost of the Work had this agreement not been terminated, the Construction Manager will terminate the subcontract, purchase order or rental agreement and the Owner will pay the Construction Manager the costs necessarily incurred by the Construction Manager because of such termination.

### § 10.2 Termination Subsequent to Establishing Guaranteed Maximum Price
Following execution of the Guaranteed Maximum Price Amendment and subject to the provisions of Section 10.2.1 and 10.2.2 below, the Contract may be terminated as provided in Article 14 of AIA Document A201–2007.

§ 10.2.1 If the Owner terminates the Contract after execution of the Guaranteed Price Amendment, the amount payable to the Construction Manager pursuant to Sections 14.2 and 14.4 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received pursuant to Sections 10.1.2 and 10.1.3 of this Agreement.

§ 10.2.2 If the Construction Manager terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager under Section 14.1.3 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received under Sections 10.1.2 and 10.1.3 above, except that the Construction Manager's Fee shall be calculated as if the Work had been fully completed by the Construction Manager, utilizing as necessary a reasonable estimate of the Cost of the Work for Work not actually completed.

### § 10.3 Suspension
The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007. In such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA Document A201–2007, except that the term "profit" shall be understood to mean the Construction Manager's Fee as described in Sections 5.1 and 5.3.5 of this Agreement.

### ARTICLE 11   MISCELLANEOUS PROVISIONS
§ 11.1 Terms in this Agreement shall have the same meaning as those in A201–2007.

### § 11.2 Ownership and Use of Documents
Section 1.5 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

### § 11.3 Governing Law
Section 13.1 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

### § 11.4 Assignment
The Owner and Construction Manager respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. The Construction Manager shall not assign its interest in the Contract or in the moneys due to the Construction Manager without obtaining the prior written consent of the Owner.   The Owner may assign its interest in the Contract   without obtaining the prior written consent of the Construction Manager.

### § 11.5 Other provisions:

### § 11.5.1 LIENS
The Construction Manager shall use diligent efforts to prevent any laborer's, material supplier's, mechanic's or other similar liens or claim from being filed or otherwise imposed on any part of the Work or the Project.   If any laborer's, material supplier's, mechanic's or other similar lien or claim is filed or otherwise imposed in connection with the Work by any Subcontractor, any material supplier, or any lower tier subcontractor or material supplier (collectively "Lien Claimant"), or if the Construction Manager shall file any laborer's, material supplier's,

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale. User Notes:                                                                                                                                        (2035177575)

**22**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

mechanics or other similar lien or claim, the Construction Manager shall either cause such lien to be released and discharged, or, in the case of a Lien Claimant, shall file a bond in lieu thereof within five (5) days of receipt of written notice thereof, except to the extent that such lien or claim arises solely as the Owner's failure timely to pay to the Construction Manager any amount properly due to the Lien Claimant in question or the Construction Manager, as the case may be. If the Construction Manager fails either to release and discharge any such lien or claim or, in the case of any Lien Claimant, obtain a lien discharge bond acceptable to the Owner within such five (5) day period, such failure shall give the Owner the right to terminate the Construction Manager for cause pursuant to Section 14.2.1 of AIA Document A201, and, in addition, the Owner shall have the right to bond off such lien or claim and withhold from the next progress payment or any other sum payable to the Construction Manager, an amount sufficient to pay the cost of the bond premium and the Owner's costs and expenses incurred in connection bonding off such lien or claim or withhold funds otherwise due Construction Manager equal to 150% of the lien amount to assure payment of such liens. The Construction Manager's obligations hereunder shall survive termination of this Contract and the completion of the Work. To the fullest extent permitted by law, the Construction Manager shall further indemnify, defend and hold harmless the Indemnitees (as defined in Section 3.18 of the A201 General Conditions) from and against any and all Claims and liens from the Construction Manager's Subcontractors and suppliers and from lower level subcontractors and employees or agents of any of them arising out of alleged or actual non-payment, insufficient payment or late payment of amounts owed for labor, materials, supplies, equipment or services provided in connection with the Project, unless such Claims or liens result from the failure of the Owner to make payments to the Construction Manager as provided for in the Contract Documents.

**§ 11.5.2 NON-INTERFERENCE**
The Construction Manager acknowledges that One North Dearborn Street and the areas nearby the One North Dearborn Street have been and will continue to be the site of continuing businesses throughout the duration of this Agreement. Construction Manager agrees to coordinate and schedule the Work so as to cause minimal interference with the ongoing businesses in One North Dearborn Street and the buildings located in the vicinity of the construction site, as well as with other construction work on-going in One North Dearborn Street. Construction Manager agrees that it will employ such means, methods and construction techniques so as to minimize to the greatest extent practicable any noise, vibration, dust or other form of interference with the businesses in proximity to the premises, as well as with other work occurring at One North Dearborn Street. Moreover, should Construction Manager or anyone performing work called for by this Agreement cause damage to the property of anyone within One North Dearborn Street or within the vicinity of One North Dearborn Street, including the City of Chicago or any utility company, Construction Manager shall forthwith repair such damage and restore the damaged property to its prior condition to the extent such damage is caused by the Construction Manager or its subcontractors or suppliers. Without limiting the foregoing, Construction Manager specifically agrees to repair all damage done to sidewalks, streets, trees, utilities and other public ways caused by it or anyone performing Work under this Agreement to the extent such damage is caused by Construction Manager or its subcontractors or suppliers.

**§ 11.5.3 NON-RECOURSE**
No officer, director, member of a governing board, trustee, employee or other principals, agents or representatives (whether disclosed or undisclosed) of the Owner shall be personally liable to the Construction Manager hereunder, for the Owner's payment obligations or otherwise, the Construction Manager hereby agreeing to look solely to the value of the Owner's interest in the real estate in the Project for the satisfaction of any liability of the Owner hereunder.

**§ 11.5.4 CONTRACTOR ADDITIONAL REPRESENTATIONS**
The Construction Manager represents and warrants the following to the Owner (in addition to any other representations and warranties contained in the Contract Documents) as a material inducement to the Owner to execute this Agreement, which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement and the final completion of the Work:

    .1    The Construction Manager is able to furnish the plant, tools, materials, supplies, equipment and labor required to complete the work and perform its obligations hereunder and has sufficient experience and competence to do so;

    .2    the Construction Manager is authorized to do business in the City of Chicago and is properly licensed by all necessary governmental and public and quasi-public authorities having jurisdiction over the Construction Manager and over the Work and the Project;

    .3    the Construction Manager's execution of this Agreement and performance thereof is within the Construction Manager's duly authorized powers;

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                                                                                                                                    (2035177575)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

    .4    the Construction Manager's duly authorized representative has visited the site of the Project and is familiar with the local conditions under which the Work is to be performed and has correlated observations with the requirements of the Contract Documents;

    .5    the Construction Manager possesses a high level of experience and expertise in the business administration, construction, construction management and superintendence of projects of the size, complexity and nature of this particular Project and will perform the Work with the care, skill and diligence of such a Construction Manager; and

    .6    the Construction Manager is financially solvent, able to pay all debts as they mature and possessed of sufficient working capital to complete the Work and perform all obligations hereunder.

### § 11.5.5 OWNER'S ADDITIONAL REPRESENTATIONS

The Owner represents and warrants the following to the Construction Manager (in addition to any other representations and warranties contained in the Contract Documents) as a material inducement to the Construction Manager to execute this Agreement which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement and the final completion of the Work;

    .1    the Owner is financially solvent, able to pay all debts as they mature and possessed of sufficient working capital to complete the Work and perform all obligations hereunder;

    .2    the Owner has obtained or will obtain the building permit (but not other permits and approvals customarily obtained by general contractors, subcontractors and suppliers) required to undertake the Project;

    .3    the entities comprising the Owner are duly organized limited liability companies existing under the laws of the State of Delaware, are in good standing and have the full power and authority to enter into this Agreement, and all action necessary to authorize the execution of this Agreement has been duly and validly taken.

### § 11.5.6 THE LENDER

The Construction Manager acknowledges that the Owner may finance the Work with funds provided and/or administered by a construction lender (the "Lender"). The Construction Manager agrees to comply with the reasonable requirements of the Lender which bear upon the performance of the Work. The Construction Manager shall also:

    .1    make the site of the Work available at reasonable times for inspection by the Lender or the Lender's representatives;

    .2    consent to and execute all documents reasonably requested by the Owner in connection with the assignment of this Agreement to the Lender. Such assignment shall provide that the Construction Manager agrees that, notwithstanding a default by the Owner under the provisions of this Agreement which would give the Construction Manager the right to terminate this Agreement, the Construction Manager will continue to perform its obligations hereunder (on the same terms and conditions as are set forth herein) for and on account of the Lender if the Lender shall notify the Construction Manager that the Lender agrees to pay the Construction Manager all amounts due and owing the Construction from and after the date of such notification. No such assignment shall affect Owner's liability for amounts due for work performed prior to the date of such notification; and

    .3    promptly furnish the Owner with information, documents and materials that the Owner may reasonably request from time to time in order to comply with the requirements of the Lender.

### ARTICLE 12   SCOPE OF THE AGREEMENT

§ 12.1 This Agreement represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Construction Manager.

§ 12.2 The following documents comprise the Agreement:

    .1    AIA Document A133–2009, Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

    .2    AIA Document A201–2007, General Conditions of the Contract for Construction

    .3    AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed, or the following:

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/26/2016 under Order No.4107745046_1 which expires on 01/12/2017, and is not for resale.
User Notes:                      (2035177575)

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

.4     AIA Document E202™–2008, Building Information Modeling Protocol Exhibit, if completed, or the following:

.5     Other documents:
*(List other documents, if any, forming part of the Agreement.)*

MB Real Estate Contractor Rules and Regulations

.6     List of Exhibits and Schedules
The following exhibits are attached hereto and incorporated herein by reference:
**Exhibit A** - Guaranteed Maximum Price Amendment
**Exhibit B** - Insurance Requirements
**Exhibit C** - CM's Rate Schedule
**Exhibit D** - Intentionally omitted
**Exhibit E** – Application for Payment and Sworn Statement
**Exhibit F** - Partial Lien Waiver
**Exhibit G** – Intentionally omitted
**Exhibit H** – Schedule of Key Personnel
**Exhibit I** –Final Lien Waiver
**Exhibit J** – Change Order Request
**Exhibit K** – Omitted
**Exhibit L** – Change Order
~~Schedule B – List of allowable general conditions costs~~

This Agreement is entered into as of the day and year first written above.

| | |
|---|---|
| **BCSP OND Property LLC, a Delaware Limited Liability Company** | **Bear Construction Company** |
| By:   **MB Real Estate Services, Inc., its agent** | |
| By: _____ | By: _____ |
| OWNER *(Signature)* | CONSTRUCTION MANAGER *(Signature)* |
| Michael Graham | ~~Nicholas Weinold~~  Scott Kurinsky |
| Its:  Senior Vice-President, General Manager | Its:  President , Executive Vice |
| Duly Authorized | Duly Authorized |
| _____ | _____ |
| *(Printed name and title)* | *(Printed name and title)* |

Init.

*I*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:57:04 on 07/28/2016 under Order No.4107745048_1 which expires on 01/12/2017, and is not for resale.
User Notes:                                        (2035177575)

25

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

## EXHIBIT A

## GUARANTEED MAXIMUM PRICE AMENDMENT

Pursuant to Section 2.2.6 of the Agreement, dated July 28, 2016 between BCP OND Property LLC *(Owner)* and Bear Construction Company *(Construction Manager)*, for the roof deck and roof penthouse renovations at One North Dearborn Street *(the Project)* (the "Owner/CM Agreement"), the Owner and Construction Manager establish a Guaranteed Maximum Price and Contract Time for the Work as set forth below.

### ARTICLE I
### GUARANTEED MAXIMUM PRICE

The Construction Manager's Guaranteed Maximum Price for the Work, including the estimated Cost of the Work as defined in Article 6 and the Construction Manager's Fee as defined in Article 5, is

This Price is for the performance of the Work in accordance with the Owner/CM Agreement and the Contract Documents listed and attached to this Amendment and marked Attachments A through H (and Exhibit C to the Owner/CM Agreement - CM's Rate Schedule, which is hereby incorporated herein by this reference), as follows:

**Attachment A**   Drawings on which the Guaranteed Maximum Price is based, page 1.

**Attachment B**   Allowance items, page 1, dated

**Attachment C**   Assumptions and clarifications made in preparing the Guaranteed Maximum Price, page 1, dated August 19

**Attachment D**   Completion schedule, pages 1 through 5, dated

**Attachment E**   Alternate prices, pages 1 through 3, dated July 25

**Attachment F**   [Not used.]

**Attachment G**   Final GMP Schedule of Values, pages 1 through 9, dated July 25

**Attachment H**   Adjustments to Final GMP, pages 1 through 3, dated July 25, 2016.

**Attachment I**   Specifications/Project Manual, pages 1 through 599 dated June 13, 2016.

### ARTICLE II
### CONTRACT TIME

The date of Substantial Completion established by this Amendment is: December 1, 2016.

The Construction Manager shall perform the Work in accordance with the completion schedule attached hereto as **Attachment D**.  The Substantial Completion date specified in the schedule set forth on **Attachment D** may be extended by the length of any delays which are excused pursuant to the provisions of Article 8 of the General Conditions.

### ARTICLE III
### SUBJECT TO OWNER/CM AGREEMENT

This Guaranteed Maximum Price Amendment is made and entered into in accordance with and shall be subject to all of the terms and conditions set forth in the Owner/CM Agreement.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

| OWNER | CONSTRUCTION MANAGER |
|---|---|
| BCSP OND Property, LLC, a Delaware Limited Liability Company | Bear Construction Company |
| By: MB Real Estate Services, Inc., its Agent | |

By: _____          By: _____

(Signature)                                          (Signature)

Michael Graham                                   Nicholas Weinold
Its: Senior Vice-President,                     Its: President  EX V·P·
General Manager                                  Duly Authorized
Duly Authorized                                   Scott Kurnsky

(Printed name and title)                         (Printed name and title)

9/7/16                                               9·7·16

Date _____          Date _____

ATTEST _____          ATTEST _____

2

7181542v1

# ATTACHMENT A

FILED DATE: 8/7/2018 12:15 PM 2018CH10012





PROJECT GENERAL NOTES

TYPICAL ABBREVIATIONS

DRAWING MATRIX

BEACON CAPITAL PARTNERS
1 N. Dearborn - Rooftop
Chicago, IL 60602
Roof Terrace

DRAWING MATRIX,
GENERAL NOTES, &
TYPICAL
ABBREVIATIONS

A002

FILED DATE: 8/7/2018 12:15 PM  2018CH10012



**Attachment B**
**Allowances**

1 N LaSalle, Suite 2700
Chicago, IL  60602

| Estimate #: | | | Date: | July 25, 2016 |
| --- | --- | --- | --- | --- |
| Job #: | | | | |

**Project: Roof Deck and Amenities**      To:      Adriana Calderon
**Address: 1 N Dearborn**                 JLL

<u>Description:</u>                     From:      **Scott J. Kurinsky**

Allowances included in Roof Deck and Amenities proposal of 6/29/16.

**Executive Vice President**
312-631-2820
scottk@bearcc.com

| Description of work/trade | Qty. | Unit Type | Unit Cost | | Quantity Totals |
| --- | --- | --- | --- | --- | --- |
| Interior floor preparation (carpet and LVT areas) | 1 | allow | 7,800.00 | $ | 7,800.00 |
| Interior floor prep allowance (Hard surface tile areas) | 1 | allow | 2,200.00 | $ | 2,200.00 |
| Roof top A/C unit associated with elevator machine rooms on floors 16 and 17 | 1 | allow | 30,000.00 | $ | 30,000.00 |
| Power for and transformer associated with the A/C unit for elevator machine rooms on floors 16 and 17 | 1 | allow | 35,000.00 | $ | 35,000.00 |
| Cost to extend natural gas line from basement level to rooftop fireplaces | 1 | allow | 30,000.00 | $ | 30,000.00 |
| | | | **TOTAL ALLOWANCES** | **$** | **105,000.00** |

1  All work to be performed during normal working hours, U.N.O.
2  No building fees are included (security, elevator operator, engineering, sprinkler drain downs, etc.).

Accepted by:

Signed: _____

*Scott J. Kurinsky*

**Executive Vice President**

Dated: _____



**BEAR**
CONSTRUCTION ®

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

ILED DATE: 8/7/2018 12:15 PM    2018CH10012

## Notes, Clarifications, & Exclusions - ATTACHMENT C

**Division 1 - General Requirements**
1   Square footages and other measurements used in this proposal are for our bid purposes only and should not be confused with or used to analyze rentable square foot (RSF) costs or other lease related terms.  Our costs are generally figured on usable square footage.
2   All work to be performed in a workmanlike manner by union workers during regular business hours.  No premium time is included unless expressly mentioned above.
3   We have included professional final cleaning.
4   No building fees (i.e.; elevator operator, drain down fees, security guards, etc.) are included.  Such fees will be at additional cost, if req'd.
5   Removal of debris generated by tenant's vendors (cabling, furniture, security, etc.) is not included.  They shall provide their own labor & dumpster(s) for disposal.  Any dumpster or removal costs for these items will be billed back to client at cost plus fees.
6   Schedule dates are contingent upon manufacturer lead times and delays, labor strikes, weather delays, etc.
7   No correction of pre-existing building code violations is included unless inherent to the specific project scope.
8   We exclude any liquidated damages.
9   We have included permit and permit expediting allowances.  (Later deleted as part of Alternates).
10  We exclude payment and performance bonds.
11  Our standard insurance policy includes builder's risk insurance on projects up to $1M in cost.  For projects larger than $1M, this coverage would be at
12  We exclude any provisions for LEED programs, qualifying materials or back up data for LEED unless noted otherwise.
13  We exclude any utility usage charges for power, water, heat during the course of work.
14  We exclude any testing unless noted otherwise.
15  We have included sales tax.
16  We exclude any costs or allowances to accelerate, expedite or quick ship any materials to maintain or accelerate the schedule.
17  We exclude all engineering and design work along with associated fees.
18  We exclude any costs associated for architectural and engineering CAD backgrounds required for preparation of shop drawings and as-built drawings.

**Division 2 - Demolition**
1   No testing or removal is included for any hazardous substances (mold, lead, asbestos, etc.).
2   We have not included any removal, scarifying or shot blasting of existing mastic, existing floor finish residue adhesives and underlayments.

**Division 8 - Doors and Windows**
1   Door lock cylinders and the keying of same by others.

**Division 9 - Finishes**
1   Floor preparation included above is limited to carpet prep.  Leveling of floors to +/- 1/4" or any other tolerances is not included.
2   Moisture testing of any new concrete or floor prep prior to flooring installation is not included.
3   No costs are included for the Mural at the exterior.

**Division 10 - Specialties**
1   All toilet accessories with the exception of the grab bars and mirrors as called out on the accessory schedule on sheet A452 are furnished by others.

**Division 12 - Furnishings**
1   All furniture booths and tables are by others.
1   All Terrace Umbrellas are excluded.  Furniture item by others.

**Division 21 - Fire Sprinklers**
1   Building Engineer to perform all drain down/fill of the system.
2   Tie-in figured to existing building riser.
3   All calculations for the existing fire pump and equipment are to be supplied by the building or their MEP engineers.

**Division 22 - Plumbing**
1   We have included pricing for reworking of vents and downspout.

**Division 26 - Electrical**
1   We have included life safety workand all programming by the building's FA vendor.

**Division 27 - Voice and Data Cabling**
1   Tenant voice and/or data wiring is not included; we provide the empty conduit system only
2   No costs are included for speakers or wiring.  We have included empty conduit only.

**Division 28 - Security**
1   No costs are included for card readers, wiring or terminations.

**RESPECTFULLY SUBMITTED:**

Scott Kurinsky

Executive Vice President
BEAR CONSTRUCTION COMPANY

# ATTACHMENT D

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

| ID | Task Name | Duration | Start |
|----|-----------|----------|-------|
| 1 | Establish Contract Value/Issue Contract | 15 days | Thu 7/21/16 |
| 2 | Permitting | 5 days | Thu 7/21/16 |
| 3 | Mobilization | 3 days | Thu 7/28/16 |
| 4 | Submit/Approve Structural Steel | 15 days | Thu 7/28/16 |
| 5 | Submit/Approve Millwork | 15 days | Thu 7/28/16 |
| 6 | Submit/Approve Roofing | 15 days | Thu 7/28/16 |
| 7 | Submit/Approve HM Doors & Hardware | 15 days | Thu 7/28/16 |
| 8 | Submit/Approve Curtainwall | 18 days | Thu 7/28/16 |
| 9 | Submit/Approve Ceramic | 15 days | Thu 7/28/16 |
| 10 | Submit/Approve Flooring | 18 days | Thu 7/28/16 |
| 11 | Submit/Approve Paints | 15 days | Thu 7/28/16 |
| 12 | Submit/Approve Synthetic Grass | 15 days | Thu 7/28/16 |
| 13 | Submit/Approve Canopy | 15 days | Thu 7/28/16 |
| 14 | Submit/Approve Fire Protection | 15 days | Thu 7/28/16 |
| 15 | Submit/Approve Plumbing | 15 days | Thu 7/28/16 |
| 16 | Submit/Approve HVAC | 18 days | Thu 7/28/16 |
| 17 | Submit/Approve Electrical | 15 days | Thu 7/28/16 |
| 18 | Fabricate Structural Steel | 25 days | Thu 8/18/16 |
| 19 | Fabricate Millwork | 15 days | Thu 8/18/16 |
| 20 | Fabricate Roofing | 5 days | Thu 8/18/16 |

FILED DATE: 8/7/2018 12:15 PM   2018CH10012



FILED DATE: 8/7/2018 12:15 PM    2018CH10012



FILED DATE: 8/7/2018 12:15 PM   2018CH10012



FILED DATE: 8/7/2018 12:15 PM   2018CH10012





**BEAR**
**CONSTRUCTION**
1 N LaSalle, Suite 2700
Chicago, IL 60602

# Attachment E
### Alternate Prices

---

| | |
|---|---|
| **Estimate #:** | **Date:** July 8, 2016 |
| **Job #:** | **Updated:** July 25, 2016 |
| **Project:** Roof Terrace | **To:** Adriana Calderon |
| **Address:** 1 N Dearborn | **cc:** Matthew Meives |

**Description:**

Adjustments to 6/29/16 base bid amount as discussed at 7/13/16 construction meeting at Wright Heerema Architects offices, as agreed by Greg O'Neal (Beacon), Adriana Calderon (JLL), Matthew Mieves (WHA), Michael Graham (MB RE) and Scott Kurinsky (Bear Construction). All proposed ADDS or DEDUCTS include Bear's negotiated percentages for OH/Insur/Fees.

**From:** Scott J. Kurinsky
Executive Vice President
312-631-2820
scottk@bearcc.com

| Description of work/trade | Qty. | Unit Type | Unit Cost | Quantity Totals | Not Accepted | Accepted |
|---|---|---|---|---|---|---|
| **Finishes and Decorative Items** | | | | | | |
| 1 Delete LVT where shown and return to carpet spec | 1 | lot | (5,900.00) | ($5,900.00) | ($5,900.00) | |
| 2A Delete VCT and plywood backer in seasonal furniture storage room, leave as raised floor | 1 | lot | (7,300.00) | ($7,300.00) | | ($7,300.00) |
| 2B Delete VCT/plywood backer and access flooring in seasonal furniture storage room. Provide plywood/2x landing, 27' ramp and guardrail to concrete floor, seal coat concrete floor. | 1 | lot | (3,891.00) | ($3,891.00) | | ($3,891.00) |
| NOTE: 2A and 2B can be taken together. | | | | | | |
| 3 Eliminate tile feature wall at fireplace. Provide $4,300 allowance for F&I of tile on wall | 1 | lot | (10,000.00) | ($10,000.00) | | ($10,000.00) |
| 4 Eliminate stainless steel footrail at exterior bar | 1 | lot | (6,800.00) | ($6,800.00) | | ($6,800.00) |
| 5 Eliminate wood ceiling feature over fireplace area Amended to $7,000.00 allowance. | 1 | lot | (17,300.00) | ($17,300.00) | | ($10,300.00) |
| 6 Eliminate mesh curtains at bench seating area | 1 | lot | (11,300.00) | ($11,300.00) | | ($11,300.00) |
| 7 Eliminate access floor raised platform at booth seating (lower to standard height) | 1 | lot | (242.00) | ($242.00) | ($242.00) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Eliminate CMU demo and masonry infill at east and west wings of penthouse. CMU currently exists at these abandoned louver locations and does not match brick. | 1 | lot | (5,300.00) | ($5,300.00) | | ($5,300.00) |
| 9 | Delete (1) F18 light fixture at foos ball table. No additional fixture has been added. This was a WHA VE suggestion. | 1 | lot | (3,879.00) | ($3,879.00) | | ($3,879.00) |
| 10 | Reduce quantity of CAPZ acoustic panels by 50%. New layout to be determined by architect. | 1 | lot | (7,875.00) | ($7,875.00) | | ($7,875.00) |
| 11 | Eliminate interior bar table and let furniture vendor provide as was once discussed. | 1 | lot | (7,350.00) | ($7,350.00) | ($7,350.00) | |
| 11 | Eliminate section of turf at southern most portion of deck near the bar (approximately 50% of turf scope) | 1 | lot | (10,000.00) | ($10,000.00) | | ($10,000.00) |

**Structural and Demolition Related Items**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Eliminate demolition of abandoned structure at east end with old elevator over run (white glazed masonry structure) and associated floor infill. This cost INCLUDES a $12,300 allowance to extend decking and structural on the alternate path, but this must be verified with Perry for structural. | 1 | lot | (66,800.00) | ($66,800.00) | | ($66,800.00) |
| 2 | Cost of thru bolting process to allow for window washing attachments. Demolition ($15k), Concrete ($19k), Steel thru bolts ($22k), Steel increase in members and attachment detail to steel structure and clips ($58k), Roofing ($27k) increase in mobilizations and scope. Remainder is additional weather protection and 5% fees. | 1 | lot | (148,750.00) | ($148,750.00) | ($148,750.00) | |
| 3 | Eliminate demolition of the abandoned concrete pads. Cost includes a small upcharge from the raised flooring vendor to work around the pads. This may cause several issues with structural, mechanicals and access flooring and we do not recommend accepting this savings. The offset in other costs may be higher. | 1 | lot | (11,300.00) | ($11,300.00) | ($11,300.00) | |
| 4 | Eliminate umbrella base details (umbrella cost NIC) | 1 | lot | (2,000.00) | ($2,000.00) | ($2,000.00) | |
| 5 | Eliminate FRP wall panels in 1819, but as WHA pointed out there will need to be some wall protection at the janitor's sink. So this may not be a good option. | 1 | lot | (1,000.00) | ($1,000.00) | ($1,000.00) | |

**Other Items**

| # | Description | Qty | Unit | | | | |
|---|-------------|-----|------|---|---|---|---|
| 1 | Eliminate all finishes and assocated work for interior build out of Conference Room including ceiling and entry glass & framing. Access flooring to remain in bid. | 1 | lot | (26,623.00) | ($26,623.00) | ($26,623.00) | |
| 2 | Eliminate clerestory glass at elevator lobby. Drywall and metal panels to replace glass. | 1 | lot | (2,016.00) | ($2,016.00) | | ($2,016.00) |
| 3A | Delete exterior bar entirely. | 1 | lot | (24,106.00) | ($24,106.00) | ($24,106.00) | |
| 3B | Delete exterior bar trellis entirely. | 1 | lot | (40,658.00) | ($40,658.00) | ($40,658.00) | |
| 4 | Eliminate fire pit. | 1 | lot | 0.00 | $0.00 | | |
| 5 | Replace (5) L4 bollards with (6) L1 bollards. | 1 | lot | (14,111.00) | ($14,111.00) | | ($14,111.00) |
| 6 | Eliminate rope lighting at railing and use (6) L1 bollards. | 1 | lot | (9,904.00) | ($9,904.00) | | ($9,904.00) |
| 7 | Provide closer connection point. Piping size will need to remain 2.5". Must confirm if viable location for tie-in. | 1 | lot | (12,075.00) | ($12,075.00) | | ($12,075.00) |
| 8 | Eliminate hot water return loop and use local 10 6 gallon water heater at interior bar sink. Figured to install the HWH in cabinetry | 1 | lot | (6,300.00) | ($6,300.00) | | ($6,300.00) |
| 9 | Budget cost to eliminate relocation of HVAC unit to roof and all work related to demolition of that room near elevator lobby. Includes credits for $30,000 HVAC allowance and $35,000 electrical allowances (which are actually coming back at $56k and $12k). | 1 | lot | (97,605.00) | ($97,605.00) | ($597,605.00) | |
| 10 | Supply pre-owned Tate CCN1250 bare panel access flooring in lieu of new | 1 | lot | (22,108.00) | ($22,108.00) | | ($22,108.00) |
| 11 | Eliminate roughly 45' of curtain wall near restrooms and conference room. This is an APPROXIMATE number and will need to be verified with design and structure. For now we have assumed painting the steel exterior doors and drywalling the interior corridor. | 1 | lot | (110,000.00) | ($110,000.00) | | ($110,000.00) |
| 12 | Remove door opening 1801b at Elevator Lobby | 1 | lot | (3,382.00) | ($3,382.00) | ($3,382.00) | |
| 13 | Add allowance for natural gas to roof | 1 | lot | 31,500.00 | $31,500.00 | | $31,500.00 |
| 14 | Expediting fees (to be paid by Beacon) | 1 | lot | (3,000.00) | ($3,000.00) | | ($3,000.00) |
| 15 | Permit fees (to be paid by Beacon) | 1 | lot | (15,000.00) | ($15,000.00) | | ($15,000.00) |

| | | |
|---|---|---|
| **TOTAL POSSIBLE DEDUCTS** | ($682,375.00) | |
| **TOTAL ACCEPTED DEDUCTS** | | ($306,459.00) |
| **BID DATED 6/29/16** | | $3,689,466.00 |
| **PROPOSED CONTRACT AMOUNT** | | $3,383,007.00 |

# ATTACHMENT G

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

FILED DATE: 8/7/2018 12:15 PM    2018CH10012


**BEAR**
CONSTRUCTION ®

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| | | | | | |
|---|---|---|---|---|---|
| **Project:** | *Rooftop Terrace Improvement* | | | | |
| **Location:** | *1 North Dearborn* | | | | |
| **Architect:** | *Enter architect here* | | | | |
| **Plans:** | *6/13/2016* | | | | |
| **Addendums & RFI's:** | *RFI Answers 1 to 5* | | | | |
| **Estimator:** | *Paul Lyons / Stephen Hoelter* | | | | |

| Description of work / trade | Actual Qty. | Unit Type | Unit Cost | | |
|---|---|---|---|---|---|

### Division 1 - General Requirements

General cost/sf | $ | 13.05 | | *General Notes*

**General**

| | | | | | |
|---|---|---|---|---|---|
| Supervision - 40 hours weekly, 22 weeks | 880 | hrs | $ | 108.00 | |
| Supervision - Saturdays (12) | 96 | hrs | $ | 146.00 | |
| General Clean up, staging, protection - 32 hours weekly | 704 | hrs | $ | 95.00 | |
| Provide dumpsters/disposal | 17 | ea | $ | 420.00 | |
| Final Cleaning of interior area | 7,171 | sf | $ | 0.25 | |
| Materials for temp safety and enclosures | 1 | lot | $ | 18,500.00 | |
| Project setup/gang box | 1 | lot | $ | 850.00 | |

| | | | **General Subtotal:** | $ | **204,219.00** |
|---|---|---|---|---|---|

### Division 2 - Existing Conditions

Demo cost/sf | $ | 15.25 | | *General Notes*

**Demolition**

| | | | | | |
|---|---|---|---|---|---|
| Demolition of all MEP Items (disconnect by MEP) | 1 | lot | $ | - | |
| Demo cleanup | 1 | lot | $ | - | |
| Demo plaster ceilings | 1 | lf | $ | - | |
| Demo concrete pads | 1 | lot | $ | - | |
| Demo walls | 1 | lot | $ | - | |
| Demo rooftop openings | 1 | lot | $ | - | |
| Concrete topping removal at structural connections | 1 | lot | $ | - | |
| Demo plaster/clay tile at beam reinforcing | 1 | lot | $ | - | |
| Demo of structure at elevator extension | 1 | lot | $ | - | |
| Demo at stairs | 1 | lot | $ | - | |
| Temporary shoring of existing roof joists | 1 | ea | $ | 13,000.00 | |
| Notch out concrete at south wall as needed for new steel ($3,000 add to base) | 4 | ea | $ | 750.00 | |
| Demo of existing clay tile roof as need per details 16 & 17/S300 | 35 | ea | $ | - | |
| Haul demolished work out of building | 1 | lot | $ | - | |
| Haul demolished work out of building - MEP | 1 | lot | $ | - | |

| | | | **Demolition Subtotal:** | $ | **238,700.00** |
|---|---|---|---|---|---|

### Division 3 - Concrete

Concrete cost/sf | $ | 6.60 | | *General Notes*

**Concrete**

| | | | | | |
|---|---|---|---|---|---|
| Curb wall at 21/22 S301 | 1 | lot | | | |
| Slab infill 6/7/8 S302 | 1 | lot | | | |
| Concrete patch at steel roof connections | 45 | ea | $ | - | |
| Curb at curtainwall vestibule | 1 | lot | | | |
| Grout Steel plates | 1 | lot | | | |
| Patch clay tile roof at structural threaded rods 16 & 17 S300 | 20 | ea | $ | - | |

| | | | **Concrete Subtotal:** | $ | **103,350.00** |
|---|---|---|---|---|---|

### Division 4 - Masonry

Masonry cost/sf | $ | 1.54 | | *General Notes*

**Masonry**

| | | | | | |
|---|---|---|---|---|---|
| Demo/saw cutting/toothing/disposal of existing | 1 | lot | $ | - | |
| Masonry infill work | 1 | lot | $ | - | |
| All masonry patching | 1 | lot | $ | - | |
| New water barrier/weather | 1 | lot | $ | - | |
| All masonry flashing, weep rope, vents, ss drip edge | 1 | lot | $ | - | |



1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

| | | | | | | |
|---|---|---|---|---|---|---|
| Cleaning of new masonry work | | | 1 | lot | $ | - |

| | | | Masonry Subtotal: | $ | 25,640.00 |
|---|---|---|---|---|---|

## Division 5 - Metals

| | Struc. Stl cost/sf | $ | 53.07 | | General Notes |
|---|---|---|---|---|---|

**Structural Steel**

| | | | | |
|---|---|---|---|---|
| Plate reinforcing per S101 | 100 | ea | $ | - |
| Deck infills per sheet S100 | 1 | lot | $ | - |
| Canopy framing per 2/S100 | 1 | lot | $ | - |
| RTU openings support angles | 1 | lot | $ | - |
| Raised roof over stairs | 1 | lot | $ | - |
| Structural steel, columns, connections, metal decking stair hallway | 1 | lot | $ | - |
| Storefront support steel per S100 | 1 | lot | $ | - |
| Trellis posts per 2/S101 | 1 | lot | $ | - |
| Galvanized tube steel support for new perimeter rail | 495 | lf | $ | - |
| Umbrella base tubes | 3 | ea | $ | - |
| Vanity supports | 2 | lot | $ | - |
| Wall handrails at stairs, new stairs as detailed | 1 | lot | $ | - |
| Cut out for recessed lighting at perimeter handrail | 1 | lot | $ | - |
| Rooftop bar support steel | 1 | lot | $ | - |
| Bar stainless steel and foot rail ($11,465) | 1 | lot | $ | - |

| | | | Structural Steel Subtotal: | $ | 830,565.00 |
|---|---|---|---|---|---|

## Division 6 - Wood and Plastic

| | Carpentry cost/sf | $ | 1.05 | | General Notes |
|---|---|---|---|---|---|

**Carpentry**

| | | | | |
|---|---|---|---|---|
| Install doors, frames, hardware | 12 | openings | $ | - |
| Provide roof blocking | 1 | lot | $ | - |
| Provide misc. in-wall blocking | 1 | lot | $ | - |
| Provide blocking for millwork | 1 | lot | $ | - |
| Provide blocking at storefront | 1 | lot | $ | - |
| Install toilet accessories | 1 | lot | $ | - |
| Install smartboard - provided by others | 1 | ea | $ | 400.00 |
| Install TV - provided by others | 1 | ea | $ | 400.00 |
| Provide FRP paneling at Janitor Closet 1819 | 1 | ea | $ | 900.00 |
| | 0 | lot | $ | - |
| | 0 | lf | $ | - |
| | 0 | lf | $ | - |

| | | | Carpentry Subtotal: | $ | 16,625.00 |
|---|---|---|---|---|---|

| | Millwork cost/sf | $ | 4.13 | | General Notes |
|---|---|---|---|---|---|

**Millwork**

| | | | | |
|---|---|---|---|---|
| Install suspended wood bars with steel top plate and aircraft cable attached to deck at Fireplace in Lounge 1805 | 12 | ea | $ | - |
| Provide wood sill at Lobby | 1 | lot | $ | - |
| Provide QZ-2 quartz countertop and PL-6 plastic laminate base cabinets at Pantry 1807 | 16 | lf | $ | - |
| Provide WD-2 Reclaimed Wood Counter top with PL-6 plastic laminate base cabinets and panels at Pantry 1807 (Island Counter) | 12 | lf | $ | - |
| Provide QZ-2 quartz floating counter with in-wall support at Corridor 1815 | 12 | lf | $ | - |
| Provide plastic laminate ADA shelf and rod at Closet 1816 | 6 | lf | $ | - |
| Provide QZ-2 quartz vanity top with steel supports at Men's Toilet Room 1817 | 15 | lf | $ | - |
| Provide QZ-2 quartz vanity top with steel supports at /Women's Toilet Room | 20 | lf | $ | - |
| Provide GT-1 granite bar top and transaction top at Exterior Bar | 1 | ea | $ | - |
| Provide stainless steel storage cabinet at Exterior Bar | 1 | ea | $ | - |

| | | | Millwork Subtotal: | $ | 64,701.00 |
|---|---|---|---|---|---|

## Division 7 - Thermal and Moisture Protection

| | Roofing cost/sf | $ | 7.38 | | General Notes |
|---|---|---|---|---|---|

**Roofing**



1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| | | | | |
|---|---|---|---|---|
| New curb flashing | 3 | ea | $ | - |
| Roofing demolition/temporary roofing at elevator lobby | 854 | s | | |
| Roofing demolition/temporary roofing at stair 2 passage | 100 | sf | | |
| New flashing at curtainwall | 118 | lf | | |
| New patching/infill of roofing penthouse | 1 | lot | | |
| New roofing/sheet metal at elevator machine room | 1 | lot | | |
| Cut holes, temporary flashing new holes at steel penetrations | 42 | ea | | |
| New roofing at vestibule | 86 | sf | $ | |

| | **Roofing Subtotal:** | $ | **115,469.00** |
|---|---|---|---|
| | Metal Panels cost/sf | $ 4.13 | *General Notes* |

**Metal Panels**

| | | | | |
|---|---|---|---|---|
| Provide (horizontally) galvanized steel hat channel as required. Over which a 24 gauge prefinished steel 7.2 corrugated exposed fastener wall panel will be installed vertically. Panel manufactured by the Petersen Aluminum Corporation in a standard finish. We include all associated trim, sill, flashings and foam closures as needed to complete the system. | 860 | sf | $ | - |
| Provide 2 1/2" rigid insulation behind metal panel system | 860 | sf | $ | - |

| | **Metal Panels Subtotal:** | $ | **35,550.00** |
|---|---|---|---|
| | Metal Panels cost/sf | $ 4.13 | *General Notes* |

**Insulation & Fireproofing**

| | | | | |
|---|---|---|---|---|
| Provide 6" closed cell spray foam | 1 | lot | $ | - |
| Provide fireproofing at beam reinforcement 17th floor | 1 | lot | $ | - |
| Provide fireproofing at elevator overrun | 1 | lot | $ | - |

| | **Insul. & F.P. Subtotal:** | $ | **30,120.00** |
|---|---|---|---|
| | D/F/H cost/sf | $ 1.91 | *General Notes* |

## Division 8 - Openings

**Doors, Frames, Hardware**

| | | | | |
|---|---|---|---|---|
| Furnish HM Door - Type A | 4 | each | $ | - |
| Furnish HM Door (B-Rated) - Type A | 4 | each | $ | - |
| Furnish HM Pair of Doors - Type E | 3 | pairs | $ | - |
| Furnish SCW pair of Doors - Type E | 1 | pair | $ | - |
| Furnish single aluminum frame | 4 | each | $ | - |
| Furnish single aluminum frame (B-Rated) | 3 | each | $ | - |
| Furnish single HM frame (B-Rated) | 1 | each | $ | - |
| Furnish double aluminum frame | 1 | each | $ | - |
| Furnish double aluminum architectural frame (Conference Sidelites) | 1 | each | $ | - |
| Furnish double HM frame | 1 | each | $ | - |
| Provide associated hardware | 1 | lot | $ | - |

| | **Drs, Frs, Hrdw Subtotal:** | $ | **29,952.00** |
|---|---|---|---|
| | Glazing cost/sf | $ 13.98 | *General Notes* |

**Glazing**

| | | | | |
|---|---|---|---|---|
| Provide curtain wall front and vestibule | 1 | lot | $ | - |
| Provide aluminum door openings | 2 | pairs | $ | - |
| Provide auto operators | 2 | ea | $ | - |
| Provide glass canopy | 1 | lot | $ | - |
| Provide 1/2" clear tempered glass at Conference Room Sidelites | 1 | lot | $ | - |
| Provide glass balustrade system with handrail at Elevator Lobby access ramp | 16 | lf | $ | - |
| Provide glazed window openings with vinyl film at Elevator Lobby | 8 | ea | $ | - |
| Provide mirrors at restrooms | 8 | ea | $ | - |

| | **Glazing Subtotal:** | $ | **218,757.00** |
|---|---|---|---|
| | Drywall cost/sf | $ 6.44 | *General Notes* |

## Division 9 - Finishes

**Drywall**

| | | | | |
|---|---|---|---|---|
| Provide drywall taped and sanded, ready for paint | 1 | lot | $ | - |
| Provide 20 gauge metal framing | 1 | lot | $ | - |

ILED DATE: 8/7/2018 12:15 PM   2018CH10012

ILED DATE: 8/7/2018 12:15 PM   2018CH10012



**BEAR CONSTRUCTION®**

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| | | | | |
|---|---|---|---|---|
| Provide CSJ 16 ga exterior wall framing | 1 | l t | $ | - |
| Provide mineral wool fiber insulation | 1 | lot | $ | - |
| Provide shaft wall partitions | 1 | lot | $ | - |
| Provide furred out partitions | 1 | l t | $ | - |
| Provide underpinned partitions | 1 | lot | $ | - |
| Provide 2 hour partitions | 1 | lot | $ | - |
| Provide full height partitions | 1 | lot | $ | - |
| Provide shaft wall partitions | 1 | lot | $ | - |
| Provide chase partitions | 1 | lot | $ | - |
| Provide partial height partitions | 1 | lot | $ | - |
| Provide drywall TV alcove | 1 | lot | $ | - |
| Provide drywall fireplace alcove | 1 | lot | $ | - |
| Provide drywall coves | 1 | lot | $ | - |
| Provide drywall soffits | 1 | lot | $ | - |
| Provide drywall ceilings | 1 | lot | $ | - |
| Provide drywall shaft wall ceilings | 1 | lot | $ | - |
| Provide miscellaneous drywall patching at Stairways 1, 2, 3 | 1 | lot | $ | - |
| Provide finish taping | 1 | lot | $ | - |

| | | | | |
|---|---|---|---|---|
| | | Drywall Subtotal: | $ | 109,783.00 |
| | | ACT cost/sf | $ 1.34 | *General Notes* |

**Acoustical Ceiling**

| | | | | |
|---|---|---|---|---|
| Provide Armstrong Optima #3251 24"x24"x1" reveal edge tile laid in Armstrong Surpafine 9/16" flat grid. | 1200 | sf | $ | - |
| Provide Armstrong CAPZ 24"x48" ceiling panels | 70 | ea | $ | - |

| | | | |
|---|---|---|---|
| | Acoustical Ceiling Subtotal: | $ | 21,000.00 |
| | Flooring cost/sf | $ 3.87 | *General Notes* |

**Flooring**

| | | | | |
|---|---|---|---|---|
| Provide CPT-4 Carpet Tile | 390 | sy | $ | - |
| Provide CTP-5 Carpet Tile | 54 | sy | $ | - |
| Provide CTP-6 Walk Off Mat | 13 | sy | $ | - |
| Provide VCT-2 vinyl composition tile | 945 | sf | $ | - |
| Provide VCT -5 luxury vinyl tile | 756 | sf | $ | - |
| Provide VCT-6 luxury vinyl tile | 756 | sf | $ | - |
| Provide 1/4" masonite cover board with joints taped and filled for VCT-2, VCT-5 and VCT-6 | 1 | lf | $ | - |
| Provide WB-7 wall base | 240 | lf | $ | - |
| Provide WB-8 wall base | 360 | lf | $ | - |
| Provide WB-9 wall base | 120 | lf | $ | - |
| Provide WB-11 wall base | 120 | lot | $ | - |
| Provide stainless steel transitions between flooring types | 1 | lf | $ | - |
| Provide Vulcan Tactile warning bars | 1 | lf | $ | - |
| Provide floor prep allowance $7,800.00 | 1 | lot | $ | - |

| | | | |
|---|---|---|---|
| | Flooring Subtotal: | $ | 60,600.00 |
| | Tile cost/sf | $ 3.36 | *General Notes* |

**Ceramic Tile**

| | | | | |
|---|---|---|---|---|
| Provide FT-2 Porcelain Floor Tile | 560 | sf | $ | - |
| Provide 1/2" cement board substrate - glued and screwed at FT-2 | 560 | sf | $ | - |
| Provide waterproofing at FT-2 | 560 | sf | $ | - |
| Provide WT-3 wall tile | 126 | sf | $ | - |
| Provide WT-4 wall tile and base | 1 | lot | $ | - |
| Provide WT-5 wall tile and base | 964 | sf | $ | - |
| Provide WT-6 wall brick veneer and base | 1 | lot | $ | - |
| Provide epoxy wall and floor grout | 1 | lot | $ | - |
| Provide Schlueter wall transitions | 1 | lot | $ | - |
| Provide Schlueter floor transitions | 1 | lot | $ | - |
| Provide floor prep allowance $2,200.00 | 550 | sf | $ 4.00 | |

| | | | |
|---|---|---|---|
| | Ceramic Tile Subtotal: | $ | 52,585.00 |
| | Tile cost/sf | 0 | *General Notes* |

**Access Flooring**



1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

| | | | | |
|---|---|---|---|---|
| Provide TecCrete 1250 bare (1,000lb) concrete filled corner lock raised flooring on to 16", 28" & 34" FFH pedestal understruture. | 7100 | sf | $ | - |
| Provide raised seating area | 1 | ea | $ | - |
| Provide ramp assembly | 1 | ea | $ | - |
| Provide stair assembly | 1 | ea | $ | - |
| Provide aluminum fascia surrounding ramp and step | 1 | ea | $ | - |
| Provide cut outs at floor for linear grills, electrical boxes, plumbing | 30 | ea | $ | - |

| Access Flooring Subtotal: | $ | 89,757.00 |
|---|---|---|

## Decorating

| | | | | | | Decorating cost/sf | $ | 4.20 | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Provide PT-7 General Paint | 1 | lot | $ | - |
| Provide PT-7 Exposed Ceiling and Mechanical Equipment/Ductwork | 1 | lot | $ | - |
| Provide PT-8 Accent Paint & Drywall Ceilings | 1 | lot | $ | - |
| Provide PT-9 Accent Paint | 1 | lot | $ | - |
| Provide PT-10 at Brick (Exterior) | 1 | lot | $ | - |
| Provide PT-10 at Brick Veneer (Interior) | 1 | lot | $ | - |
| Paint Existing Stairs 1, Existing Stairs 2, Existing Stairs 3 - 1 floor only | 1 | lot | $ | - |
| Provide WC-5 wallcovering | 1 | lot | $ | - |
| Paint core doors and frames | 1 | lot | $ | - |
| Paint new hollow metal doors and frames | 1 | lot | $ | - |
| Provide building signage painted on wall - Graphics by owner | 1 | lot | $ | - |
| Paint exterior steel railings | 1 | lot | $ | - |
| Paint exterior exposed steel at glass canopy | 1 | lot | $ | - |
| Provide SC-1 concrete sealer | 1 | lot | $ | - |
| Provide custom mural on exterior wall - NO COSTS FIGURED | 1 | lot | $ | - |

| Decorating Subtotal: | $ | 65,711.00 |
|---|---|---|

## Division 10 - Specialties

| | | | | | | Specialties cost/sf | $ | 1.51 | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|

### Specialties

| Provide room identification signage - $750 Allowance | 1 | lot | $ | 750.00 |
|---|---|---|---|---|
| Furnish toilet partitions | 1 | lot | $ | 9,815.00 |
| Furnish toilet accessories - Grab Bars only per schedule | 1 | lot | $ | 296.00 |
| Furnish fireplace | 1 | lot | $ | 12,272.00 |
| Furnish fire extinguisher cabinet | 1 | lot | $ | 445.00 |

| Specialties Subtotal: | $ | 23,578.00 |
|---|---|---|

## Division 11 - Equipment

| | | | | | | Equipment cost/sf | $ | 0.48 | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|

### Equipment

| Provide Marvel 15" under counter icemaker with pump | 1 | ea | $ | 7,347.00 |
|---|---|---|---|---|
| Provide Perlick 24" under counter beverage center - ADA compliant | 2 | ea | Included | |
| Distribute and install appliances | 3 | ea | $ | 110.00 |

| Equipment Subtotal: | $ | 7,457.00 |
|---|---|---|

## Division 12 - Furnishings

| | | | | | | Furnishings cost/sf | $ | 0.91 | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|

### Furnishings

| Provide full height Shimmer Screen, Gun Metal, 3/4" beads between booths | 3 | ea | $ | 10,698.00 |
|---|---|---|---|---|
| Provide manually operated mechoshades with fascia at Conference Room | 2 | ea | $ | 3,575.00 |

| Furnishings Subtotal: | $ | 14,273.00 |
|---|---|---|

## Division 13 - Special Construction

| | | | | | | Special Construction cost/sf | $ | - | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|

### Special Construction

| No work figured | 0 | lot | | |
|---|---|---|---|---|

| Special Construction Subtotal: | $ | - |
|---|---|---|

## Division 14 - Conveying

| | | | | | | Conveying cost/sf | $ | - | | General Notes |
|---|---|---|---|---|---|---|---|---|---|---|



FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**BEAR CONSTRUCTION ®**

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| Conveying | | | | |
|---|---|---|---|---|
| No work figured | 0 | lot | | |

| | | | Conveying Subtotal: | $ |
|---|---|---|---|---|

| Fire Suppression | Fire Protection cost/sf | $ | 1.73 | General Notes |
|---|---|---|---|---|

**Fire Protection**

| | | | | |
|---|---|---|---|---|
| Provide new upright sprinkler head | 48 | ea | $ | - |
| Provide new concealed sprinkler head | 26 | ea | $ | - |
| Provide new sidewall sprinkler head | 5 | ea | $ | - |
| Provide new sidewall elevator shaft sprinkler head | 2 | ea | $ | - |
| Provide new branch lines | 1 | lot | $ | - |
| Provide new main lines | 1 | lot | $ | - |
| Provide fire extinguisher cabinet with fire extinguisher | 2 | ea | $ | - |
| Provide fire hose valve with fire extinguisher in recessed cabinet | 1 | ea | $ | - |
| Provide drawings/calculations/fees | 1 | lot | $ | - |
| Provide hydrostatic testing | 1 | lot | $ | - |

| | | | Fire Protection Subtotal: | $ | 26,998.00 |
|---|---|---|---|---|---|

| *Division 22 - Plumbing* | Plumbing cost/sf | $ | 8.81 | General Notes |
|---|---|---|---|---|

**Plumbing**

| | | | | |
|---|---|---|---|---|
| Provide demo of existing plumbing at active main | 1 | ea | $ | - |
| Provide scanning | 1 | lot | $ | - |
| Rough in waste, water and vent | 1 | lot | $ | - |
| Rework existing vents per plans | 1 | lot | $ | - |
| Provide roof drain connection | 1 | ea | $ | - |
| Provide WC water closet | 7 | ea | $ | - |
| Provide UR urinal | 3 | ea | $ | - |
| Provide SK stainless steel sink with faucet | 1 | ea | $ | - |
| Provide LAV lavatory with faucet | 8 | ea | $ | - |
| Provide WH-1 30 gallon electric hot water heater with drip pan | 1 | ea | $ | - |
| Provide HWR-1 hot water recirculation pump | 1 | ea | $ | - |
| Provide DWBS domestic water booster system | 1 | ea | $ | - |
| Provide MV thermostatic mixing valve | 2 | ea | $ | - |
| Provide FD floor drain | 4 | ea | $ | - |
| Provide OHD drain | 1 | ea | $ | - |
| Provide FPSC freeze proof sill cock | 2 | ea | $ | - |
| Provide DF drinking fountain | 1 | ea | $ | - |
| Provide MB mop basin | 1 | ea | $ | - |
| Provide cold water connection | 2 | ea | $ | - |

| | | | Plumbing Subtotal: | $ | 137,900.00 |
|---|---|---|---|---|---|

| *Division 23 - Heating, Ventilating, & Air Conditioning* | HVAC cost/sf | $ | 16.23 | General Notes |
|---|---|---|---|---|

**HVAC**

| | | | | |
|---|---|---|---|---|
| Provide sheet metal ductwork as required (underfloor & overhead) | 1 | lot | $ | - |
| Provide duct insulation | 1 | lot | $ | - |
| Provide offset of existing duct for toilet exhaust | 1 | ea | $ | - |
| Relocate existing 3-Ton air conditioner to new location for elevator | 1 | ea | $ | - |
| New 15T AHU - ALLOWANCE $30,000 | 1 | allow | $ | - |
| Provide rooftop unit (RTU-A) | 1 | ea | $ | - |
| Provide rooftop unit (RTU-B) | 1 | ea | $ | - |
| Provide controls - Automated Logic | 1 | lot | $ | - |
| Provide toilet exhaust (TE-A) | 1 | ea | $ | - |
| Provide toilet exhaust (TE-R) | 1 | ea | $ | - |
| Provide fire dampers | 8 | ea | $ | - |
| Provide volume dampers | 1 | lot | $ | - |
| Provide 2x2 supply diffuser | 10 | ea | $ | - |
| Provide 2x2 exhaust diffuser | 2 | ea | $ | - |
| Provide 36x12 exhaust grill | 4 | ea | $ | - |

FILED DATE: 8/7/2018 12:15 PM   2018CH10012



**BEAR**
**CONSTRUCTION** ®

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| Description | Qty | Unit | | |
|---|---|---|---|---|
| Provide 12x12 exhaust diffuser | 5 | ea | $ | - |
| Provide 12x6 supply grill | 1 | ea | $ | - |
| Provide 48"x4" floor mounted linear supply bar grill w/ radial damper | 17 | ea | $ | - |
| Provide 48"x4" ceiling mounted linear supply bar grill w/ radial damper | 4 | ea | $ | - |
| Provide 24"x4" floor mounted linear bar grill w/ radial damper | 2 | ea | $ | - |
| Provide door grills | 2 | ea | $ | - |
| Furnish electric cabinet heater (ECH) | 6 | ea | $ | - |
| Provide electric unit heater (EUH) | 2 | ea | $ | - |
| Provide test and balance | 1 | lot | $ | - |
| Provide hoisting of roof-mounted equipment | 1 | lot | $ | - |
| Provide opening of roof deck for RTU's | 1 | lot | $ | - |

PLUG NUMBER

| | HVAC Subtotal: | $ | 253,957.00 |
|---|---|---|---|

## Division 26 - Electrical

| | Electrical cost/sf | $ | 20.03 | General Notes |
|---|---|---|---|---|

**Electrical**

| Description | Qty | Unit | | |
|---|---|---|---|---|
| Provide temporary lighting and power | 1 | lot | $ | - |
| Provide fixture F2 | 8 | each | $ | - |
| Provide fixture F3 | 9 | each | $ | - |
| Provide fixture F4 | 2 | each | $ | - |
| Provide fixture F6 | 4 | each | $ | - |
| Provide fixture F7 | 6 | each | $ | - |
| Provide fixture F7b | 6 | each | $ | - |
| Provide fixture F12 | 10 | each | $ | - |
| Provide fixture F16 | 4 | each | $ | - |
| Provide fixture F17 | 1 | each | $ | - |
| Provide fixture F18 | 1 | each | $ | - |
| Provide fixture F19 | 45 | each | $ | - |
| Provide fixture F20 | 5 | each | $ | - |
| Provide fixture F21 | 2 | each | $ | - |
| Provide fixture F22 | 30 | each | $ | - |
| Provide fixture F23 | 1 | each | $ | - |
| Provide fixture F24 | 4 | each | $ | - |
| Provide exit sign | 9 | each | $ | - |
| Provide fixture L1 | 26 | each | $ | - |
| Provide fixture L2 | 3 | each | $ | - |
| Provide fixture L3 | 4 | each | $ | - |
| Provide fixture L4 | 5 | each | $ | - |
| Provide fixture L5 | 5 | each | $ | - |
| Provide fixture L6 | 4 | each | $ | - |
| Provide fixture L7 | 4 | each | $ | - |
| Provide fixture L8 | 2 | each | $ | - |
| Provide ceiling occupancy/vacancy sensor | 16 | each | $ | - |
| Provide ceiling daylight sensor | 2 | each | $ | - |
| Provide Lutron Switch | 5 | each | $ | - |
| Provide Dimming Switch | 1 | each | $ | - |
| Provide wall vacancy sensor switch | 2 | each | $ | - |
| Provide PC photocell for exterior lighting | 1 | each | $ | - |
| Provide duplex outlet | 21 | each | $ | - |
| Provide duplex GFI outlet | 7 | each | $ | - |
| Provide duplex WP GFI outlet | 12 | each | $ | - |
| Provide duplex SC GFI outlet | 3 | each | $ | - |
| Provide duplex SC WP GFI outlet | 4 | each | $ | - |
| Provide quad outlet | 3 | each | $ | - |
| Provide duplex floor outlet - Raised Floor | 7 | each | $ | - |
| Provide duplex WP GFI floor outlet - Pedestal Mounted | 7 | each | $ | - |
| Provide duplex outlet - Table Mounted | 1 | each | $ | - |
| Provide power feed for fireplace | 1 | each | $ | - |
| Provide card reader location - empty conduit | 3 | each | $ | - |
| Provide ADA push button location - empty conduit | 2 | each | $ | - |
| Provide camera location - empty conduit | 8 | each | $ | - |
| Provide tele/data location - empty conduit | 2 | each | $ | - |
| Provide speaker location - empty conduit | 10 | each | $ | - |
| Provide WP speaker location - empty conduit | 6 | each | $ | - |

FILED DATE: 8/7/2018 12:15 PM  2018CH10012



1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

| | | | | |
|---|---|---|---|---|
| Provide WAP - empty conduit | 2 | each | $ | - |
| Provide AVR Rack - empty conduit | 2 | each | $ | - |
| Provide AVF Floor Box - empty conduit | 1 | each | $ | - |
| Provide TV location - empty conduit | 2 | each | $ | - |
| Provide A/V location - empty conduit | 2 | each | $ | - |
| Provide CPU location empty conduit | 1 | each | $ | - |
| Provide 1 1/2" empty conduit to phone closet | 1 | each | $ | - |
| Provide fire alarm device | 7 | each | $ | - |
| Provide WP fire alarm device | 6 | each | $ | - |
| Provide HWR power feed | 1 | each | $ | - |
| Provide DWBS power feed | 1 | each | $ | - |
| Provide WH power feed | 1 | each | $ | - |
| Provide toilet exhaust feed | 2 | each | $ | - |
| Provide ECH & EUH power feed | 8 | each | $ | - |
| Connect to RTU and provide transformer - Sketch 6/27/16 ALLOWANCE $35,000.00 | 1 | each | $ | - |
| Provide RTU power feed | 2 | each | $ | - |
| Provide new circuit in existing panel | 1 | each | $ | - |
| Provide RDP-1 roof deck panel | 1 | each | $ | - |
| Provide HP-1 heat panel | 1 | each | $ | - |
| Provide TC-1 time clock | 1 | each | $ | - |
| Provide transformer | 1 | each | $ | - |
| Provide labor to relocate all equipment, piping and wiring for existing elevator machine room | 1 | lot | $ | - |

| | | | |
|---|---|---|---|
| **Electrical Subtotal:** | **$** | | **313,477.00** |

## Division 27 - Communications

| | | | | | Voice/Data cost/sf | $ | - | *General Notes* |
|---|---|---|---|---|---|---|---|---|

**Voice / Data Cabling**

| | | | | |
|---|---|---|---|---|
| Being handled direct by MB Real Estate for Beacon | 0 | lot | $ | - |

| | | | |
|---|---|---|---|
| **Voice/Data Cabling Subtotal:** | **$** | | **-** |

**Audio Visual**

| | | Audio Visual cost/sf | $ | - | *General Notes* |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Being handled direct by MB Real Estate for Beacon | 0 | lot | $ | - |

| | | | |
|---|---|---|---|
| **Audio Visual Subtotal:** | **$** | | **-** |

## Division 28 - Electronic Safety & Security

| | | Security cost/sf | $ | - | *General Notes* |
|---|---|---|---|---|---|

**Security Equipment**

| | | | |
|---|---|---|---|
| No work figured | lot | $ | - |

| | | | |
|---|---|---|---|
| **Elect. Safety & Security Subtotal:** | **$** | | **-** |

## Division 32 - Exterior Improvements

| | | Landscaping cost/sf | $ | 26.51 | *General Notes* |
|---|---|---|---|---|---|

**Landscaping**

| | | | | |
|---|---|---|---|---|
| General conditions | 1 | ls | $ | - |
| Pavers | 5078 | sf | $ | - |
| Planters | 19 | ea | $ | - |
| Synthetic turf | 1714 | sf | $ | - |
| Ipe railings | 351 | lot | $ | - |
| IPE at bar front | 1 | lot | $ | - |
| Ipe soffit | 1 | lot | $ | - |
| Canopy | 1 | lot | $ | - |
| Geofoam to level paver system - allow $60,000.00 | 1 | allow | $ | - |

| | | | |
|---|---|---|---|
| **Landscaping Subtotal:** | **$** | | **414,909.00** |



**CONSTRUCTION** ®

1501 Rohlwing Road
Rolling Meadows, Illinois 60008-1336
Phone: (847) 222-1900
Fax: (847) 222-9910
www.Bearcc.com

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

| | | | | |
|---|---|---|---|---|
| DIRECT CONSTRUCTION COSTS | $ | 3,496,633.00 | $ | 3,496,633.00 |
| PERMIT ALLOWANCE | | ls | $ | 15,000.00 |
| PERMIT EXPEDITOR ALLOWANCE | | ls | $ | 3,000.00 |
| BOND | 0 | ls | | EXCLUDED |
| INSURANCE | 1.00% | ls | $ | 34,967.00 |
| OVERHEAD | 1.50% | ls | $ | 52,450.00 |
| CONTRACTOR FEE | 2.50% | ls | $ | 87,416.00 |
| Division 1 General conditions: 5.84% | | | Total Fee: 10.84% | |
| TOTAL cost, subject to notes, clarifications, and alternates: | | | $ | 3,689,466.00 |
| | 0.00% | | CONTINGENCY: $ | |
| TOTAL cost, subject to notes, clarification, alternates, INCLUDING CONTINGENCY: | | | $ | 3,689,466.00 |

# ATTACHMENT H

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012



**BEAR**
CONSTRUCTION

1 N LaSalle, Suite 2700
Chicago, IL 60602

| | |
|---|---|
| Estimate #: | **Date:** July 8, 2016 |
| Job #: | **Updated:** July 25, 2016 |
| **Project:** Roof Terrace | **To:** Adriana Calderon |
| **Address:** 1 N Dearborn | **cc:** Matthew Meives |

**Description:**

Adjustments to 6/29/16 base bid amount as discussed at 7/13/16 construction meeting at Wright Heerema Architects offices, as agreed by Greg O'Neal (Beacon), Adriana Calderon (JLL), Matthew Mieves (WHA), Michael Graham (MB RE) and Scott Kurinsky (Bear Construction). All proposed ADDS or DEDUCTS include Bear's negotiated percentages for OH/Insur/Fees.

**From:** Scott J. Kurinsky
Executive Vice President
312-631-2820
scottk@bearcc.com

| | Description of work/trade | Qty. | Unit Type | Unit Cost | Quantity Totals | Not Accepted | Accepted |
|---|---|---|---|---|---|---|---|
| | Finishes and Decorative Items | | | | | | |
| 1 | Delete LVT where shown and return to carpet spec | 1 | lot | (5,900.00) | ($5,900.00) | ($5,900.00) | |
| 2A | Delete VCT and plywood backer in seasonal furniture storage room, leave as raised floor | 1 | lot | (7,300.00) | ($7,300.00) | | ($7,300.00) |
| 2B | Delete VCT/plywood backer and access flooring in seasonal furniture storage room. Provide plywood/2x landing, 27' ramp and guardrail to concrete floor, seal coat concete floor. | 1 | lot | (3,891.00) | ($3,891.00) | | ($3,891.00) |
| | NOTE: 2A and 2B can be taken together. | | | | | | |
| 3 | Eliminate tile feature wall at fireplace. Provide $4,300 allowance for F&I of tile on wall | 1 | lot | (10,000.00) | ($10,000.00) | | ($10,000.00) |
| 4 | Eliminate stainless steel footrail at exterior bar | 1 | lot | (6,800.00) | ($6,800.00) | | ($6,800.00) |
| 5 | Eliminate wood ceiling feature over fireplace area Amended to $7,000.00 allowance. | 1 | lot | (17,300.00) | ($17,300.00) | | ($10,300.00) |
| 6 | Eliminate mesh curtains at bench seating area | 1 | lot | (11,300.00) | ($11,300.00) | | ($11,300.00) |
| 7 | Eliminate access floor raised platform at booth seating (lower to standard height) | 1 | lot | (242.00) | ($242.00) | ($242.00) | |

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Eliminate CMU demo and masonry infill at east and west wings of penthouse. CMU currently exists at these abandoned louver locations and does not match brick. | 1 | lot | (5,300.00) | ($5,300.00) | ($5,300.00) |
| 9 | Delete (1) F18 light fixture at foos ball table. No additional fixture has been added. This was a WHA VE suggestion. | 1 | lot | (3,879.00) | ($3,879.00) | ($3,879.00) |
| 10 | Reduce quantity of CAPZ acoustic panels by 50%. New layout to be determined by architect. | 1 | lot | (7,875.00) | ($7,875.00) | ($7,875.00) |
| 11 | Eliminate interior bar table and let furniture vendor provide as was once discussed. | 1 | lot | (7,350.00) | ($7,350.00) | ($7,350.00) | |
| 11 | Eliminate section of turf at southern most portion of deck near the bar (approximately 50% of turf scope) | 1 | lot | (10,000.00) | ($10,000.00) | ($10,000.00) |

**Structural and Demolition Related Items**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Eliminate demolition of abandoned structure at east end with old elevator over run (white glazed masonry structure) and associated floor infill. This cost INCLUDES a $12,300 allowance to extend decking and structural on the alternate path, but this must be verified with Perry for structural. | 1 | lot | (66,800.00) | ($66,800.00) | ($66,800.00) |
| 2 | Cost of thru bolting process to allow for window washing attachments. Demolition ($15k), Concrete ($19k), Steel thru bolts ($22k), Steel increase in members and attachment detail to steel structure and clips ($58k), Roofing ($27k) increase in mobilizations and scope. Remainder is additional weather protection and 5% fees. | 1 | lot | (148,750.00) | ($148,750.00) | ($148,750.00) | |
| 3 | Eliminate demolition of the abandoned concrete pads. Cost includes a small upcharge from the raised flooring vendor to work around the pads. This may cause several issues with structural, mechanicals and access flooring and we do not recommend accepting this savings. The offset in other costs may be higher. | 1 | lot | (11,300.00) | ($11,300.00) | ($11,300.00) | |
| 4 | Eliminate umbrella base details (umbrella cost NIC) | 1 | lot | (2,000.00) | ($2,000.00) | ($2,000.00) | |
| 5 | Eliminate FRP wall panels in 1819, but as WHA pointed out there will need to be some wall protection at the janitor's sink. So this may not be a good option. | 1 | lot | (1,000.00) | ($1,000.00) | ($1,000.00) | |

| Other Items | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Eliminate all finishes and assocated work for interior build out of Conference Room including ceiling and entry glass & framing. Access flooring to remain in bid. | 1 | lot | (26,623.00) | ($26,623.00) | ($26,623.00) | |
| 2 | Eliminate clerestory glass at elevator lobby. Drywall and metal panels to replace glass. | 1 | lot | (2,016.00) | ($2,016.00) | | ($2,016.00) |
| 3A | Delete exterior bar entirely. | 1 | lot | (24,106.00) | ($24,106.00) | ($24,106.00) | |
| 3B | Delete exterior bar trellis entirely. | 1 | lot | (40,658.00) | ($40,658.00) | ($40,658.00) | |
| 4 | Eliminate fire pit. | 1 | lot | 0.00 | $0.00 | | |
| 5 | Replace (5) L4 bollards with (6) L1 bollards. | 1 | lot | (14,111.00) | ($14,111.00) | | ($14,111.00) |
| 6 | Eliminate rope lighting at railing and use (6) L1 bollards. | 1 | lot | (9,904.00) | ($9,904.00) | | ($9,904.00) |
| 7 | Provide closer connection point. Piping size will need to remain 2.5". Must confirm if viable location for tie-in. | 1 | lot | (12,075.00) | ($12,075.00) | | ($12,075.00) |
| 8 | Eliminate hot water return loop and use local 10 6 gallon water heater at interior bar sink. Figured to install the HWH in cabinetry. | 1 | lot | (6,300.00) | ($6,300.00) | | ($6,300.00) |
| 9 | Budget cost to eliminate relocation of HVAC unit to roof and all work related to demolition of that room near elevator lobby. Includes credits for $30,000 HVAC allowance and $35,000 electrical allowances (which are actually coming back at $56k and $12k). | 1 | lot | (97,605.00) | ($97,605.00) | ($97,605.00) | |
| 10 | Supply pre-owned Tate CCN1250 bare panel access flooring in lieu of new | 1 | lot | (22,108.00) | ($22,108.00) | | ($22,108.00) |
| 11 | Eliminate roughly 45' of curtain wall near restrooms and conference room. This is an APPROXIMATE number and will need to be verified with design and structure. For now we have assumed painting the steel exterior doors and drywalling the interior corridor. | 1 | lot | (110,000.00) | ($110,000.00) | | ($110,000.00) |
| 12 | Remove door opening 1801b at Elevator Lobby | 1 | lot | (3,382.00) | ($3,382.00) | ($3,382.00) | |
| 13 | Add allowance for natural gas to roof | 1 | lot | 31,500.00 | $31,500.00 | | $31,500.00 |
| 14 | Expediting fees (to be paid by Beacon) | 1 | lot | (3,000.00) | ($3,000.00) | | ($3,000.00) |
| 15 | Permit fees (to be paid by Beacon) | 1 | lot | (15,000.00) | ($15,000.00) | | ($15,000.00) |
| | | **TOTAL POSSIBLE DEDUCTS** | | | ($682,375.00) | | |
| | | | | **TOTAL ACCEPTED DEDUCTS** | | | ($306,459.00) |
| | | | | **BID DATED 6/29/16** | | | $3,689,466.00 |
| | | | | **PROPOSED CONTRACT AMOUNT** | | | $3,383,007.00 |

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**EXHIBIT B**

CONTRACTOR'S INSURANCE REQUIREMENTS

A.      Commencing with performance of Contractor's services hereunder and continuing during the term of this Agreement, Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, having a rating of A-VIII or better by AM Best, such insurance as will protect the Contractor and Owner from claims set forth below which may arise out of or result from the operations under the Agreement and for which the Contractor may be legally liable, whether such operations be by the Contractor by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone whose acts any of them may be liable:

1.      Worker's Compensation Insurance in compliance with statutory requirements of the state(s) in which the employee resides, is hired and in which the services are being performed and shall apply to all persons employed by Contractor;

2.      Employer's Liability Insurance in the amount of $500,000 each accident for bodily injury by accident, $500,000 each employee for bodily injury by disease, and $500,000 policy limit for bodily injury by disease, or such other amount as may be required by umbrella policy to effect umbrella coverage.

3.      Commercial General Liability Insurance, including coverage for bodily injury (including coverage for death, mental anguish), Premises-Operations, Independent Contractors' Protective, Products-Completed Operations, Blanket Contractual Liability, Personal Injury and Broad Form Property Damage (including coverage for Explosion, Collapse and Underground hazards), and including Cross Liability and Severability of Interests, with the following minimum limits:

4.      $1,000,000      Each Occurrence;

5.      $2,000,000      General Aggregate;

6.      $1,000,000      Personal and Advertising Injury; and

7.      $2,000,000      Products-Completed Operations Aggregate.

8.      Such policy shall provide coverage on an on a per occurrence basis and be endorsed to have the General Aggregate apply on a per location/ per project basis.  Products and Completed Operations insurance shall be maintained for a minimum period equal to the greater of (i) the period under which a claim can be asserted under the applicable statutes of limitations and/or repose or (ii)  (3) years after Substantial Completion of the Work.  The Contractual Liability Insurance shall include coverage sufficient to meet the indemnity obligations in this agreement

9.      Comprehensive Automobile Liability Insurance, including coverage for owned, non-owned, leased and hired autos, in the minimum amount of $1,000,000. combined single limit for Bodily Injury and Property Damage if

7223548v1

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

automobiles are used in the performance of Contractor's obligations hereunder;

10.     Umbrella/Excess Liability Insurance on a follow form basis with a per occurrence and annual aggregate limit of $10,000,000 per location / project. Coverage shall be excess of CGL (including products and completed operations coverage), Auto Liability and Employers Liability with such coverage being concurrent with and not more restrictive than underlying insurance.

11.     Contractor may also carry such other insurance as it deems necessary for its own protection, and any such insurance must include a waiver of insurers' rights of subrogation against Owner.

B.     Under no circumstances will Owner accept an Owner's and Contractor's Protective Liability policy or similar policy in exchange for any of the above requirements

C.     Contractor and Subcontractors are responsible for their own tools and equipment and all associated property insurance.

D.     Contractor's Insurance shall be primary and non-contributory with regard to any other insurance that may be available to Owner and additional insureds.

E.     The Owner and the Owner's lenders and all other parties otherwise designated by the Owner from time to time, including those named in paragraph J hereto, shall each shall be added as an additional insured (using CG2010 (11/85) or equivalent) on a primary non-contributory basis on all insurance (including completed operations coverage for the full term required by contract), other than Workers' Compensation and Professional Liability.  Contractor shall provide certificates of insurance during the full period of the contract and for a period of at least three (3) years (depending on the applicable statute and scope of work) after final acceptance of the Work by Owner. The above insurance policies and associated certificates shall provide that they may not be canceled or materially reduced without at least thirty (30) days' prior written notice to Owner.  In addition, renewal policies shall be obtained, and certificates delivered to Owner at least thirty (30) days prior to expiration. The Description of Location on the Certificate of Insurance must reference the Property. All costs, premiums and deductibles for the above policies shall be the sole responsibility of Contractor. All liability policies shall provide that defense costs from any claim will apply outside the applicable limits of insurance. No deductible or self-retention amount in any insurance required by the Contractor hereunder shall (a) apply to the Owner or any other additional insured or (b) exceed $25,000.

F.     Contractor and any of its Subcontractors, sub-subcontractors, agents and employees, waive all rights of subrogation against Owner for any liability and workers' compensation claims they incur in relation to work under this contract and

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

agree to have all such policies appropriately endorsed with Waiver of Subrogation endorsements.

G.       Contractor shall cause each Subcontractor to maintain insurance coverage's equivalent to those standard in the industry but in no event less than the primary GL and WC limits required above. Contractor shall cause each Subcontractor to include the same additional insured requirements and certificates of insurance as noted above for Contractor.

H.       Any insurance limits required by the contract documents are minimum limits only and not intended to restrict the liability imposed on any contractor for work performed under the contract.

I.       Each policy shall also provide that a written notice of cancellation or change of Contractor's insurance shall be sent to Owner by Contractor's insurance carrier at least thirty (30) days prior to the effective date of any such cancellation or change.

J.       The liability insurance policy or policies required hereunder shall be issued by a company or companies satisfactory to Owner in its sole discretion and shall be issued naming the following:

1.       The certificate holder is:
BCSP OND Property LLC
c/o MB Real Estate Services Inc.
One North Dearborn
Chicago, IL 60602
Attn: Michael Graham, General Manager

2.       The following entities should be named as additional insureds:
BCSP OND Property LLC;
BCSP OND LLC;
BCSP OND Alternative LLC;
BCSP VII Property Management LLC;
BCSP VII Investments, L.P.;
BCSP VII Alternative Investments, L.P.;
BCSP REIT VII, L.P.;
BCSP REIT VII GP, LLC;
BCP Strategic Partners VII, L.P.;
Beacon Capital Strategic Partners VII, L.P.;
MB Real Estate Services, Inc.;
and their successors and/or assigns

K.       Certificates evidencing the insurance coverage and conditions required must be furnished and satisfactory at least 24 hours prior to the commencement of any Work or services to be provided. A current certificate of insurance with the appropriate requirements may be faxed

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

to (312) 781-2418, Attn: Vincent Torossy, or emailed to vtorossy@mbres.com. If you have any questions, please call (312) 781-2410.

       Original certificates should be mailed to:
       MB Real Estate Services Inc.
       One North Dearborn
       Chicago, Illinois 60602
       Attn: Michael Graham

       L.      Contractor's certificate must be accompanied by an endorsement for additional insureds, CG 20 10 07 04 "ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS." An Additional Insured Blanket or Automatic Status form is unacceptable.

7223548v1

FILED DATE: 8/7/2018 12:15 PM   2018CH10012



**Exhibit C**
**Contractor Unit Costs**

1 N LaSalle, Suite 2700
Chicago, IL  60602

| | |
|---|---|
| **Date:** | July 25, 2016 |
| | |
| **Project: Roof Deck and Amenities** | **To:** Adriana Calderon |
| **Address: 1 N Dearborn** | JLL |
| | |
| <u>Description:</u> | **From:** Scott J. Kurinsky |
| | Executive Vice President |
| **Labor rates** | 312-631-2820 |
| | scottk@bearcc.com |

| Labor Class | | Hourly Rate | Overtime | Double Time | Holiday |
|---|---|---|---|---|---|
| Project Executive | $ | 125.00 | na | na | na |
| Project Manager | $ | 90.00 | na | na | na |
| Project Engineer | $ | 65.00 | na | na | na |
| Project Accountant | $ | 55.00 | na | na | na |
| | | | | | |
| Carpenter Superintendent | $ | 116.00 | $  144.00 | $  172.00 | $  172.00 |
| Carpenter Foreman | $ | 112.00 | $  139.00 | $  166.00 | $  166.00 |
| Carpenter | $ | 108.00 | $  132.00 | $  156.00 | $  156.00 |
| Carpenter Apprentice | $ | 98.00 | $  120.00 | $  142.00 | $  142.00 |
| | | | | | |
| Laborer Foreman | $ | 101.00 | $  123.00 | $  145.00 | $  145.00 |
| Laborer | $ | 97.00 | $  117.00 | $  137.00 | $  137.00 |

**One North Dearborn Building**
**CONTRACTOR RULES AND REGULATIONS**

The following Building Rules and Regulations should be strictly followed by all contractors working at One North Dearborn Building:

1. The Building Manager will provide the Contractor with a list of contacts to use in the event of an emergency. The Contractor shall provide the same to the Building Manager, along with a list of all subcontractors that will be working in the building.

2. A copy of these rules must be posted on the job site at all times.

3. Building permits must be posted on the job site at all times.

4. All construction workers must be properly, permanently, and visually identified. The identification system must be approved by the General Manager prior to the start of contractor's work, and may take the form of hard hats with numbered decals or badges for attachment to clothing. All companies will maintain an updated list of authorized workers with building security and will notify security of each change.

5. All workers shall enter and exit the building through loading dock area only.

6. All workers, while working in the building, shall act in a professional manner to include but not limited to:
   a. No abusive language.
   b. No smoking.
   c. No drinking in public areas.
   d. No physical violence.
   e. No standing in lobbies.
   f. No riding in passenger elevators; any violators of this rule will be removed from the building.
   g. No use of radios in the construction area.
   h. No stealing.
   i. No article deemed hazardous, no explosives nor firearms shall be brought into the building.

7. While on site, construction workers are confined to the construction area. They are not allowed in any tenant space or public area on the first floor. Construction workers are prohibited from loitering in or around the building (sidewalks on Dearborn, Madison, State or Calhoun).

8. Construction workers may not park in the alley or dock area.

9. No interviewing of job applicants by subcontractors will occur on-site without prior approval by Building Management and a prior scheduled appointment.

10. All work areas should be cleaned daily of trash, debris and non-useful materials. Failure to do so will result in Management Office providing this service and back charging the contractor accordingly. Certain demolition and removal of trash must be done after normal Building hours. Normal business weekday hours are 7:00 a.m. – 5:30 p.m. Any dumpsters required are the responsibility of the Contractor, and must be scheduled with the Building Manager or Chief Engineer, and placed in the loading dock or other area designated by the Building Manager.

11. The construction area should be kept clean and organized at all times. The General Contractor should enforce this standard with each subcontractor and maintain the area to a level satisfactory with the Landlord.

12. Contractors will be required to monitor all traffic and work through the public elevator lobbies and corridors to insure that dust and debris are not tracked into public areas. Contractor shall place walk-off mats at all exits of construction zones to eliminate tracking of dust and dirt. If necessary, Contractor shall vacuum hallways daily to remove dirt and dust caused by the construction activity. Additionally, all trash and debris must be covered, to limit airborne dust, before entering freight elevators.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012



**One North Dearborn Building**
**CONTRACTOR RULES AND REGULATIONS**

13. Acceptable construction barricades and/or lockable doors must be maintained and used to control noise and dust pollution to a minimum level. There will be no signage posted on perimeter of barricades. All lockable doors shall be on the building master keyway.

14. All subcontractors will use rubber wheeled carts, hand trucks and tool chests, etc. when moving materials through the Building or removing trash from the Building. Tile, carpet or wall damage will be the subcontractor's responsibility. Protection of all public corridor and elevator surfaces is the responsibility of the Contractor. Masonite floor protection, or equivalent, must be provided as necessary. Protection devices must be removed nightly to facilitate cleaning.

15. During normal business hours, contractors may only use freight elevators and must allow time for normal day-to-day business to continue without any disruption.

16. The freight elevator can be reserved for contractors only after normal business hours. The Management Office will provide an elevator operator; costs associated with the use of the freight elevator shall be the tenant's General Contractor's responsibility unless otherwise noted. Absolutely no materials shall be placed on top of the freight elevator.

17. All delivery of materials to the site shall be to the loading dock. No materials may be delivered through the main entrance doors. Major deliveries and movements of materials into and through the building must be done before or after normal business hours or on a mutually agreed schedule. Major deliveries include metal studs, drywall, conduit, piping, HVAC equipment, ceiling tile, wall covering, paint and carpet. Minor deliveries will be allowed under special circumstances, but must be scheduled and approved in advance. Normal weekday business hours are 7:00 a.m. to 5:30 p.m.

18. There is a freight operator on duty from 7am to 3pm M-F. Any deliveries outside of this time must be scheduled in advance at a tenant cost of $40.00 per hour with a four hour minimum unless time rolls into regular freight hours (i.e. 6am delivery on a Monday would require only 1 hour of overtime freight cost).

19. There is no available storage space on the site. Subcontractors must store all materials within the construction area or at a mutually agreed staging area. The General Contractors and subcontractors are responsible for keeping the loading dock clear of material.

20. No materials, supplies, tools, ladders or equipment will be provided by the Building. Contractors and subcontractors must provide all such items.

21. All work that requires continuous loud noise such as core boring and setting of anchors must be scheduled 48 hours in advance and be done before or after normal business hours.

22. No coring is permitted without prior approval from Landlord. A structural engineer designated by Landlord will be required at contractor's expense unless otherwise noted.

23. No vendor or outside contractor is permitted to perform Building work inside any Building equipment or mechanical room including, but not limited to, electrical closets and telephone rooms.

24. No vendor or outside contractor is permitted to perform work in or on ceilings of any Building public areas.

25. If access to other tenant spaces is required, such access will be coordinated with Management Office at least 48 hours in advance, shall be scheduled outside normal office hours, and may involve hourly charges to contractor for building engineers' time. Please note: No spray painting during regular business hours. All after-hours spray painting must be coordinated with building engineer personnel in advance.

26. If an electrical shutdown is required which might affect existing tenants, the General Contractor should notify the Building two weeks prior to the shutdown. Shutdown shall be performed only by Landlord's approved contractor. All costs associated with the shutdown are the General Contractor's responsibility.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**One North Dearborn Building**
**CONTRACTOR RULES AND REGULATIONS**

27. Electrical subcontractors are responsible for labeling all electrical panel directories.

28. Lights in construction work areas should be turned off at the end of the work day.

29. All unused or abandoned conduits (excluding home runs), cables, and ductwork shall be removed and capped.

30. Details and specifications of any roof penetrations or equipment mounting on the roof must be submitted in writing to the Office of the Building for approval by the Landlord.

31. HVAC subcontractors are responsible for balancing the HVAC system to the satisfaction of the Building and must provide a written report of the balance test results. The Chief Engineer will review the location and calibration of all thermostats.

32. Prior to any demolition and/or construction work, it must be determined whether such work will affect the fire alarm system. If the fire alarm system is affected, the Management Office must be notified to coordinate the effort. Under no circumstance will the Building allow the fire alarm system to be shutdown overnight, on weekends or holidays. Forty-eight (48) hours written notice to the General Manager is required by the General Contractor before any work affecting the fire alarm system is undertaken. The General Contractor will be responsible for paying any fines resulting from failure to provide required notification.

33. No storage of flammable substances will be allowed in the Building unless approved in writing by the General Manager.

34. Contractor shall provide adequate fire extinguishers in the work area throughout the construction period.

35. All exposed steel must be fire proofed.

36. Should there be any damage to fireproofing on columns or beams, the General Contractor will be responsible for reinstallation of the fireproofing as approved by Landlord.

37. All penetrations through the Building's walls, floors, and ceilings must be sealed with a City of Chicago approved fire-rated material(s).

38. Under no circumstances shall the contractor drill, burn, or fasten anything to any structural steel members or clay tile system without prior written consent of Landlord.

39. In case of any accident, reports must be made out by your company and copies must be sent to both the General Manager and Security Director. Any unsafe condition noted by the Building Manager or Chief Engineer must be corrected immediately.

40. Contractor shall coordinate a pre-construction walk-through with a designated representative from the Management Office to document all existing damage in the space and at all areas which will be used by contractor, i.e. washrooms, loading docks, service corridors, etc.

EXHIBIT E

## APPLICATION FOR PAYMENT

**TO OWNER:** BCSP OND Property LLC     **APPLICATION NO.** _____
**FROM CONTRACTOR:** _____     **EFFECTIVE DATE:** _____
**PROJECT:** _____     **PERIOD TO:** _____
**TYPE OF WORK:** _____

_____

This Application for Payment attaches and incorporates hereto a Contractor's Sworn Statement current through the Effective Date of this Application for Payment.

| | | |
|---|---|---|
| 1. | **Contract Sum** | $_____ |
| 2. | **Net Change by Change Orders:** | $_____ |
| 3. | **Contract Sum to Date:** | $_____ |
| 4. | **Total Completed and Stored to Date:** | $_____ |
| 5. | **Retainage:** | $_____ |
| 6. | **Total Earned Minus Retainage (Lines 4-5):** | $_____ |
| 7. | **Line 6 Minus Prior Payments:** | $_____ |
| 8. | **CURRENT PAYMENT DUE:** | $_____ |
| 9. | **BALANCE TO FINISH:** | $_____ |

**CHANGE ORDER SUMMARY:**

| | | |
|---|---|---|
| A. | Total Change Orders Issued by Owner in Prior Months | $_____ |
| B. | Total Change Orders Issued by Owner this Month: | $_____ |
| C | Net Changes by Change Order: | $_____ |

| **CONTRACTOR'S AFFIDAVIT** | **DESIGN PROFESSIONAL'S CERTIFICATE FOR PAYMENT** |
|---|---|
| STATE OF_____    PROJECT:<br>      ) SS    _____<br>COUNTY OF_____ )<br><br>The undersigned ("Contractor"), being duly sworn, certifies that the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.<br><br>CONTRACTOR: _____<br><br>By: _____<br><br>Title: _____<br><br>Date: _____<br><br>Subscribed and sworn to me this ___ day of _____,20___<br><br>Notary Public_____<br>My Commission Expires_____ | In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Design Professional certifies to the Owner that to the best of the Design Professional's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to the AMOUNT CERTIFIED.<br><br>AMOUNT CERTIFIED     $_____<br><br>*(Attach explanation if amount certified differs from the amount applied for.)*<br><br>DESIGN PROFESSIONAL:<br>_____<br><br>By: _____<br><br>Title: _____<br><br>Date: _____<br><br>This Certificate is non-negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under the Agreement. |

G-1 – 2

**Error! Unknown document property name.**

## SWORN STATEMENT FOR CONTRACTOR AND SUBCONTRACTOR TO OWNER

Page____ of____ Pages

State of _____

County of _____  } SS

*The affiant* _____ *being first duly*
*(Name)*

*sworn, on oath deposes and says that he/she is* _____
*(Position)*

*of* _____ *that he/she*
*(Company Name, Address and Phone Number)*

*has contract with* BCSP Property LLC _____, *owner(s) for* _____
*(Owner)*

_____
*(Description of Work)*

*on the following described premises in Cook County, Illinois, to wit:* One North Dearborn Street, Chicago, Illinois
*(Property Address of Improvements)*

*That, for the purposes of said contract, the following persons have been contracted with, and have furnished, or are furnishing and preparing materials for, and have done or are doing labor on said improvement. That there is due and to become due them, respectively, the amounts set opposite their names for materials or labor as stated. That this statement is a full, true and complete statement of all such persons, the amounts paid and the amounts due or to become due to each.*

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Name and Address | Kind of work | Amount of Contract | Retention (incl. Current) | Net Previously Paid | Net Amount This Payment | Balance to Complete |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| TOTAL |  |  |  |  |  |  |

| AMOUNT OF ORIGINAL CONTRACT | $_____ | WORK COMPLETED TO DATE | $_____ |
|---|---|---|---|
| EXTRAS TO CONTRACT | $_____ | LESS      %RETAINED | $_____ |
| TOTAL CONTRACT AND EXTRAS | $_____ | NET AMOUNT EARNED | $_____ |
| CREDITS TO CONTRACT | $_____ | NET PREVIOUSLY PAID | $_____ |
| ADJUSTED TOTAL CONTRACT | $_____ | NET AMOUNT OF THIS PAYMENT | $_____ |

G-2 – 2

Error! Unknown document property name.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

BALANCE TO BECOME DUE (Inc. Retention)$_____

*It is understood that the total amount paid to date plus the amount requested in this application shall not exceed _____ % of the cost of work completed to date.*

*I agree to furnish waivers of lien for all materials under my contract when demanded.*

*Signed*_____

_____
(Position)

*Subscribed and sworn to before me this* _____ *day of* _____ 20_____

_____ Notary Public

The above sworn statement should be obtained by the owner before each and every payment.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Error! Unknown document property name.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

## EXHIBIT F

## WAIVER OF LIEN TO DATE AND CONTRACTOR'S AFFIDAVIT

State of Illinois

File No.:

County of

Project:

THE UNDERSIGNED BEING duly sworn, deposes and says:
That he/she is _____ of _____, and has been
employed by _____ to furnish _____ for the
building located at One North Dearborn Street, Chicago, Illinois for which BCSP OND
Property LLC is the Owner. That the Total amount of the contract, including extras, is
$_____ on which he has received payment of $_____ prior to this
payment. That all waivers are true, correct and genuine and delivered unconditionally
and that there is no claim either legal or equitable to defeat the validity of said waivers.
That the following are the names of all parties who have furnished material or labor, or
both, for said work and all parties having contracts or subcontract(s) for specific portions
of said work or for materials entering into construction thereof and the amount due or
become due to each, and that the items mentioned include all labor and material
required to complete said work according to plans and specifications:

| Name | What for | Contract Price | Amount Paid | This Payment | Balance Due |
|------|----------|----------------|-------------|--------------|-------------|
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |

That there are no other contracts for said work outstanding, and there is nothing due or
to become due to any person for material, labor or other work of any kind done or to be
done upon or in connection with said work other than above stated.

THE UNDERSIGNED, for and in consideration of $_____, and all other good and
valuable consideration, the receipt whereof is hereby acknowledged, does hereby waive
and release any and all lien or claim of, or right to, lien, under the Statutes of the State
of Illinois, relating to mechanic's liens, with respect to and on said above-described
premises, and the improvement thereon, and on the material, fixtures, apparatus or

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

machinery furnished and on the moneys, funds or other considerations due or to become due from the Owner, on account of labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, including extras as heretofore described.

NOTE: All waivers must be for the full amount paid. If waiver is for a corporation, the corporate name should be used and the title of the officer signing waiver should be set forth. If waiver is for a partnership, the partnership name should be used, a partner should sign and designate himself as "Partner".

Signed this _____ day of _____, 20___.

Signature:_____

Subscribed and sworn to before me this _____day of _____, 20___.

Notary Signature:_____     (Notary Seal)
                           Notary Public

7223556v1

FILED DATE: 8/13/2018 12:15 PM   2018CH10012

EXHIBIT H



**BEAR CONSTRUCTION** ®

**PROJECT DIRECTORY/KEY PERSONNEL**

Bear Construction Company
1 N LaSalle, Suite 2700
Chicago, IL 60602
PH: (847) 222-1900   FX: (312)726-4?

**Bear Job No.:**
**Project:** Roof Terrace/Amenities
**Project Address:** 1 N. Dearborn, Chicago

### General Contractor

| Company | Responsibility | Contact | Phone Number | Cell Number | Email |
|---|---|---|---|---|---|
| Bear Construction Company | Executive Vice President | Scott Kurinsky | 312-631-2820 | 847-421-5964 | scottk@bearcc.com |
| Bear Construction Company | Project Executive | Steve Hoelter | 847-704-6602 | 224-500-4558 | stephenh@bearcc.com |
| Bear Construction Company | Senior Project Manager | Jack Kammerer | 312-631-2822 | 847-421-5875 | jackk@bearcc.com |
| Bear Construction Company | Superintendent | Dennis Wills | | 847-409-0895 | dwills@bearcc.com |
| Bear Construction Company | Project Coordinator | Pam Kowalski | 312-631-2816 | | pamk@bearcc.com |

### Client

| Company | Responsibility | Contact | Phone Number | Cell Number | Email |
|---|---|---|---|---|---|
| Beacon Capital | Owner | Jason Rascoe | | | jrascoe@beaconcapital.com |
| Beacon Capital | Owner | Greg O'Neal | 312.646.5109 | 312.907.7514 | goneal@beaconcapital.com |
| JLL | Project Manager | Adriana Calderon | 312.228.2179 | 312.961.2286 | adriana.calderon@am.jll.com |
| MB Real Estate | SVP, General Manager | Mike Graham | 312.781.2410 | 312.781.2418 | mgraham@mbres.com |
| MB Real Estate | Asst. General Manager | Hannah Thomas | 312.781.2410 | | hthomas@mbres.com |
| | | | | | |
| | | | | | |

### Architect/Engineer

| Company | Responsibility | Contact | Phone Number | Cell Number | Email |
|---|---|---|---|---|---|
| Wright Heerema Architects | Project Manager | Matthew Meives | 312.356.7957 | | mmeives@wharchs.com |
| | | | | | |
| | | | | | |

### Subcontractors

| Subcontractor | Trade | Contact | Phone Number | Cell Number | Email |
|---|---|---|---|---|---|
| | | | | | |

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## EXHIBIT I

### FINAL WAIVER OF LIEN AND CONTRACTOR'S AFFIDAVIT

State of Illinois                                            File No.:

County of                                                     Project:


THE UNDERSIGNED BEING duly sworn, deposes and says:
That he/she is _____ of _____, and has been
employed by _____ to furnish _____ for the
building located at One North Dearborn Street, Chicago, Illinois for which BCSP OND
Property LLC is the Owner.  That the Total amount of the contract, including extras, is
$_____ on which he has received payment of $_____ prior to this
payment.  That all waivers are true, correct and genuine and delivered unconditionally
and that there is no claim either legal or equitable to defeat the validity of said waivers.
That the following are the names of all parties who have furnished material or labor, or
both, for said work and all parties having contracts or subcontract(s) for specific portions
of said work or for materials entering into construction thereof and the amount due or
become due to each, and that the items mentioned include all labor and material
required to complete said work according to plans and specifications:

| Name | What for | Contract Price | Amount Paid | This Payment | Balance Due |
|------|----------|----------------|-------------|--------------|-------------|
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |
|      |          |                |             |              |             |

That there are no other contracts for said work outstanding, and there is nothing due or
to become due to any person for material, labor or other work of any kind done or to be
done upon or in connection with said work other than above stated.

THE UNDERSIGNED, for and in consideration of $_____, and all other good and
valuable consideration, the receipt whereof is hereby acknowledged, does hereby waive
and release any and all lien or claim of, or right to, lien, under the Statutes of the State
of Illinois, relating to mechanic's liens, with respect to and on said above-described
premises, and the improvement thereon, and on the material, fixtures, apparatus or

machinery heretofore furnished or which may be furnished at any time hereafter for the above-described premises, including extras as heretofore described.

NOTE: All waivers must be for the full amount paid. If waiver is for a corporation, the corporate name should be used and the title of the officer signing waiver should be set forth. If waiver is for a partnership, the partnership name should be used, a partner should sign and designate himself as "Partner".

Signed this _____ day of_____, 20__.

Signature:_____

Subscribed and sworn to before me this _____day of _____, 20__.

Notary Signature:_____          (Notary Seal)

　　　　　　　　　　　　　　Notary Public

7223563v1

EXHIBIT J

## CHANGE ORDER REQUEST FORM

Project: _____ (Name)  Change Order Date: _____
         _____ (Address)  Contract Date: _____
         _____              Contract For: _____

### I.  DESCRIPTION OF REQUESTED CHANGES:

_____
_____
_____
_____
_____
_____
_____

### II.  COST AND TIME ANALYSIS:

- The original Contract Sum was.................................................................$_____
- Net change to original Contract Sum by previously authorized Change Orders.......$_____
- The Contract Sum prior to this Change Order was...................................$_____
- The Contract Sum will be changed by the amount of...............................$_____
- The new Contract Sum will be.............................................................$_____

- The Date of Substantial Completion will be changed by ____ days to _____, 20___

- The Date of Final Completion will be changed by ____ days to _____, 20___

**NOTE: It is understood that the requested changes will not be undertaken until a Change Order is approved by the parties and that the General Terms and Conditions of the Agreement govern all work to be done under this Change Order Request Form.**

Submitted by Contractor:_____

Signed:_____

Title:_____

D-2

Error! Unknown document property name.

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

EXHIBIT L

## CHANGE ORDER

Project: _____ (Name)   Change Order Date: _____
         _____ (Address)   Contract Date: _____
         _____          Contract For: _____

### I.   SCOPE OF THE WORK FOR THIS CHANGE ORDER:

_____
_____
_____
_____
_____
_____
_____

### II.   COST AND TIME ANALYSIS:

- The original Contract Sum was.............................................................$_____
- Net change to original Contract Sum by previously authorized Change Orders.......$_____
- The Contract Sum prior to this Change Order was..................................$_____
- The Contract Sum will be changed by the amount of..............................$_____
- The new Contract Sum will be.................................................$_____

- The Date of Substantial Completion will be changed by ____ days to _____, 20___

- The Date of Final Completion will be changed by ____days to _____, 20___

### III.   CONTRACTOR'S WAIVER OF RIGHTS:

- Contractor waives any and all rights to claim additional time or money under the Agreement for Work to be performed pursuant to this Change Order.

### SIGNATURES

| Contractor: _____ | Owner: _____ | Design Professional: _____ |
|---|---|---|
| Signed by: _____ | Signed by: _____ | Signed by: _____ |
| Title: _____ | Title: _____ | Title: _____ |
| Date Signed: _____ | Date Signed: _____ | Date Signed: _____ |

D-3

Error! Unknown document property name.

FILED
8/7/2018 12:15 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# EXHIBIT C

Insured: BEAR CONSTRUCTION COMPANY ALGONQUIN ASSOCIA
Claim Number: 0001892730
Date of Loss: September 21, 2016



WESTFIELD
INSURANCE
Sharing Knowledge. Building Trust.®

Policy Number: CMM 4871702
Policy Period(s): 1/1/2016 - 1/1/2017
Policy Cancelled: _____

☑ CERTIFIED POLICY

I, __Lisa Evison_____, Region Service Leader of the
Westfield Insurance Company, do hereby certify that the foregoing copy was prepared under my
supervision and to the best of my knowledge and belief is a true and correct copy of the policy
with an effective date of 1/1/2016 - 1/1/2017.

Signature: _____

☐ NON-CERTIFIED POLICY

This policy is not certified for the following reason(s): _____

_____

_____

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# Commercial Insurance

# Coverage Policy



**THIS POLICY HAS BEEN
ESPECIALLY DESIGNED**

*FOR:*

*BEAR CONSTRUCTION COMPANY
ALGONQUIN ASSOCIATES, LLC*

*BY:*

*ASSURANCE AGENCY LTD*

*THROUGH:*

*WESTFIELD INSURANCE COMPANY*



**W E S T F I E L D
I N S U R A N C E**
Sharing Knowledge. Building Trust.®

ID 7004 (0411)

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

*IN WITNESS WHEREOF,* this Company has caused this policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Company if required by law.

Frank A Carrino          *Secretary*                    Edward J Layol IV          *President*

ASSURANCE AGENCY LTD
1750 E GOLF RD 11TH FLR
SCHAUMBURG, IL 60173-5835

847-797-5700

Policy Number: **CMM 4871702**

**BEAR CONSTRUCTION COMPANY**
**ALGONQUIN ASSOCIATES, LLC**
**1501 ROHLWING ROAD**
**ROLLING MEADOWS IL 60008**

# Assembly Instructions

These pages update your current policy. To keep it current, you should:

1. Check the upper right hand corner of each page in this packet.

   a. If it says "Renewal or Rating Period Declarations", **remove** the expired declarations page from your current policy and **replace** it with the updated "Renewal or Rating Period Declarations" page.

   b. If it says "Amended Declarations", insert this amended page **on top** of the last declarations page you received.

2. Every time you receive a "Renewal or Rating Period Declarations", **remove** all prior "Amended Declarations".

3. When you remove pages from your policy, retain them for a permanent record.

Thank you for placing your business with us!



## W E S T F I E L D
### I N S U R A N C E
Sharing Knowledge. Building Trust.®

P.O. Box 5001, Westfield Center, Ohio 44251-5001

CRP2117 (08-10)

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# NOTICE TO OUR POLICYHOLDERS

### PLEASE READ

Please take a moment to review your revised Commercial Vehicle Certificate. This card will replace the Vehicle Certificate currently in use.

Your card(s) are located at the back of your policy packet and should be kept with the described vehicle at all times. If you lose or misplace the card contact your agency or us for a replacement.

AD 8149 08-10

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## IMPORTANT NOTICE TO ILLINOIS POLICYHOLDERS

In compliance with House Bill 1472, approved by the Illinois Legislature on September 20, 1977, we are listing below the address of our Company and the address of the Public Service Division of the Department of Insurance:

1. Westfield Insurance
   Compliance Department
   P.O. Box 5001
   Westfield Center, Ohio 44251-5001

   1-800-368-3530
   330-887-0101

2. Illinois State Department of Insurance
   Consumer Services Section
   320 West Washington Street
   Springfield, Illinois 62767

You may direct questions about this policy to either address.  Please provide your policy number, and your agent's name and address, with any inquiry.

**AD 555** (8-10)

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

# ILLINOIS UNINSURED MOTORISTS COVERAGE AND UNDERINSURED MOTORISTS COVERAGE SELECTION/REJECTION

| Policy Number:<br>CMM 4871702 | Policy Effective Date:<br>01/01/16 |
|---|---|
| Company: | Producer: |

| Applicant/Named Insured:<br>BEAR CONSTRUCTION COMPANY | |

Illinois law permits you to make certain decisions regarding Uninsured Motorists Coverage and Underinsured Motorists Coverage. This document describes these coverages and the options available.

You should read this document carefully and contact us or your agent if you have any questions regarding Uninsured Motorists Coverage and Underinsured Motorists Coverage and your options with respect to these coverages.

This document includes general descriptions of coverage. However, no coverage is provided by this document. You should read your policy and review your Declarations page(s) and/or Schedule(s) for complete information on the coverages you are provided.

Please indicate your choice from **A.** and **B.** by initialing next to the appropriate item(s) and signing below.

**A. Bodily Injury Uninsured And Underinsured Motorists Coverages**

**Bodily Injury Uninsured Motorists Coverage** provides insurance protection to an insured for compensatory damages which the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury caused by an automobile accident. Also included are damages due to bodily injury that result from an automobile accident with a hit-and-run vehicle whose owner or operator cannot be identified.

**Bodily Injury Underinsured Motorists Coverage** provides insurance protection to an insured for compensatory damages which the insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury caused by an automobile accident.

Every automobile liability policy must include Bodily Injury Uninsured Motorists Coverage at limits equal to your limits for Bodily Injury Liability Coverage or Combined Single Limit for Liability Coverage except as described below.

If your Bodily Injury Liability Coverage limits exceed $25,000 for each person/$50,000 for each accident or a Combined Single Limit of $50,000 for each accident, you may select limits that are lower than your Bodily Injury Liability Coverage limits or Combined Single Limit for Liability Coverage for your Bodily Injury Uninsured Motorists Coverage BUT you may not select Bodily Injury Uninsured Motorists Coverage limits less than $25,000 for each person/$50,000 for each accident or a Combined Single Limit of $50,000 for each accident.

Underinsured Motorists Coverage will be provided to you ONLY IF your Bodily Injury Uninsured Motorists Coverage limits are greater than $25,000 for each person/$50,000 for each accident or a Combined Single Limit of $50,000 for each accident. When provided, your Bodily Injury Underinsured Motorists Coverage limits will be equal to your Uninsured Motorists Coverage limits.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

Please indicate your choice by initialing next to the appropriate item(s) if you are selecting Uninsured Motorists Coverage at limits less than the Bodily Injury Liability limits of your policy.

**(Initials)**

_____    I reject Bodily Injury Uninsured Motorists Coverage at limits equal to my Bodily Injury Liability Coverage (split limits) or Combined Single Limit for Liability Coverage and select the following lower limits.

**(Choose one):**

| (Initials) | Split Limits | OR | (Initials) | Combined Single Limit |
|---|---|---|---|---|
| _____ | $  25,000/50,000* | | _____ | $  50,000* |
| _____ | 50,000/100,000 | | _____ | 100,000 |
| _____ | 100,000/300,000 | | _____ | 250,000 |
| _____ | 250,000/500,000 | | _____ | 300,000 |
| _____ | 500,000/1,000,000 | | _____ | 350,000 |
| _____ | $_____ (Other) | | _____ | 500,000 |
| | | | _____ | 1,000,000 |
| | | | _____ | $_____ (Other) |

**\* IF YOU CHOOSE THIS LIMIT, BODILY INJURY UNDERINSURED MOTORISTS COVERAGE WILL NOT BE PROVIDED.**

**B.   Notice Of Availability Of Property Damage Uninsured Motorists Coverage**

**Property Damage Uninsured Motorists Coverage** provides insurance protection to an insured for compensatory damages which the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of injury to or destruction of a covered auto caused by an automobile accident. However, Property Damage Uninsured Motorists Coverage is available only for autos for which you have not purchased Collision Coverage.

Please indicate your choice by initialing next to the appropriate item(s) below.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

| (Initials) | |
|---|---|
| _____ | **I select Property Damage Uninsured Motorists Coverage at a limit of $15,000 for the following vehicle(s).** |
| | **(Specify Year/Make/Model):** |
| | |
| | |
| | |
| | |
| | **Premium:  $** |
| _____ | **I reject Property Damage Uninsured Motorists Coverage.** |

_____          _____

**Signature Of Applicant/Named Insured**                          **Date**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012



## IMPORTANT NOTICE TO OUR POLICYHOLDERS

*Westfield Insurance Fraud Hot-Line*

PLEASE READ THIS IMPORTANT INFORMATION

- Fraudulent insurance claims cost us all money.
- Call us if you have information concerning a fraudulent insurance claim.
- All information will be kept confidential.
- Call and discuss your information with a trained investigator, or leave the information anonymously on a telephone answering machine.
- We can all help fight insurance fraud.

AD 8522  (08-10)

## Be a Fraud Buster
## 1-800-654-6482

## Detach and retain information below for future use.

---



**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**



**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**

THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY SHALL PREVAIL.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
## INSURANCE COVERAGE and PREMIUM

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

## PREMIUM CHARGED

During your current policy period, the portion, if any, of your premium that is attributable to coverage for acts of terrorism as defined in the Act is $_____ (refer to Common Policy Declarations if blank).

**If you do not desire the coverage** for acts of terrorism as defined in the Act, as amended, you may reject the coverage and instruct the insurance company to remove it and refund the premium described above. **To reject the coverage, you must:**

1) advise the insurance company by letter (on your company letterhead),

2) signed by the owner, representative, or properly designated official of the named insured.

**The insurance company must receive your letter within 60 days** from the date shown at the bottom right side of the forms titled "Common Policy Declarations". Please refer to "Common Policy Declarations" for the mailing address of the insurance company.

If your policy premium is $500, that may represent a minimum premium. In that case, the portion that is attributable to acts of terrorism as defined in the Act, as amended, may be included within that minimum and your total premium will not be reduced if you reject coverage for acts of terrorism. The minimum premium will still apply.

Should you have any question regarding this notice, please contact your insurance agent.

**AD 85 84** 01 15

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

# IMPORTANT -- PREMIUM AUDIT NOTICE

Westfield Insurance welcomes the opportunity to service your insurance needs. The following information outlines the company's requirements for auditing your accounting records.

Your particular type of business has a policy premium that is based on estimated exposures at the time this policy was issued. Since the exposures that are used to rate your policy fluctuate during the policy year, your final premium cannot be determined until after the expiration date of the policy term.

An accurate premium audit is a benefit to you and your business. We recommend the person(s) in charge of keeping your financial records (e.g., Payroll; Gross Sales; Total Cost) be aware of insurance auditor needs. Records that are accurate and properly maintained allow you to gain the most benefit from your premium audit. Please ask questions and allow your auditor to assist you.

## WHO WILL MAKE THE AUDIT?

You will be asked to complete a premium audit in one of three ways:

**Mail/Voluntary** - a form will be provided to you. The form will ask a series of questions relative to your type of risk and your type of policy. You will be asked to fill out the form in its entirety and return to Westfield for summary.

**Telephone** - a telephone auditor will call you on the phone to discuss your risk and gather your financials. This could be a staff auditor or vendor auditor depending on your policy.

**Physical** - a field auditor will contact you to visit your premises. They will ask about your operations and physically review your financial records. This could be a staff auditor or vendor auditor depending on your policy.

## WHAT RECORDS WILL BE NEEDED?

The Premium Auditor will examine and audit all of your records that relate to your policy. The records needed will vary depending upon the type of coverage you have. In most cases, the auditor will be able to obtain the necessary audit data from two or more of the following records:

Payroll Journals with monthly/quarterly totals    Individual Earning Cards with monthly/quarterly totals
Quarterly Tax Reports for Federal/State    Certificates of Insurance for sub-contractors
General Ledgers/Income/Sales Journals

In the course of the audit, the auditor will ask some questions about your records and your business operations. This will assist the Auditor in properly classifying your operations and employees.

## HOW SHOULD YOUR RECORDS BE KEPT:

**Payroll:** Many of the premiums for your General Liability insurance are based on payroll which is defined as remuneration. Remuneration means money or substitutes for money. Payroll includes:

Wages    Bonuses    Holiday Pay    Sick Pay
Commissions    Overtime Pay    Vacation Pay    Payment for piece work

**Overtime:** The amount paid in excess of straight time pay can be deducted if the excess can be verified by your records. Your records must show overtime separately by employee.

**Division of Payroll:** Division of an individual employee's payroll to more than one classification is not allowed. Exception: For construction or erection operations, the payroll of an employee may be allocated to each type of work performed **if proper records are kept.** Payroll **cannot** be divided between construction and office or sales classifications.

**Gross Sales:** Another premium base for General Liability insurance is gross sales. This means the gross amount charged by you to others for all goods or products, sold or distributed and operations performed by you for others.

This information is provided to you as assistance for proper record-keeping requirements. Other insurance companies may differ in their requirements.

**AD 80 12 (8-10)**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## IMPORTANT NOTICE TO CONTRACTORS

The records that you keep can effect the premium you pay for General Liability Insurance. There are steps you can take to control the cost of your insurance. This notice will address the audit requirements only.

Your General Liability premium is based on your direct payroll and any subcontractor costs you may have. Subcontractor costs is an area of concern because it is one area that can be very expensive to you, the contractor.

The Total Cost for work done by an "adequately insured" subcontractor will be assigned to the appropriate "Contractors-subcontracted work" classification. Operations performed by subcontractors without adequate insurance shall be classified and rated under the specific classification description for each operation. "Adequately insured subcontractor" (for purposes of premium computation only) means the subcontractor:

> Carries liability limits at least equal to $300,000 each occurrence.

> Carries comparable coverages to your (i.e., personal injury, products/completed operations, etc.).

> Furnishes satisfactory evidence of insurance.

**How do you know if subcontractors have the proper coverage, limits and policy period?** You **require** a certificate of liability insurance be provided to you at the **commencement** of work. The certificate must indicate that the subcontractor carries adequate insurance and the policy term should cover the period that the subcontractor performs work for you. If the certificate shows the subcontractor's insurance expires on a certain date, but they will be working beyond that date, a new certificate should be required.

**Where do you get these certificates of insurance?** The subcontractor must ask their insurance agent to send you a certificate of insurance.

**What do you do with these certificates of insurance?** You must maintain these in a file for each subcontractor and provide them to the insurance auditor at the time of the audit, usually after your policy expires.

**What happens if you do not get the certificates, or they do not have the proper limits, or do not cover the proper period?** An uninsured or inadequately insured subcontractor will substantially increase the cost of your insurance.

To control your insurance costs, you can begin by requesting the proper certificates of insurance from your subcontractors and setting up a file for the certificates. Please keep **expired** certificates of insurance until after the auditor has completed the audit. Keep **unexpired** certificates until the next annual audit.

**AD 80 13 (12-92)**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

*THIS PAGE INTENTIONALLY LEFT BLANK*

## COMMERCIAL GENERAL LIABILITY ADVISORY NOTICE TO POLICYHOLDERS

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

This notice describes changes to your insurance policy. No coverage is provided by this notification nor can it be construed to replace any provisions of your policy or endorsements. You should read your policy and review your declaration page for complete information on the coverages you are provided.

If your expiring policy provided coverage for either the Contractors General Liability Expanded (CG 70 37) or Contractors General Liability Expanded Plus (CG 70 94) coverage your renewal policy is being issued with the replacement coverage offered through the new Signature Series Commercial General Liability Contractors Endorsement (CG 71 37). Please note with this change the following coverages are no longer included: Who Is An Insured - Vendors; Additional Insured - Controlling Interest; Care, Custody or Control; Voluntary Property Damage and Damage To Your Work.

If you desire to purchase these coverages separately, or would like more information about our new Signature Series Contractors program, please contact your Independent Insurance Agent.

AD 90 88  11 12

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# NOTICE TO POLICYHOLDERS
# REGARDING EXCLUSION OF CERTIFIED ACTS OF TERRORISM

Refer to the terrorism endorsement for the definition of "certified acts of terrorism." Refer to the endorsement, and to the rest of the insurance contract, for provisions that govern coverage for, or that exclude coverage for, losses arising from terrorism.

## INFORMATION ON COVERAGE FOR FIRE FOLLOWING AN ACT OF TERRORISM IN CERTAIN STATES

The terrorism exclusion does not restrict fire coverage under commercial property coverage insurance due to a statutory requirement in the states of: GA, IL, IA, MO, NC, VA, WV and WI. For the state of AZ, this rule applies for one to four family dwellings. Such coverage is subject to all policy exclusions (for example, nuclear hazard and war exclusions) and other policy provisions, including premium charged. Government and insurer participation in payment of losses for fire following a "certified act of terrorism" is subject to the same limitations on liability as outlined above. Therefore, losses attributable to fire following an act of terrorism, if otherwise covered, remain covered under your insurance in the aforementioned line(s) of insurance.

Includes copyrighted material
of Insurance Services Office Inc.,
with its permission

AD 89 53  04 09

# ADVISORY NOTICE TO POLICYHOLDERS

If your policy contains the following:

**COMMERCIAL LIABILITY UMBRELLA COVERAGE PART - (CU 2127 - FUNGI OR BACTERIA EXCLUSION)**

- Coverage is restricted to exclude bodily injury or property damage arising, directly or indirectly, out of any fungi, including but not limited to mold, or bacteria on or in a building or structure. This exclusion applies whether or not any other cause, event, material or product contributed in any sequence to the injury or damage.

- Coverage is clarified to exclude personal and advertising injury arising, directly or indirectly, out of any fungi, including but not limited to mold, or bacteria on or in a building or structure. This exclusion applies whether or not any other cause, event, material or product contributed in any sequence to the injury.

- Coverage is restricted to exclude clean-up costs associated with fungi or bacteria.

The exclusion does not apply to fungi or bacteria intended for consumption, such as mushrooms.

If you have any questions regarding these endorsements contained in this policy and how it affects your coverage, please contact your Independent Insurance Agent.

Thank you for allowing us the opportunity to provide your insurance protection.

**AD 84 79  08 10**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

# KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS

**PROBLEMS WITH YOUR INSURANCE?** - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem.

Westfield Insurance
Compliance Department
P.O. Box 5001
Westfield Center, OH 44251-5001
1-800-368-3530
330-887-0101

You can also contact the **OFFICE OF THE COMMISSIONER OF INSURANCE,** a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the **OFFICE OF THE COMMISSIONER OF INSURANCE** by contacting:

Office of the Commissioner of Insurance
Complaints Department
P.O. Box 7873
Madison, WI 53707-7873
1-800-236-8517
608-266-0103

**AD 80 75** (08-10)

FILED DATE: 8/7/2018 12:15 PM  2018CH10012



FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

COMMERCIAL PACKAGE POLICY
RENEWAL
COMMON POLICY DECLARATIONS

SR

| COMPANY PROVIDING COVERAGE | WESTFIELD INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 12-01377 | PROD. | 000 |
|---|---|---|---|---|

BEAR CONSTRUCTION COMPANY
ALGONQUIN ASSOCIATES, LLC
1501 ROHLWING ROAD
ROLLING MEADOWS IL  60008

ASSURANCE AGENCY LTD
1750 E GOLF RD 11TH FLR
SCHAUMBURG IL 60173-5835
TELEPHONE 847-797-5700

| Policy Number: CMM 4 871 702 | 11 | WIC Account Number: 1200799809 | M |
|---|---|---|---|

| Policy Period | From | 01/01/16 | at 12:01 A.M. Standard Time at your |
| | To | 01/01/17 | mailing address shown above. |

Business: CARPENTRY CONTRACTOR            Named Insured is:  Corporation

In return for the payment of the premium, and subject to all terms of this
policy, we agree with you to provide the insurance as stated in this policy.

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS

| | |
|---|---|
| COMMERCIAL PROPERTY COVERAGE PART | $ 5,815.00 |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ 101,509.00 |
| COMMERCIAL AUTO COVERAGE PART | $ 18,008.00 |
| COMMERCIAL INLAND MARINE COVERAGE PART | $ 4,602.00 |
| CRIME AND FIDELITY COVERAGE PART | Included |
| COMMERCIAL UMBRELLA COVERAGE PART | $ 18,755.00 |
| TERRORISM INSURANCE COVERAGE EXCLUDED | $ 186.00 |

Policy Annual Premium            $  148,875.00

Total Advance Annual Policy Premium  $  148,875.00

The above is a summary of your coverages. For more detail,
please refer to the individual coverage parts inside your policy.

Forms and Endorsements applicable to all coverage parts:
IL0019   0488*, IL0017   1198*, ID7004   0411 , IL0003   0908*, IL0162   0908*,
IL0147   0911*, IL0283   0907*.

COUNTERSIGNED: _____  BY _____
                     Date                        Authorized Representative

PAGE   01 OF  01          IL 00 19 (04-88)          12/21/15          HF

INTERLINE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> CRIME AND FIDELITY COVERAGE PART
> EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued.  On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc., 2007

**IL 00 03  09 08**

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - DEFENSE COSTS

This endorsement modifies insurance provided under the following:

    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART - LEGAL LIABILITY COVERAGE FORM
    COMMERCIAL PROPERTY COVERAGE PART - MORTGAGEHOLDERS ERRORS AND OMISSIONS
    COVERAGE FORM
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    FARM COVERAGE PART
    FARM UMBRELLA LIABILITY POLICY
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    PRODUCT WITHDRAWAL COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK COVERAGE PART

**A.** The provisions of Paragraph **B.** are added to all Insuring Agreements that set forth a duty to defend under:

**1.** Section **I** of the Commercial General Liability; Commercial Liability Umbrella, Employment-Related Practices Liability, Farm, Liquor Liability, Owners And Contractors Protective Liability, Pollution Liability, Products/Completed Operations Liability, Product Withdrawal, Medical Professional Liability, Railroad Protective Liability, Underground Storage Tank Coverage Parts and the Farm Umbrella Liability Policy;

**2.** Section **II** - Liability Coverage in Paragraph **A.** Coverage under the Business Auto, Garage, Motor Carrier and Truckers Coverage Forms;

**3.** Section **A.** Coverage under the Legal Liability Coverage Form; and

**4.** Coverage **C** - Mortgageholder's Liability under the Mortgageholders Errors And Omissions Coverage Form.

**B.** If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

© ISO Properties, Inc., 2007

IL 01 62  09 08

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - CIVIL UNION

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under Illinois law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

**1.** Individual Named Insured by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of such Named Insured's household, including a ward or foster child; or

**2.** Individual named in the Schedule by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of the individual's household, including a ward or foster child, if the Driver Other Car Coverage - Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of your household, including a ward or foster child.

© Insurance Services Office, Inc., 2011

IL 01 47 09 11

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

INTERLINE

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WISCONSIN CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 10 days before the effective date of cancellation.

If this policy has been in effect for less than 60 days and is not a renewal policy, we may cancel for any reason.

If this policy has been in effect for 60 days or more or is a renewal of a policy we issued, except as provided in Paragraph **7.** below, we may cancel this policy only for one or more of the following reasons:

**a.** The policy was obtained by material misrepresentation;

**b.** There has been a substantial change in the risk we originally assumed, except to the extent that we should have foreseen the change or considered the risk in writing the policy;

**c.** There have been substantial breaches of contractual duties, conditions or warranties; or

**d.** Nonpayment of premium.

If this policy has been in effect for 60 days or more or is a renewal of a policy we issued, the notice of cancellation will state the reason for cancellation.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7. Anniversary Cancellation**

If this policy is written for a term of more than one year or has no fixed expiration date, we may cancel this policy for any reason by mailing or delivering to the first Named Insured written notice of cancellation at least 60 days before the anniversary date of the policy. Such cancellation will be effective on the policy's anniversary date.

We may cancel this policy because of the termination of an insurance marketing intermediary's contract with us only if the notice of cancellation contains an offer to continue the policy with us if we receive a written request from the first Named Insured prior to the date of cancellation.

**C.** The following applies to the:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART

**1.** We may rescind this policy because of the following:

**a.** Misrepresentation made by you or on your behalf in the negotiation for or procurement of this Coverage Part, if the person knew or should have known that the representation was false;

© ISO Properties, Inc., 2006

**IL 02 83 09 07**
**Page 1 of 3**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**b.** Breach of affirmative warranty made by you or on your behalf in the negotiation for or procurement of this Coverage Part;

**c.** Failure of a condition before a loss if such failure exists at the time of loss; or

**d.** Breach of a promissory warranty if such breach exists at the time of loss.

**2.** We may not rescind this policy:

**a.** For the reasons in Paragraphs **C.1.a.** and **C.1.b.** unless:

**(1)** We rely on the misrepresentation or affirmative warranty and the misrepresentation or affirmative warranty is either material or made with intent to deceive; or

**(2)** The facts misrepresented or falsely warranted contribute to the loss.

**b.** For the reasons in Paragraphs **C.1.c.** and **C.1.d.** unless such failure or breach:

**(1)** Increases the risk at the time of loss; or

**(2)** Contributes to the loss.

**3.** If we elect to rescind this policy, we will notify the first Named Insured of our intention within 60 days after acquiring knowledge of sufficient facts to constitute grounds for rescission.

**D.** The following are added and supersede any other provisions to the contrary:

**1. Nonrenewal**

**a.** If we elect not to renew this policy we will mail or deliver written notice of nonrenewal to the first Named Insured's last mailing address known to us. We may elect not to renew for any reason; the notice will state the reason for nonrenewal. We will mail or deliver the notice at least 60 days before the expiration date of this policy.

We need not mail or deliver the notice if:

**(1)** You have insured elsewhere;

**(2)** You have accepted replacement coverage;

**(3)** You have requested or agreed to nonrenewal of this policy; or

**(4)** This policy is expressly designated as nonrenewable.

**b.** We may refuse to renew this policy because of the termination of an insurance marketing intermediary's contract with us only if the notice of nonrenewal contains an offer to renew the policy with us if we receive a written request from the first Named Insured prior to the renewal date.

**c.** If you fail to pay the renewal or continuation premium by the premium due date, this policy will terminate on the policy expiration or anniversary date, if we have:

**(1)** Given you written notice of the renewal or continuation premium not more than 75 days nor less than 10 days prior to the due date of the premium; and

**(2)** Stated clearly in the notice the effect of nonpayment of premium by the due date.

**2. Anniversary Alteration**

If this policy is written for a term of more than one year or has no fixed expiration date, we may alter the terms or premiums of this policy by mailing or delivering written notice of less favorable terms or premiums to the first Named Insured's last mailing address known to us. We will mail, by first class mail, or deliver this notice at least 60 days prior to the anniversary date.

If we notify the first Named Insured within 60 days prior to the anniversary date, the new terms or premiums will not take effect until 60 days after the notice was mailed or delivered. The notice will include a statement of the first Named Insured's right to cancel. The first Named Insured may elect to cancel the policy at any time during the 60 day period, in accordance with Paragraph **1.** of the Cancellation Common Policy Condition. If the first Named Insured elects to cancel the policy during the 60 day period, return premiums or additional premium charges will be calculated proportionately on the basis of the old premiums.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**3. Renewal With Altered Terms**

If we elect to renew this policy but on less favorable terms or at higher premiums, we will mail or deliver written notice of the new terms or premiums to the first Named Insured's last mailing address known to us. We will mail, by first class mail, or deliver this notice at least 60 days prior to the renewal date.

If we notify the first Named Insured within 60 days prior to the renewal date, the new terms or premiums will not take effect until 60 days after the notice was mailed or delivered. The notice will include a statement of the first Named Insured's right to cancel. The first Named Insured may elect to cancel the renewal policy at any time during the 60 day period, in accordance with Paragraph **1.** of the Cancellation Common Policy Condition. If the first Named Insured elects to cancel the renewal policy during the 60 day period, return premiums or additional premium charges will be calculated proportionately on the basis of the old premiums.

We need not mail or deliver this notice if the only change adverse to you is a premium increase that:

**a.** Is less than 25% and is generally applicable to the class of business to which this policy belongs; or

**b.** Results from a change based on your action that alters the nature or extent of the risk insured against, including but not limited to a change in the classification or the units of exposure, or increased policy coverage.

**E. Special Provision - Cancellation And Nonrenewal**

With respect to insurance provided under the Commercial Automobile Coverage Part, we will not cancel or refuse to renew Liability Coverage wholly or partially because of age, sex, residence, race, color, creed, religion, national origin, ancestry, marital status or occupation of anyone who is an insured.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statues, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

**IL 00 17 11 98**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012



**SR**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 12-01377 | PROD. | 000 |
|---|---|---|---|---|

BEAR CONSTRUCTION COMPANY
ALGONQUIN ASSOCIATES, LLC
1501 ROHLWING ROAD
ROLLING MEADOWS IL  60008

ASSURANCE AGENCY LTD
1750 E GOLF RD 11TH FLR
SCHAUMBURG IL 60173-5835
TELEPHONE 847-797-5700

| Policy Number: CMM 4 871 702 | |11| | WIC Account Number: 1200799809 | | M |
|---|---|---|---|---|

| Policy Period | From 01/01/16 To 01/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**DESCRIPTION OF PREMISES**

| Loc Bldg | Address, City & State | Construction | Occupancy |
|---|---|---|---|
| 001 001 | 1501 ROHLWING ROAD ROLLING MEADOWS, IL 60008 | Masonry Non-Combustible | OFFICE/WAREHOUSE |
| 002 001 | 222 W MERCHANDISE MART PLAZA CHICAGO, IL 60654 | Frame | OFFICE |
| 003 001 | 1 N LASALLE ST CHICAGO, IL 60601 | Fire Resistive | OFFICE |
| 004 001 | 411 E WISCONSIN AVE #500 MILWAUKEE, WI 53202 | Fire Resistive | OFFICE |

**COVERAGES PROVIDED - Insurance at the described premises applies only for coverages for which a limit of insurance is shown. OPTIONAL COVERAGES applicable only when entries are made in the schedules below:**

| Loc Bldg | Coverage | Coins | Infl. Guard | Repl. Cost | Limit of Insurance | Premium |
|---|---|---|---|---|---|---|
| 001 001 | Blanket Business Pers Prop | 90% | N/A | See Below | $745,000 | $2,152 |
| 001 001 | Building | 90% | N/A | Yes | $3,000,000 | $2,160 |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Extra Expense | * | N/A | N/A | $250,000 | $616 |
| | Cause of Loss:  Special | | | | | |
| 002 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 003 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 004 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |

**\* Limits on loss payment**

001 001                          40%  80% 100%

**OPTIONAL COVERAGES**

| Loc Bldg | Applicable to | Option Description | Premium |
|---|---|---|---|
| 001 001 | | Tier 2 Expanded Property Endt | $233 |
| 002 001 | | Tier 2 Expanded Property Endt | $163 |
| 003 001 | | Tier 2 Expanded Property Endt | $163 |
| 004 001 | | Tier 2 Expanded Property Endt | $175 |

| Equipment Breakdown Coverage Premium | $ | 153.00 |
|---|---|---|

| Total Advance Annual Property Premium | $ | 5,815.00 |
|---|---|---|

| Deductible is | $2500 |
|---|---|

**Forms and Endorsements applicable to this coverage part:**

| | | | | | | |
|---|---|---|---|---|---|---|
| CP0090 | 0788*, | IL0953 | 0115*, | IL0118 | 1010*, | IL0284 | 1205*, | CP0140 | 0706*, |
| CP7083 | 0408*, | CP7084 | 0408*, | CP1032 | 0808*, | CP0149 | 0607*, | CP7098 | 1113*, |
| CPDS00 | 1014*, | CP0113 | 1002*, | CP1030 | 0607*, | CP0050 | 0607*, | CP0050 | 0607*, |
| IL0415 | 1004*, | IL7041 | 1214*, | CP7090 | 0110*, | CP0415 | 1000*, | CP0405 | 0402*, |
| CP1230 | 0695*, | CP0407 | 1091*, | CP0440 | 0607*, | CP0417 | 0607*, | CP0401 | 1000*. |

| PAGE | 01 OF  01 | CP DS 00 (10-14) | 12/21/15 | HF |
|---|---|---|---|---|

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

SR

 **WESTFIELD INSURANCE** Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY EXPANDED COVERAGE**
**ENDORSEMENT - TIER 2 SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 12-01377 | **PROD.** 000 |

| NAMED INSURED AND MAILING ADDRESS | |
|---|---|
| BEAR CONSTRUCTION COMPANY<br>ALGONQUIN ASSOCIATES, LLC<br>1501 ROHLWING ROAD<br>ROLLING MEADOWS IL  60008 | ASSURANCE AGENCY LTD<br>1750 E GOLF RD 11TH FLR<br>SCHAUMBURG IL 60173-5835<br>TELEPHONE 847-797-5700 |

| Policy Number: CMM 4 871 702 |11| | WIC Account Number: 1200799809 | M |
|---|---|---|---|

| Policy<br>Period | From<br>To | 01/01/16<br>01/01/17 | at 12:01 A.M. Standard Time at your<br>mailing address shown above. |
|---|---|---|---|

**COMMERCIAL PROPERTY EXPANDED COVERAGE**
**ENDORSEMENT - TIER 2 SCHEDULE**

This schedule modifies insurance provided under the

COMMERCIAL PROPERTY EXPANDED COVERAGE ENDORSEMENT - TIER 2

**LOCATION SCHEDULE**
Note: Crime Coverages included via CR 00 21 (or CR 00 25) apply on a
policy-level basis, including those locations/buildings not scheduled below.

| Loc.<br>No. | Bldg.<br>No. | Address, City & State |
|---|---|---|
| 001 | 001 | 1501 ROHLWING ROAD, ROLLING MEADOWS, IL 60008 |
| 002 | 001 | 222 W MERCHANDISE MART PLAZA, CHICAGO, IL 60654 |
| 003 | 001 | 1 N LASALLE ST, CHICAGO, IL 60601 |
| 004 | 001 | 411 E WISCONSIN AVE #500, MILWAUKEE, WI 53202 |

The limits listed in Section I below are the most we will pay for each coverage
in any one occurrence unless a different limit is listed in Section II below.
(Refer to policy language for specific coverages, conditions and exclusions.)

**Section I**

| Coverage | Limit of Insurance |
|---|---|
| Accounts Receivable (CM 00 66)<br>    Property At Your Premises<br>    Property Away From Your Premises | <br>$50,000<br>NIL |
| Backup of Sewers or Drains | $25,000 |
| Brands and Labels (CP 04 01) | Included |
| Business Income from Dependent Properties | $25,000 |
| Changes in Temperature | $50,000 |
| Computer Coverage<br>    Hardware, Data and Media<br>    Laptops/Portable Computers and Software (away from premises) | <br>$100,000<br>$10,000 |
| Credit Card Invoices | $1,000 |
| Debris Removal - Additional Insurance (CP 04 15)<br>    Building & Contents (Combined) | <br>$75,000 |
| Deferred Payments | $50,000 |
| Employee Theft (CR 00 21) Or<br>Employee Theft - Per Loss Coverage (CR 00 25)<br>    Deductible Amount Per Occurrence: | <br>$25,000<br>NIL |
| Extra Expense | $50,000 |
| Fine Arts (IM 74 00)<br>    Max per item<br>    Catastrophe Limit<br>    Deductible:<br>    Breakage: | <br>$2,500<br>$10,000<br>NIL<br>Breakage Exclusion Applies |



**SR**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY EXPANDED COVERAGE**
**ENDORSEMENT - TIER 2 SCHEDULE**

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

| COMPANY PROVIDING COVERAGE | WESTFIELD INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 12-01377 | **PROD.** | 000 |

| NAMED INSURED AND MAILING ADDRESS | AGENCY INFO |
|---|---|
| BEAR CONSTRUCTION COMPANY<br>ALGONQUIN ASSOCIATES, LLC<br>1501 ROHLWING ROAD<br>ROLLING MEADOWS IL  60008 | ASSURANCE AGENCY LTD<br>1750 E GOLF RD 11TH FLR<br>SCHAUMBURG IL 60173-5835<br>TELEPHONE 847-797-5700 |

**Policy Number: CMM 4 871 702**    |11|    **WIC Account Number: 1200799809**    | M

| Policy Period | From | 01/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| | To | 01/01/17 | mailing address shown above. |

| | |
|---|---|
| Fire Department Service Charge<br> (Virginia Includes Volunteer Fire Departments)<br> (Increased Limits Are Not Available For Arizona) | $10,000 |
| Fire Extinguisher Recharge Expense | Included |
| Forgery or Alteration (CR 00 21 or CR 00 25)<br> Deductible Amount Per Occurrence: | $25,000<br>NIL |
| Foundations of Buildings | Included |
| Inside the Premises - Theft of Money & Securities  (CR 00 21 or CR 00 25)<br> Deductible Amount Per Occurrence:<br>Outside the Premises (CR 00 21 or CR 00 25)<br> Deductible Amount Per Occurrence: | $25,000<br>NIL<br>$25,000<br>NIL |
| Inventory and Appraisals | $10,000 |
| Lock Replacement | $2,500 |
| Newly Acquired or Constructed Property<br> Buildings<br> Business Personal Property<br> Business Income | $1,000,000/180 days<br>$500,000/180 days<br>180 days |
| Ordinance or Law (CP 04 05)<br> Loss to undamaged portion of Building (if applicable)<br> Demolition Cost<br> Increased Cost Of Construction | Incl up to bld lmt<br>$50,000<br>$50,000 |
| Outdoor Property<br> Any one tree, shrub or plant<br> Any one occurrence | $1,000<br>$10,000 |
| Outdoor Signs | $12,500 |
| Patterns, Dies, Molds, and Forms | $10,000 |
| Peak Season - Automatic Increase (CP 12 30)<br> Period (From/To): Annual Policy Period | Lesser of: 25% or $50,000 |
| Personal Effects and Property of Others<br> Any one person in any one loss<br> Any one occurrence | $5,000<br>$50,000 |
| Pollutant Clean Up and Removal  (CP 04 07)<br> Deductible: | $50,000<br>NIL |
| Premises Boundary Increased Distance | 1,000 feet |
| Property in Transit | $50,000 |
| Property off Premises<br> Max per salesperson | $25,000<br>$10,000 |
| Reward Payment<br> Information<br> Stolen Property | $10,000<br>$10,000 |

SR



**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY EXPANDED COVERAGE**
**ENDORSEMENT - TIER 2 SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 12-01377 | PROD. | 000 |
|---|---|---|---|---|

BEAR CONSTRUCTION COMPANY
ALGONQUIN ASSOCIATES, LLC
1501 ROHLWING ROAD
ROLLING MEADOWS IL  60008

ASSURANCE AGENCY LTD
1750 E GOLF RD 11TH FLR
SCHAUMBURG IL 60173-5835
TELEPHONE 847-797-5700

| Policy Number: CMM 4 871 702 | 11 | WIC Account Number: 1200799809 | M |
|---|---|---|---|

| Policy Period | From | 01/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| | To | 01/01/17 | mailing address shown above. |

Spoilage includes Refrigeration Maintenance Agrmt, Selling Price,
Breakdown Or Contamination and Power Outage (CP 04 40)      $50,000
Deductible:                                                    $500

Stamps, tickets, including lottery tickets held for sale, and
letters of credit                                             $500

Utility Services - Direct Damage (CP 04 17)
Building                                                    $50,000
   Includes: Water Supply Property
             Communication Supply Property (No Overhead
             Transmission Lines)
             Power Supply Property (No Overhead Transmission
             Lines)
Business Personal Property                                  $50,000
   Includes: Water Supply Property
             Communication Supply Property (No Overhead
             Transmission Lines)
             Power Supply Property (No Overhead Transmission
             Lines)

Vacancy                                                   11% Occupied

Valuable Papers and Records (CM 00 67)
   All Other Covered Property                              $50,000
   Property Away From Your Premises                         $5,000
   Deductible:                                                NIL

**If a limit is listed in Section II, that limit will supersede the limit in
Section I for the designated coverage(s), location(s) and building(s)
listed below.**

**If no limit is listed in Section II, there are no changes to Section I.**

Note: If "All" is designated as the Loc. No./Bldg. No. Coverage applies to all
locations, including those locations / buildings not scheduled.

**Section II**

| Loc. No. | Bldg. No. | Coverage | Limit of Insurance |
|---|---|---|---|

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

**2.** The coverage territory is:

    **a.** The United States of America (including its territories and possessions);

    **b.** Puerto Rico; and

    **c.** Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

a. Someone insured by this insurance;
b. A business firm:
   (1) Owned or controlled by you; or
   (2) That owns or controls you; or
c. Your tenant.

This will not restrict your insurance.

FILED DATE: 8/7/2018 12:15 PM    2018CH10012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to Standard Property Policy **CP 00 99**, the terms Coverage Part and Coverage Form in this endorsement are replaced by the term Policy.

**B.** The following is added to the **Legal Action Against Us** Condition:

The two year period for legal action against us is extended by the number of days between the date the proof of loss is filed with us and the date we deny the claim in whole or in part.

**C.** If this policy covers:

**1.** The following in **a.** and **b.**, then Paragraphs **2.** and **3.** apply:

**a.** Real property used principally for residential purposes up to and including a four family dwelling; or

**b.** Household or personal property that is usual or incidental to the occupancy of any premises used for residential purposes.

**2.** The second paragraph of the **Appraisal** Condition is deleted and replaced by the following:

**a.** Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally, except as provided in **b.** below.

**b.** We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions exist:

**(1)** You demanded the appraisal; and

**(2)** The full amount of loss, as set by your appraiser, is agreed to by our appraiser or by the umpire.

**3.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

**Concealment, Misrepresentation Or Fraud**

**a.** This Coverage Part or Coverage Form is void if you or any insured ("insured") commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this insurance, and such fraud, concealment or misrepresentation is stated in the policy or endorsement or in the written application for this policy and:

**(1)** Was made with actual intent to deceive; or

**(2)** Materially affected either our decision to provide this insurance or the hazard we assumed.

However, this condition will not serve as a reason to void this Coverage Part or Coverage Form after the Coverage Part or Coverage Form has been in effect for one year or one policy term, whichever is less.

**b.** This Coverage Part or Coverage Form is void if you or any other insured ("insured"), at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

**(1)** This Coverage Part or Coverage Form;

**(2)** The Covered Property;

**(3)** Your interest in the Covered Property; or

**(4)** A claim under this Coverage Part or Coverage Form.

**c.** Notwithstanding the limitations stated in **3.a.** above, we may cancel the Coverage Part or Coverage Form in accordance with the terms of the Cancellation Condition.

**D.** For the Commercial Property Coverage Part and the Standard Property Policy, the following exclusion and related provisions are added to Paragraph **B.2.** Exclusions in the Causes of Loss Forms and to any Coverage Form or policy to which a Causes of Loss Form is not attached:

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

1. We will not pay for loss or damage arising out of any act an insured commits or conspires to commit with the intent to cause a loss.

   In the event of such loss, no insured is entitled to coverage, even insureds who did not commit or conspire to commit the act causing the loss.

2. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

   a. The loss arose out of a pattern of criminal domestic violence; and

   b. The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **D.2.**, our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

E. The **Intentional Loss Exclusion** in the Causes of Loss Form - Farm Property, Mobile Agricultural Machinery And Equipment Coverage Form and Livestock Coverage Form is replaced by the following:

   1. We will not pay for loss ("loss") or damage arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss ("loss").

      In the event of such loss ("loss"), no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss ("loss").

   2. However, this exclusion, will not apply to deny payment to an innocent co-"insured" who did not cooperate in or contribute to the creation of the loss ("loss") if:

      a. The loss ("loss") arose out of a pattern of criminal domestic violence; and

      b. The perpetrator of the loss ("loss") is criminally prosecuted for the act causing the loss.

   3. If we pay a claim pursuant to Paragraph **E.2.**, our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

F. The **Intentional Loss Exclusion** in the Capital Assets Program (Output Policy) Coverage Part is replaced by the following:

   1. We will not pay for loss or damage arising out of any act an insured commits or conspires to commit with the intent to cause a loss.

      In the event of such loss, no insured is entitled to coverage, even insureds who did not commit or conspire to commit the act causing the loss.

   2. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

      a. The loss arose out of a pattern of criminal domestic violence; and

      b. The perpetrator of the loss is criminally prosecuted for the act causing the loss.

   3. If we pay a claim pursuant to Paragraph **F.2.**, our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> FARM COVERAGE PART

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. If this policy has been in effect for 60 days or less, except as provided in paragraphs **8.** and **9.** below, we may cancel this policy by mailing written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than 60 days, except as provided in paragraphs **8.** and **9.** below, we may cancel this policy only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** You have violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director that the continuation of the policy could place us in violation of the insurance laws of this State.

If we cancel this policy based on one or more of the above reasons except for nonpayment of premium, we will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

4. We will mail our notice to you, any mortgagee or lienholder known to us and to the agent or broker.

5. Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.  The cancellation will be effective even if we have not made or offered a refund.

7. Our notice of cancellation will state the reason for cancellation.

8. **REAL PROPERTY OTHER THAN RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

   The following applies only if this policy covers real property other than residential property occupied by 4 families or less:

   If any one or more of the following conditions exists at any building that is Covered Property in this policy, we may cancel this policy by mailing to you written notice of cancellation, by both certified and regular mail, if;

   **a.** After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

   **b.** The building has been unoccupied 60 or more consecutive days.  This does not apply to:

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

(1) Seasonal unoccupancy; or

(2) Buildings under repair, construction or reconstruction, if properly secured against unauthorized entry.

c. The building has:

(1) An outstanding order to vacate;

(2) An outstanding demolition order; or

(3) Been declared unsafe in accordance with the law.

d. Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

The policy will cancel 10 days following receipt of the written notice by the named insured(s).

**9. RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

The following applies if this policy covers residential properties occupied by 4 families or less:

If this policy has been in effect for 60 days, or if this is a renewal policy, we may only cancel this policy for one or more of the following reasons:

a. Nonpayment of premium;

b. The policy was obtained by misrepresentation or fraud; or

c. Any act that measurably increases the risk originally accepted.

If we cancel this policy based on one or more of the above reasons except for nonpayment of premium, we will mail written notice at least 30 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

**10.** For insurance provided under the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part, the following applies:

**GRAIN IN PUBLIC GRAIN WAREHOUSES**

(Not applicable to grain owned by the Commodity Credit Corporation)

The following applies only with respect to grain in public grain warehouses:

The first Named Insured or we may cancel this policy at any time by mailing to:

a. The other; and

b. The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

**B.** The following is added:

**NONRENEWAL**

**1.** If we decide not to renew or continue this policy, we will mail you, your agent or broker, and any mortgagee or lienholder known to us written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**2.** The following provision applies only if this policy covers residential properties occupied by 4 families or less:

a. If this policy has been issued to you and in effect with us for 5 or more years, we may not fail to renew this policy unless:

(1) The policy was obtained by misrepresentation or fraud;

(2) The risk originally accepted has measurably increased; or

(3) You received 60 days' notice of our intent not to renew as provided in 1. above.

b. If this policy has been issued to you and in effect with us for less than 5 years, we may not fail to renew this policy unless you received 30 days' notice as provided in 1. above.

**C.** The following is added:

**MAILING OF NOTICES**

We will mail cancellation and nonrenewal notices to the last addresses known to us. Proof of mailing will be sufficient proof of notice.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

COMMERCIAL PROPERTY

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

   **1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

   **2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2006          **CP 01 40  07 06**

POLICY NUMBER:  CMM 4871702                                    COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

These coverages apply to all locations covered on the policy, unless otherwise specified.

## SCHEDULE OF COVERED LOCATIONS WITH DEDUCTIBLES

| Loc. No. | Bldg. No. | Combined All Coverages Deductible | Direct Coverages Deductible | Indirect Coverages Deductible | Spoilage Deductible ($ Amt. or % of Loss) |
|---|---|---|---|---|---|
| 001 | ALL | $ 2,500 | | | |
| 002 | ALL | $ 2,500 | | | |
| 003 | ALL | $ 2,500 | | | |
| 004 | ALL | $ 2,500 | | | |

CP 70 83  04 08

POLICY NUMBER:  CMM 4871702                                    COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

Equipment Breakdown is subject to the Limits of Insurance shown in the Commercial Property Coverage Part Declarations unless otherwise specified on the schedule below.

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | $ |
| Business Income | $ |
| Extra Expense | $ |

The Limits for the following Coverages are included in the Equipment Breakdown Coverage form for $50,000 each unless otherwise specified on the schedule below.  (Note:  The Service Interruption Limit will follow the Business Income, Extra Expense or Spoilage Limit with a 24 hour waiting period).

| Coverages | Limits |
|---|---|
| Expediting Expenses | $ |
| Hazardous Substances | $ |
| Spoilage | $ |
| Computer Equipment | $ |
| Data Restoration | $ |
| Service Interruption | $ |

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

POLICY NUMBER:  CMM 4871702                                    COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

**Other Conditions**

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

CP 70 83  04 08

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The following is added as an **Additional Coverage** to the **Causes of Loss - Basic Form, Broad Form or Special Form.**

**Additional Coverage - Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below:

**1.** We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   **a.** mechanical breakdown, including rupture or bursting caused by centrifugal force;

   **b.** artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   **c.** explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   **d.** loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   **e.** loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

**2.** Unless otherwise shown in the Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance:

   **a. Expediting Expenses**

   With respect to your damaged Covered Property, we will pay up to $50,000 unless otherwise shown in a Schedule, the reasonable extra cost to:

   **(1)** make temporary repairs; and

   **(2)** expedite permanent repairs or permanent replacement.

   **b. Hazardous Substances**

   We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

   This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **2.c.(1)(b)** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

   The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

   **c. Spoilage**

   **(1)** We will pay:

      **(a)** for physical damage to "perishable goods" due to spoilage;

      **(b)** for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

      **(c)** any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**(2)** If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $50,000 unless otherwise shown in the Schedule.

**d. Computer Equipment**

We will pay for loss, damage or expense caused by or resulting from an "accident" to "computer equipment."

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, is shown as covered, is $50,000 unless otherwise shown in a Schedule. Computers used primarily to control or operate "covered equipment" are not subject to this limit.

**e. Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

**f. Service Interruption**

**(1)** Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by an "accident" to equipment that is owned by a utility, landlord or other supplier with whom you have a contract to supply you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that is not Covered Property.

**(2)** Unless otherwise shown in a Schedule, Service Interruption coverage will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident."

**(3)** The most we will pay for loss, damage or expense under this coverage is the limit that applies to Business Income, Extra Expense or Spoilage, except that if a limit is shown in a Schedule for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

**g. Business Income and Extra Expense**

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. The most we will pay for loss of Business Income you sustain or necessary Extra Expense you incur is the limit shown in the Declarations for that coverage, unless otherwise shown in a Schedule.

**3.** EXCLUSIONS

All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

**a.** The exclusions are modified as follows:

**(1)** If the Causes of Loss - Basic Form or Causes of Loss - Broad Form applies, the following is added to Exclusion **B.2.**:

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. But if an "accident" results, we will pay for the resulting loss, damage or expense.

**(2)** The following is added to Exclusion **B.1.g.**:

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

However, if electrical "covered equipment" requires drying out because of Water as described in **g.(1)** through **g.(3)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

**(3)** If the Causes of Loss - Special Form applies, as respects this endorsement only, the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

**b.** We will not pay under this endorsement for loss, damage or expense caused by or resulting from:

**(1)** your failure to use all reasonable means to protect Covered Property from damage following an "accident";

**(2)** any defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind. But if an "accident" results, we will pay for the resulting loss, damage or expense; or

**(3)** any of the following tests:

a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

**c.** With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in **A.1.c.** above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**d.** With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

**(1)** loss caused by your failure to use due diligence and dispatch all reasonable means to resume business; or

**(2)** any increase in loss resulting from an agreement between you and your customer or supplier.

**e.** We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident": Any mold, fungus, mildew or yeast, including any spores or toxins produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such mold, fungus, mildew or yeast, spores or toxins. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that spoilage is covered under Spoilage coverage.

**f.** We will not pay under this endorsement for any loss or damage to animals.

**4.** DEFINITIONS

The following definitions are added:

**a.** "Boilers and vessels" means:

**(1)** Any boiler, including attached steam, condensate and feedwater piping; and

**(2)** Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**b.** "Computer equipment" means Covered Property that is electronic computer or other data processing equipment, including "media" and peripherals used in conjunction with such equipment.

**c.** "Covered equipment"

**(1)** "Covered equipment" means, unless otherwise specified in a Schedule, Covered Property:

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**(a)** that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

**(b)** which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

**(2)** None of the following is "covered equipment":

**(a)** structure, foundation, cabinet, compartment or air supported structure or building;

**(b)** insulating or refractory material;

**(c)** sewer piping, underground vessels or piping, or piping forming a part of a sprinkler system;

**(d)** water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

**(e)** "vehicle" or any equipment mounted on a "vehicle";

**(f)** satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

**(g)** dragline, excavation or construction equipment; or

**(h)** equipment manufactured by you for sale.

**d.** "Data" means information or instructions stored in digital code capable of being processed by machinery.

**e.** "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

**f.** "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

**g.** "One accident" means: If an initial "accident" causes other "accidents,"

all will be considered "one accident." All "accidents" that are the result of the same event will be considered "one accident."

**h.** "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

**i.** "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. However, "production machinery" does not mean any fired or unfired pressure vessel other than a cylinder containing a movable plunger or piston.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**j.** "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

**B.** The Building and Personal Property Coverage Form is modified as follows. The definitions stated above also apply to section **B.** of this endorsement.

**1.** DEDUCTIBLE

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a Schedule. If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision D. DEDUCTIBLE is deleted and replaced with the following:

**a.** Deductibles for Each Coverage

**(1)** Unless the Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**(2)** We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

**(3)** If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

**b.** Direct and Indirect Coverages

**(1)** Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule.

**(2)** Unless more specifically indicated in the Schedule:

**(a)** Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and

**(b)** Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

**c.** Application of Deductibles

**(1)** Dollar Deductibles

We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

**(2)** Time Deductible

If a time deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of hours or day immediately following the "accident." If a time deductible is expressed in days, each day

shall mean twenty-four consecutive hours.

**(3)** Multiple of Average Daily Value (ADV)

If a deductible is expressed as a number of times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income Value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the period of restoration.

The number indicated in the Schedule will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

**(4)** Percentage of Loss Deductibles

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**2.** CONDITIONS

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form and the Common Policy Conditions.

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

**a.** Suspension

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

**(1)** your last known address; or

**(2)** the address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

**b.** Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**c.** Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

**d.** Coinsurance

If a coinsurance percentage is shown in a Schedule for specified coverages, the following condition applies.

We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# WATER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

**B. Water**

   **1.** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

   **2.** Mudslide or mudflow;

   **3.** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

   **4.** Water under the ground surface pressing on, or flowing or seeping through:

      **a.** Foundations, walls, floors or paved surfaces;

      **b.** Basements, whether paved or not; or

      **c.** Doors, windows or other openings; or

   **5.** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

© Insurance Services Office, Inc., 2008

**CP 10 32   08 08**

# ILLINOIS CHANGES - ARTIFICIALLY GENERATED ELECTRICAL CURRENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in:

    **1.** Paragraph **B.2.a.** of the Standard Property Policy, the Causes Of Loss - Basic Form, the Causes Of Loss - Broad Form and the Causes Of Loss - Special Form; and

    **2.** Paragraph **B.2.b.** of the Mortgageholders Errors And Omissions Coverage Form

is replaced by the following exclusion:

We will not pay for loss or damage caused by or resulting from artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

© Insurance Services Office, Inc., 2008

**CP 01 49 06 07**

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WISCONSIN CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The **Concealment, Misrepresentation Or Fraud Commercial Property** Condition is replaced by the following:

**CONCEALMENT, MISREPRESENTATION OR FRAUD**

**1.** No misrepresentation and no breach of affirmative warranty made by you or on your behalf in the negotiation for or procurement of this Coverage Part affects our obligations unless, if a misrepresentation, the person knew or should have known that the representation was false, and unless:

**a.** We rely on the misrepresentation or affirmative warranty and the misrepresentation or affirmative warranty is either material or made with intent to deceive; or

**b.** The facts misrepresented or falsely warranted contribute to the loss.

**2.** No failure of a condition before a loss and no breach of a promissory warranty affects our obligation under this Coverage Part unless such failure or breach exists at the time of loss and either:

**a.** Increases the risk at the time of loss; or

**b.** Contributes to the loss.

**B. Legal Action Against Us**

**1.** The **Legal Action Against Us** Commercial Property Condition is replaced by the following:

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless the action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**2.** Paragraph **a.** of Additional Condition **H.5. Legal Action Against Us** in the Mortgageholders Errors And Omissions Coverage Form is replaced by the following:

No one may bring a legal action against us under Coverages **A** and **B** unless the action is brought within 2 years after you discover the error or accidental omission.

**3.** The following are deleted:

**a.** The Legal Action Against Us Loss Condition in the Legal Liability Coverage Form; and

**b.** Paragraph **b.** of Additional Condition **H.5.** Legal Action Against Us in the Mortgageholders Errors And Omissions Coverage Form.

**C.** The following exclusion and related provisions are added to Paragraph **B.2. Exclusions** in the Causes Of Loss Forms and to any Coverage Form or policy to which a Causes Of Loss Form is not attached:

**1.** We will not pay for loss or damage arising out of any act committed:

**a.** By or at the direction of any insured; and

**b.** With the intent to cause a loss.

**2.** However, this exclusion will not apply to deny coverage to an insured who did not cooperate in or contribute to the creation of the loss, provided the loss is otherwise covered under this Coverage Part and:

**a.** The loss arose out of an act or pattern of abuse or domestic abuse; and

**b.** The perpetrator of the loss is criminally prosecuted for the act or acts causing the loss.

**3.** If we pay a claim pursuant to Paragraph **C.2.**, our payment to the innocent insured is limited to that insured's ownership interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**D.** The following is added to the **Transfer Of Rights Of Recovery Against Others To Us** Commercial Property Condition:

If we pay an insured a loss described in Paragraph **C.2.**, the rights of the insured to recover damages from the perpetrator are transferred to us to the extent of our payment. Following the loss, the insured may not waive such rights to recover against the perpetrator.

We will be entitled to a recovery only after you have been fully compensated for damages.

**E.** The following are added:

**1. Knowledge And Acts Of Agents**

**a.** If any of our agents knows any fact that breaches a condition of this policy, we will be considered to know it also if that fact:

**(1)** Is known to the agent at the time the policy is issued or an application made; or

**(2)** Later becomes known to the agent in the course of his or her dealings as an agent with you.

**b.** Any fact that breaches a condition of this policy and is known to the agent before the loss will not:

**(1)** Void this policy; or

**(2)** Prevent a recovery in the event of loss.

**2.** The **Ordinance Or Law** Exclusion in the Basic, Broad and Special - Causes Of Loss Forms, or in any endorsement, does not apply to dwelling properties occupied as a residence by you.

**3. Conformity To Statute Or Rule**

Any provision of this Coverage Part (including endorsements which modify the Coverage Part) that is in conflict with a Wisconsin statute or rule is hereby amended to conform to that statute or rule.

The term rule means a valid rule promulgated by the Commissioner of Insurance in accordance with the rule-making authority conferred under Wis. Stat. Ann. S. 227.11(2) and published in the Wisconsin Administrative Code.

**F.** The following is added to the **Loss Payment** Loss Condition in the Commercial Property Coverage Part:

If a municipality, which is a first class city, has elected to apply the provisions of Wis. Stat. Ann. Secs. 632.10 through 632.104, a part of our payment for fire or explosion loss or damage to your covered real property in that municipality will be withheld if the loss or damage is subject to the aforementioned provisions.

**1.** The withheld amount will be paid in accordance with the law, to the following:

**a.** The municipality where the covered property is located;

**b.** You and any other interest named in the Declarations; or

**c.** The mortgageholder, if any.

However, we will not pay more than the amount of loss payable under this policy.

**2.** Within 10 days after withholding the required amount, we will give written notice of the withholding to the following:

**a.** The building inspection official of the municipality where the covered property is located;

**b.** You;

**c.** Any mortgageholder and any other lienholder who has an existing lien against the property and is named in the Declarations; and

**d.** The court in which judgment was entered if the final settlement was determined by judgment.

**3.** We will not be liable in any cause of action, nor may any liability be imposed on us, arising from the payment, withholding or transferring of all or any portion of a final settlement in accordance with Wis. Stat. Ann. Secs. 632.10 through 632.104.

**G.** The following is added to the **Valuation** Loss Condition:

**1.** When this Coverage Part insures real property in Wisconsin which is owned and occupied by you primarily as a dwelling, and the property is wholly destroyed, we will pay the limit of insurance that applies to such property, subject to the exceptions and conditions in Paragraphs **G.2.** and **G.3.** below.

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

2. Builders Risk policies of insurance covering property in the process of being constructed shall be valued and settled according to the actual value of that portion of the construction completed at the time of the loss. The Limit of Insurance on a Builders Risk policy represents the value of the building when it is completed.

3. The Valued Policy Provision, Paragraph **G.1.** above, does not apply to any claim for loss to any building which is insured under a blanket form or endorsement with one Limit of Insurance applicable to two or more buildings. When a building, owned and occupied by you primarily as a dwelling, is wholly destroyed, the loss will be settled at the value stated in the most recent Statement of Values on file with us.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

COMMERCIAL PROPERTY

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.**, Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or

**2.** Limited in Section **C.**, Limitations;

that follow.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of any ordinance or law:

   **(1)** Regulating the construction, use or repair of any property; or

   **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

   **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   **(1)** Earthquake, including any earth sinking, rising or shifting related to such event;

   **(2)** Landslide, including any earth sinking, rising or shifting related to such event;

   **(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   **(4)** Earth sinking (other than sinkhole collapse), rising or

shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   **(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   **(a)** Airborne volcanic blast or airborne shock waves;

   **(b)** Ash, dust or particulate matter; or

   **(c)** Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

© ISO Properties, Inc., 2007

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access to access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in g.(1) through g.(4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**1.** When "fungus", wet or dry rot or bacteria results from fire or lightning; or

**2.** To the extent that coverage is provided in the Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

FILED DATE: 8/7/2018 12:15 PM  2018CH10012

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results

in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

   **(1)** An abrupt falling down or caving in;

   **(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

   **(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

   **(a)** To the extent that coverage is provided under the Additional Coverage - Collapse; or

   **(b)** To collapse caused by one or more of the following:

      **(i)** The "specified causes of loss";

      **(ii)** Breakage of building glass;

      **(iii)** Weight of rain that collects on a roof; or

      **(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   **a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

   **b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   **c.** Faulty, inadequate or defective:

      **(1)** Planning, zoning, development, surveying, siting;

      **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      **(3)** Materials used in repair, construction, renovation or remodeling; or

      **(4)** Maintenance;

   of part or all of any property on or off the described premises.

**4.** **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

   **a.** **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

   We will not pay for:

      **(1)** Any loss caused by or resulting from:

         **(a)** Damage or destruction of "finished stock"; or

**CP 10 30  06 07**
**Page 4 of 10**

FILED DATE: 8/7/2018 12:15 PM 2018CH10012

**(b)** The time required to re-produce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

    **(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

    **(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

    **(a)** Your cancelling the lease;

    **(b)** The suspension, lapse or cancellation of any license; or

    **(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

    **(a)** Paragraph **B.1.a.**, Ordinance Or Law;

    **(b)** Paragraph **B.1.c.**, Governmental Action;

    **(c)** Paragraph **B.1.d.**, Nuclear Hazard;

    **(d)** Paragraph **B.1.e.**, Utility Services; and

    **(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

    **(a) Contractual Liability**

    We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

        **(i)** Your assumption of liability was executed prior to the accident; and

        **(ii)** The building is Covered Property under this Coverage Form.

    **(b) Nuclear Hazard**

    We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

FILED DATE: 8/7/2018 12:15 PM   2018CH10012

## LOSS OR DAMAGE TO PRODUCTS

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

### C. Limitations

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income Coverage or to Extra Expense Coverage.

3. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are: